JUDGE CASTEL

Robert L. Sills (RS 8896)
Jay K. Musoff (JM 8716)
David M. Fine (DF 4479)
Orrick, Herrington & Sutcliffe LLP
666 Fifth Avenue, New York, New York 10103
Telephone: (212) 506-5000
Facsimile: (212) 506-5151



'08 CIV 5623

- and -

Peter S. O'Driscoll
Orrick, Herrington & Sutcliffe LLP
25 Old Broad Street
London EC2N 1HQ
DX: 557 London/City
United Kingdom
Telephone: 011 44 20 7562 5000

Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------ X

**TELENOR EAST INVEST AS,**
                                                    :
                            Plaintiff,              :        08-CV-
                                                    :
                -against-                           :        ECF CASE
                                                    :
**FARIMEX PRODUCTS, INC., ECO**                     :
**TELECOM LIMITED and ALTIMO**                      :        **COMPLAINT**
**HOLDINGS & INVESTMENTS LIMITED,**                 :
                                                    :
                            Defendants.             :
                                                    :
------------------------------------------------------------ X

       Plaintiff Telenor East Invest AS ("Telenor East") alleges, upon knowledge as to itself and its own acts, and upon information and belief as to all other matters, by its undersigned attorneys, for its complaint against Defendants, as follows:

**INTRODUCTION**

1.     This action arises out of the violation of the arbitration agreements entered into between Telenor East and various affiliates of the Alfa Group Consortium (the "Alfa Group") – namely, Altimo Holdings & Investments Limited ("Altimo") and Eco Telecom Limited ("Eco Telecom") (collectively, the "Alfa Entities") – in the Shareholders Agreement and related Guarantee in respect of Telenor East and Eco Telecom's joint ownership of Open Joint Stock Company "Vimpel-Communications," the second largest mobile telecommunications company in Russia ("VimpelCom").

2.     As set forth below, the Alfa Entities have attempted to circumvent their contractual obligations to arbitrate any disputes arising out of the Shareholders Agreement and the Guarantee through collusive litigation filed in Siberia by a fourth Alfa Group affiliate, a British Virgin Islands shell company called Farimex Products, Inc. ("Farimex").

3.     Farimex is subject to the complete control of Altimo Entities.  In its Siberian litigation, Farimex makes virtually identical allegations, and seeks virtually identical relief, as that sought by Eco Telecom in an arbitration proceeding recently commenced by Eco Telecom in Geneva, Switzerland, in which Eco Telecom seeks damages of $1 billion.  Declaratory and injunctive relief is therefore required to prevent the Alfa Entities and Farimex from evading their obligations under the arbitration provisions of the Shareholders Agreement by pursuing litigation that the Alfa Entities could not bring themselves, in a proceeding in which Telenor East has not been served and which is being conducted in a remote court that has already proceeded to the damages phase of the case without first assessing liability.

2

**JURISDICTION AND VENUE**

4.      This Court has jurisdiction over the subject matter of this action pursuant to Chapter 2 of the Federal Arbitration Act (the "FAA"), 9 U.S.C. §§ 203 and 206.

**THE PARTIES**

**I.      PLAINTIFF**

5.      Telenor East is, and at all times relevant herein, has been, a corporation duly organized and existing under the laws of the Kingdom of Norway, with its principal place of business in Fornebu, Norway.  It is an indirect wholly-owned subsidiary of Telenor ASA ("Telenor ASA"), also a Norwegian corporation.  Telenor ASA is the largest provider of telecommunications services in Norway.  Through its various subsidiaries and affiliates, Telenor ASA has mobile telecommunications operations in 12 countries.  53.97% of Telenor ASA's issued and outstanding shares are held by the Ministry of Trade and Industry of the Kingdom of Norway; the remainder are publicly held.  Telenor ASA's shares are listed in Norway on the Oslo Stock Exchange. The company has over 40,000 shareholders.

6.      For many years, Telenor ASA has invested in, and developed strategic partnerships with, mobile telecommunications companies located outside of Norway.  As of June 2008, Telenor ASA and its affiliates in Europe and Asia had over 150 million mobile subscribers, making Telenor ASA the seventh largest mobile telephone company in the world.  Measured by the market value of its investments, Telenor ASA is the second largest foreign investor in Russia.  As of the date of this complaint, Telenor East owns 29.9% of the voting capital stock of VimpelCom.

## II.    DEFENDANTS

7.    Altimo, formerly known as Alfa Telecom Limited, is, and at all times relevant herein, has been, a corporation organized and existing under the laws of the British Virgin Islands. Altimo is majority owned and controlled by the Alfa Group, and acts as a holding company for the Alfa Group's telecommunications assets.

8.    Eco Telecom is, and at all times relevant herein, has been, a corporation organized and existing under the laws of Gibraltar. As of the date of this complaint, according to documents filed with the U.S. Securities and Exchange Commission (the "SEC"), Eco Telecom beneficially owns approximately 44.00001% of VimpelCom's voting shares. Eco Telecom is wholly owned by Altimo, and acts as a holding company for Altimo's VimpelCom's shares.

9.    As noted above, Farimex is, and at all times relevant herein, has been, a corporation organized and existing under the laws of the British Virgin Islands. The only known director of Farimex is Dmitry Lvovich Fridman, the first cousin of Mikhail Fridman, a co-founder and the Chairman of the Supervisory Board of the Alfa Group. Farimex is a shell company with no operations of its own. As of the date of this complaint, according to documents filed with the Business Court for the Khanty-Mansi Autonomous Okrug in the Russian Federation, Farimex beneficially owns 25,000 American Depositary Receipts of VimpelCom ("ADRs"), which represent an interest in 1,250 shares of VimpelCom's common stock.

## III.    THE ALFA GROUP

10.    The Alfa Group is one of Russia's largest privately owned financial-industrial groups, with interests in oil and gas, commodities trading, commercial and investment banking, insurance, retail trade and telecommunications.  The group was founded and is controlled by, among others, Mikhail Fridman and Peter Aven.

## IV.    VIMPELCOM

11.    VimpelCom is the second largest mobile telecommunications company in Russia, and holds licenses to operate in all eight regions in Russia.  By the end of December 2007, VimpelCom had approximately 51.7 million subscribers, including approximately 9.5 million subscribers in countries other than Russia that were formerly part of the Soviet Union.

## FACTUAL ALLEGATIONS

## V.    THE VIMPELCOM SHAREHOLDERS AGREEMENT

12.    On May 30, 2001, as a condition to Eco Telecom becoming a shareholder of VimpelCom through the acquisition of shares from VimpelCom's co-founder, Dr. Dmitry Zimin, as well as new shares directly from VimpelCom, Telenor East and Eco Telecom entered into a shareholders agreement (the "Shareholders Agreement") concerning VimpelCom's corporate governance.  A true and correct copy of the Shareholders Agreement is attached hereto as Exhibit A.

13.    The Shareholders Agreement governs, among other things, the parties' right to nominate candidates for election to VimpelCom's Board of Directors (the "Board"), with Telenor East entitled to nominate five candidates for election to the Board, and Eco Telecom entitled to nominate four candidates.  Telenor East's fifth candidate must be approved by Eco Telecom.  Shareholders Agreement § 4.01.

5

14.     The Shareholders Agreement also contains an arbitration clause, which provides that "[a]ny and all disputes and controversies arising under, relating to or in connection with this Agreement shall be settled by arbitration by a panel of three (3) arbitrators under the United Nations Commission on International Trade Law (UNCITRAL) Arbitration Rules . . ." Shareholders Agreement § 6.13(a). "The place of the arbitration shall be Geneva, Switzerland." Id. at § 6.13(a)(ii).

15.     With respect to enforcement, the Shareholders Agreement specifies that "[t]he award of the arbitrators may be enforced by any court of competent jurisdiction and may be executed against the person and assets of the losing party in any competent jurisdiction." Shareholders Agreement § 6.13(a)(vii).

16.     The Shareholders Agreement generally prohibits litigation between the parties, with limited exceptions for litigation necessary to give effect to the agreement's arbitration clause. "Except for arbitration proceedings pursuant to Section 6.13(a), no action, lawsuit or other proceeding (other than the enforcement of an arbitration decision, an action to compel arbitration or an application for interim, provisional or conservatory measures in connection with the arbitration) shall be brought by or between the parties to this Agreement in connection with any matter arising out of or in connection with this Agreement." Shareholders Agreement § 6.13(b).

17.     The Shareholders Agreement provides that the parties may be served with legal process in New York. "Each Shareholder irrevocably appoints CT Corporation System, located on the date hereof at 111 Eighth Avenue, 13th Floor, New York, New York 10011, USA, as its true and lawful agent and attorney to accept and acknowledge service of any and all process against it in any judicial action, suit, or

proceeding permitted by Section 6.13(b), with the same effect as if such party were a resident of the State of New York and had been lawfully served with such process in such jurisdiction . . ." Shareholders Agreement § 6.13(c).

18.    The Shareholders Agreement likewise provides that New York courts shall have jurisdiction with respect to the limited types of litigation allowed by the agreement. "Each party hereby irrevocably submits to the non-exclusive jurisdiction of the United States District Court for the Southern District of New York and of any New York state court sitting in New York City, in connection with any such action, suit or proceeding . . ." Shareholders Agreement § 6.13(c).

19.    Section 6.13(c) of the Shareholders Agreement further provides that "[e]ach party hereby irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such action, suit or proceeding brought in such a court and any claim that any such action, suit or proceeding brought in such a court has been brought in an inconvenient forum."

20.    The Shareholders Agreement contains a choice of law provision which states that "[t]his Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, United States of America, without giving effect to any conflicts of laws principles thereof which would result in the application of the laws of another jurisdiction." Shareholders Agreement § 6.14.

21.    CTF Holdings Limited ("CTF"), a corporation organized and existing under the laws of Gibraltar, with a controlling interest, directly or indirectly, in Altimo, serves as a holding company for the Alfa Group. CTF and an entity called Eco Holdings Limited ("Eco Holdings") entered into a Guarantee Agreement on May 30,

2001 (the "Guarantee") for the benefit of, among others, Telenor East. The Guarantee contains essentially the same arbitration clause as the Shareholders Agreement. A true and correct copy of the Guarantee is attached hereto as Exhibit B.

22.     Following a transfer by Eco Holdings to Altimo of all of Eco Holdings' ownership interests in Eco Telecom, the Guarantee was amended by an Endorsement dated March 19, 2007 (the "Endorsement") which had the effect of making Altimo a party to the Guarantee in place of Eco Holdings "as if [Altimo] were an original signatory to the Guarantee." A true and correct copy of the Endorsement is attached hereto as Exhibit C.

## VI.     THE PATTERN OF ALFA GROUP'S ATTACKS ON TELENOR'S OWNERSHIP INTEREST IN VIMPELCOM

### A.     The Makarenko Litigation

23.     In the summer and autumn of 2004, Eco Telecom's nominees on VimpelCom's Board were actively promoting the proposed acquisition by VimpelCom of Ukrainian Radio Systems, a small Ukrainian mobile operator doing business under the name of WellCom ("URS").

24.     Under the terms of VimpelCom's charter, an acquisition of shares in another company requires the approval of 80% of the members of the Board, *i.e.*, eight of the nine members.

25.     Although Telenor East's nominees on the Board supported VimpelCom's expansion into Ukraine, they were skeptical about the proposed acquisition of URS due to, among other things, a very high proposed purchase price, URS's lack of subscribers and poor market position, the massive investment that would be required to make URS profitable, a complete lack of transparency in the transaction, including no

disclosure to the Board of the identity of URS's ultimate beneficial owners, and rumors that Alfa Group executives were the true financial beneficiaries of the transaction.

26.     In October 2004, a 25-year old individual named Victor Makarenko, who was a resident of Temryuk, Russia and the purported owner of two shares of VimpelCom common stock, filed the first of three lawsuits against VimpelCom challenging the minority protections in VimpelCom's charter, including the provision requiring that acquisitions be approved by at least eight members of the Board. The suits were filed in rural courts in the Krasnodar region of southern Russia.

27.     Mr. Makarenko's claims contained detailed confidential information regarding the proposed acquisition by VimpelCom of URS. This information was available only to members of the Board and senior VimpelCom management.

28.     In the second suit he filed, Mr. Makarenko obtained a default judgment that purported to invalidate the minority protection provisions of VimpelCom's charter. In order to protect its rights, Telenor East intervened in these cases, and appealed the principal case directly to the Russian Supreme Court. In June 2005, the court order purporting to invalidate the minority protection provisions of VimpelCom's charter was overturned by the Russian Supreme Court.

29.     Telenor East requested that Russian prosecutors investigate whether the lower courts involved in the case brought by Mr. Makarenko were the subject of improper influence. An investigation was conducted, and a judge involved in one of the cases brought by Mr. Makarenko was removed from his position.

30.     Despite the direct alignment of their interests with Mr. Makarenko's claims, and Mr. Makarenko's possession of documents that could have come only from them or VimpelCom's Management, Eco Telecom's nominees on the Board denied that the Alfa Group was involved in Mr. Makarenko's actions.

**B.     The Eco Telecom Litigation**

31.     In May 2005, Eco Telecom filed its own action in a Moscow court against VimpelCom and three of Telenor East's nominees on the VimpelCom Board, seeking to suspend the minority protections in VimpelCom's charter and authorizing the acquisition of URS by a simple majority of the Board.

32.     The claim filed by Eco Telecom made allegations similar to the allegations made in one of the claims filed by Mr. Makarenko and sought similar relief. When it became clear that the Russian Supreme Court intended to rule in favor of Telenor East in the Makarenko case (which Telenor East had appealed), Eco Telecom withdrew its lawsuit.

**C.     Eco Telecom's Refusal To Comply with the Shareholders Agreement**

33.     Prior to VimpelCom's annual general meeting ("AGM") in June 2005, Eco Telecom nominated seven candidates for election to the Board, in direct violation of its obligation under the Shareholders Agreement to nominate no more than four.  In addition, Eco Telecom failed to respond to multiple requests from Telenor East to approve two potential fifth candidates put forward by Telenor East.

34.     As a consequence of Eco Telecom's conduct, Telenor East was forced to engage in a lengthy proxy contest with Eco Telecom, as each party sought to have its nominees elected to the Board.  At that point in time, Eco Telecom owned 32.9% of VimpelCom's voting shares, and Telenor East owned only 26.6% of the voting shares.

Eco Telecom was able to use its voting share advantage to secure the election of five of its seven candidates to the Board at the June 2005 AGM. Only four of Telenor East's five candidates were elected to the Board.

35.    In 2006, Eco Telecom again violated the Shareholders Agreement by nominating five candidates for election to the Board, and refused to withdraw any of them. In addition, Eco Telecom again refused to consent to the fifth nominee put forward by Telenor East for election to the Board.

**D.    The First Geneva Arbitration**

36.    On November 19, 2005, Telenor East commenced an arbitration in Geneva, Switzerland governed by the UNCITRAL Arbitration Rules against Eco Telecom, CTF and Eco Holdings to enforce the provisions of the Shareholders Agreement relating to the nomination of candidates for election to the Board. In response, Eco Telecom asserted that this provision of the Shareholders Agreement was unenforceable, and that it had the unwaivable right to nominate nine candidates for election to the Board.

37.    On January 25, 2007, the arbitration tribunal in the Geneva arbitration (the "Tribunal") rendered an interim award (the "January 25, 2007 Award"), upholding the validity of the Shareholders Agreement and ruling that Eco Telecom could not nominate more than four candidates for election to the Board, and was required to approve one of the potential fifth candidates proposed by Telenor East.

38.    Eco Telecom initially refused to comply with the January 25, 2007 Award, and persisted in putting forward five nominees for election to the Board. On April 18, 2007, on Telenor East's application, the Tribunal issued an order instructing Eco Telecom to comply with the January 25, 2007 Award by May 14, 2007. On May 14,

2007, Eco Telecom complied with the Tribunal's order by withdrawing one of its candidates for election to the Board.

39.     The Tribunal issued its final award on January 21, 2008 (the "Final Award"), again in favor of Telenor East, upholding the validity of the Shareholders Agreement, limiting Eco Telecom to four nominees for election to the Board, establishing a procedure for Eco Telecom to approve Telenor East's fifth candidate and ordering Eco Telecom to pay $117,617.10 of Telenor East's attorneys' fees. Eco Telecom did not challenge the Final Award.

### E.     The Second Geneva Arbitration

40.     Eco Telecom commenced a new arbitration against Telenor East on March 21, 2008 (the "Second Geneva Arbitration"). A true and correct copy of Eco Telecom's Notice of Arbitration (the "Notice") is attached hereto as Exhibit D.

41.     In the Notice, Eco Telecom claims that Telenor East acted in bad faith by causing the directors it nominated to the Board to breach their fiduciary duties, allegedly by blocking VimpelCom's purchase of URS and thereby delaying VimpelCom's acquisition of URS by one year. Notice at ¶ 10.

42.     Eco Telecom maintains that Telenor East blocked VimpelCom's acquisition of URS in an effort to prevent VimpelCom from competing with a Ukrainian mobile operator, Closed Joint Stock Company "Kyivstar G.S.M." ("Kyivstar"), in which Telenor Mobile Communications AS ("Telenor Mobile"), an affiliate of Telenor East, owns 56.5% of the shares, and Storm LLC, an indirect subsidiary of Altimo, owns 43.5% of the shares. Id. at ¶ 11.

43.     Eco Telecom claims that VimpelCom suffered damages in the amount of $1 billion as a result of the one year delay in VimpelCom's acquisition of

URS, which Eco Telecom alleges was caused by Telenor East. Eco Telecom further claims that if VimpelCom had acquired URS one year earlier, its present value, and hence the value of VimpelCom, would be "significantly higher". Id. at ¶ 10.

44.    Telenor East has, in accordance with Section 6.13(a)(iii) of the Shareholders Agreement, nominated Professor William Park as its party-nominated arbitrator in the Second Geneva Arbitration, and Eco Telecom has nominated Jeffrey Herzfeld as its party-nominated arbitrator. The two party-nominated arbitrators are currently in the process of appointing a third arbitrator to serve as chairman of the arbitration tribunal.

45.    Eco Telecom's claim that Telenor East and its nominees on the Board blocked VimpelCom's expansion into Ukraine in order to protect Kyivstar is strikingly similar to claims made recently by Mikhail Fridman and other Russian shareholders in relation to TNK-BP Ltd. ("TNK"), a Russian oil and gas venture in which the Alfa Group and two other Russian shareholders own 50% and BP PLC ("BP") owns 50%. See "Tension Turns to Impasse For BP, Russian Partners," The Wall Street Journal Online (June 4, 2008).

**F.    The Siberian Litigation**

46.    On April 14, 2008, less than one month after Eco Telecom commenced the Second Geneva Arbitration, an undated statement of claim (the "Statement of Claim") was delivered to the Moscow office of Telenor Russia AS, a subsidiary of Telenor ASA and a sister company of Telenor East, by counsel for Farimex. Telenor East, which has no presence in Russia, has not been served in Norway in accordance with the Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters (The Hague, November 15, 1965) and the

statements made by Russia and the Kingdom of Norway at the time when they ratified the Convention.

      47.    Farimex's Statement of Claim was filed in the Business Court for the Khanty-Mansi Autonomous Okrug (the "Khanty-Mansi Court") and names as defendants, in addition to Telenor East, the following Alfa Group subsidiaries: Eco Telecom, Altimo, Open Joint Stock Company CT-Mobile ("CT Mobile"),[1] Avenue Limited ("Avenue"), Janow Properties Limited ("Janow") and Santel Limited ("Santel"). Farimex also named three of Telenor's former nominees on the Board, VimpelCom, and Alfa Group Supervisory Board members Mikhail Fridman and Alexei Reznikovich as third parties. A true and correct copy of Farimex's Statement of Claim (without attachments), together with an English translation thereof, is attached hereto as Exhibit E.

      48.    Farimex, which is incorporated in the British Virgin Islands, chose to file its claim in Khanty-Mansiysk, an oil town located in western Siberia, thousands of miles away from Moscow. TNK, in which the Alfa Group is the leading Russian shareholder, has significant operations in and around Khanty-Mansiysk.

      49.    In its Statement of Claim before the Khanty-Mansi Court, Farimex claims to own 25,000 VimpelCom ADRs (representing 1,250 shares of VimpelCom's common stock, which equates to 0.00002% of VimpelCom's 51,281,022 issued and outstanding shares of common stock). The only evidence of Farimex's ADR holding in the Statement of Claim is a letter from Alfa Capital. A true and correct copy of Alfa Capital's letter, along with an English translation, is attached as Exhibit F.

---

[1] The Alfa Group holds 25% plus one share of the Russian mobile operator Open Joint Stock Company "MegaFon," which is a competitor of VimpelCom, through CT Mobile. CT Mobile has no connection, through share ownership or otherwise, to VimpelCom.

50.     Under Article 71(5) of the Joint Stock Company Law of the Russian Federation, a plaintiff bringing a claim of the type brought by Farimex must be a shareholder (as opposed to an ADR holder) and must own not less than 1% percent of the common stock of the company.  According to its Statement of Claim, Farimex holds only ADRs and, even taking into account the number of shares of common stock represented by its ADRs, has far less than 1% of VimpelCom's common stock.

51.     Farimex's Statement of Claim is signed by D.S. Chernyi, acting under a power of attorney dated March 31, 2008 (the "Power of Attorney").  The Power of Attorney was signed by Dmitry Fridman, the sole director of Farimex and a first cousin of Mikhail Fridman, a co-founder and the Chairman of the Supervisory Board of the Alfa Group, who was also named as a third party in the Statement of Claim.  A true and correct copy of the Power of Attorney is attached hereto as Exhibit G.

52.     Dmitry Fridman was an officer or employee of one or more entities that were members of the Alfa Group when the Alfa Group was first formed.  However, other officers and directors of the Alfa Group, including Peter Aven, were unhappy with his performance and persuaded Mikhail Fridman to cause Dmitry Fridman to leave the Alfa Group.  Following Dmitry Fridman's departure from the Alfa Group, Mikhail Fridman established an offshore trust of which he retained under his control, for the benefit of, among others, Dmitry Fridman, and funded it in the amount of approximately $4 billion, with the express intention that this trust should be used for litigation, and "corporate raiding" transactions outside Mikhail Fridman and Alfa Group's apparent control.  That trust is believed to be the beneficial owner of Farimex.

53.     Persons or entities connected to the Alfa Group are thus participating on all sides of Farimex's Siberian litigation (the "Siberian Litigation"), including playing the role of plaintiff, defendants (Eco Telecom, CT-Mobile, Avenue, Janow and Santel are all affiliates of the Alfa Group), and third parties (Mikhail Fridman and Alexei Reznikovich are both members of the Alfa Group Supervisory Board, and VimpelCom is 44.00001% owned by Eco Telecom and publicly claimed by Altimo to be under its "structural control").

54.     The claim asserted by Farimex in the Siberian Litigation in April 2008 is virtually identical to the claim that Eco Telecom submitted in the Second Geneva Arbitration commenced in March 2008. It alleges that Telenor East acted in bad faith by causing its nominees who were elected to the Board to prevent VimpelCom from acquiring URS based on the conflicting commercial interests of affiliates of Telenor East, and it seeks damages in the amount of $3.8 billion. Farimex has further petitioned the Khanty-Mansi Court to arrest Telenor East's shares in VimpelCom. A true and correct copy of Farimex's Request for Arrest of Shares, together with an English translation thereof, is attached hereto as Exhibit H.

55.     As was the case with respect to the litigation commenced by Victor Makarenko, Farimex's Statement of Claim and its attachments include information and documents only available to members of VimpelCom's Board and senior VimpelCom management and, in certain instances, only available to Altimo and its affiliates.

56.     Representatives of Eco Telecom have appeared in the Siberian Litigation, even though the Siberian Litigation involves factual allegations similar to

those in the Second Geneva Arbitration, and seeks relief similar to that sought in the Second Geneva Arbitration.

57.    The Khanty-Mansi Court issued an order on June 10, 2008, in which it ordered VimpelCom to produce voluminous amounts of financial information. The Court granted a motion made by Farimex for the appointment of an expert to determine the amount of VimpelCom's damages, even though there has been no determination of any of the respective defendants' liability, nor has there been a proceeding of any kind regarding liability. A true and correct copy of the Khanty-Mansi Court's June 10, 2008 order, together with an English translation thereof, is attached hereto as Exhibit I.

### G.    OTHER VEXATIOUS LITIGATION FILED BY THE ALFA GROUP AND ITS AFFILIATES

58.    In addition to the litigation discussed above, the Alfa Group has shown a pattern of pursuing frivolous and vexatious lawsuits against Telenor ASA's affiliates, either directly or through Alfa's affiliates.

59.    For example, Telenor Mobile, Altimo's wholly-owned subsidiary Storm and Kyivstar entered into a Shareholders Agreement dated January 30, 2004 (the "Kyivstar Shareholders Agreement") regarding the ownership and corporate governance of Kyivstar, which is the largest mobile operator in Ukraine. Despite an arbitration clause in the Kyivstar Shareholders Agreement specifying that all disputes between Telenor Mobile and Storm are required to be settled by arbitration in New York under the UNCITRAL Arbitration Rules, during the period from August 2005 through 2007, Storm and individuals connected to the Alfa Group commenced at least 15 separate legal proceedings in Ukrainian courts, aimed at, among other things, invalidating various

provisions of Kyivstar's charter and the Shareholders Agreement itself. A number of these Ukrainian lawsuits were brought by one Alfa Group entity or individual against another Alfa Group entity or individual, with injunctions or orders issued by the relevant Ukrainian courts that purported to bind third parties, including Telenor Mobile and its affiliates, who were not named as defendants.

60.     In February 2006, Telenor Mobile commenced an arbitration proceeding against Storm in relation to Storm's violations of the Kyivstar Shareholders Agreement. Storm claimed that the arbitration tribunal did not have jurisdiction, and that the Kyivstar Shareholders Agreement was invalid. In an effort to bolster its claims of invalidity with respect to the Kyivstar Shareholders Agreement, and to stop the arbitration, Alpren Limited ("Alpren"), an Alfa Group subsidiary, commenced several lawsuits in Ukraine against Storm and its general director. Alpren was represented in those suits by a lawyer used regularly by Storm.

61.     On April 25, 2006, a Ukrainian trial court issued a ruling, on Alpren's application declaring that the Kyivstar Shareholders Agreement was invalid. The minutes of that Ukrainian proceeding show that the hearing lasted a total of 14 minutes. Storm "appealed" the judgment, but on May 25, 2006, a Ukrainian appellate court affirmed that decision. Storm then moved before the arbitration tribunal to dismiss the arbitration, arguing that, based on the judgment rendered by the Ukrainian courts, the entire Kyivstar Shareholders Agreement was "null and void," and accordingly, that the tribunal lacked jurisdiction to hear the underlying dispute.

62.     Notwithstanding Storm's efforts, in October 2006, the arbitration tribunal issued an interim award in which it held that it had jurisdiction to hear the

dispute. On November 13, 2006, Storm tried to halt the arbitration proceeding by filing

an action in New York state court seeking to enjoin the proceeding and vacate the

arbitration panel's interim award. Telenor Mobile immediately removed the case to this

Court. On November 22, 2006, Judge Gerard E. Lynch denied all of Storm's motions

seeking to enjoin the proceeding and vacate the panel's partial award. Judge Lynch

described Storm's litigation efforts in the Ukraine as a "shabby tactic" which was "not to

be condoned."

63.     Immediately prior to a hearing on the merits in the arbitration

scheduled to take place on December 7 and 8, 2006, Telenor Mobile and Storm received

notice from a Ukrainian court that they could face criminal prosecution in Ukraine if they

were to participate further in the arbitration. Telenor Mobile filed a motion in the United

States District Court for the Southern District of New York asking Judge Lynch to issue a

preliminary anti-suit injunction against Altimo, Alpren and Storm that would permit the

arbitration to go forward. On December 15, 2006, Judge Lynch granted that motion,

enjoining Altimo, Alpren and Storm and those acting in concert with them from

"bringing or attempting to cause the enforcement of any legal action in Ukraine that

could disrupt, delay or hinder in any way the arbitration proceedings between Telenor

and Storm in New York."

64.     In granting the injunction, Judge Lynch observed that "[t]he

foreign litigation here has been conducted in the most vexatious way possible." *Storm*

*LLC v. Telenor Mobile Communications AS*, 2006 WL 3735657, *9 (S.D.N.Y. Dec. 15,

2006). Judge Lynch went on to describe the lawsuits brought in Ukraine by Alfa, stating:

> After every set back in the arbitration or in this Court, parties associated
> with Storm have proceeded to the Ukrainian Courts, seeking and obtaining

broad rulings without any meaningful opposition. Telenor seeks to arbitrate this dispute in a neutral forum; Storm and its parents seek to co-opt that process by resorting to a forum in which their home court advantage is magnified by their willingness to play the game without letting the other team show up.

65. Judge Lynch further held that:

[T]he Court is persuaded that Telenor is likely to succeed in establishing, at a minimum, that the litigation in Ukraine has been collusive, and not truly adversarial. The Ukrainian litigation was brought in Storm's as well as Alpren's interests, sought relief that Storm had every reason to desire, and was not meaningfully resisted by Storm or its general director. Storm has effectively conceded before this Court that it wants to preserve the Ukrainian judgment 'against' it. Accordingly, it is a fair inference, and one that on this limited record the Court finds more likely true than not, that Storm colluded in the bringing of this litigation against itself. It can therefore be enjoined from continuing with such actions.

2006 WL 3735657, at *12. On December 18, 2006, Judge Lynch entered a formal order binding on Altimo, Alpren and Storm.

66. Despite Judge Lynch's order, in late December 2006, the Alfa Group caused Storm to file suit in a Ukrainian court against Kyivstar and its auditors, Ernst and Young ("E&Y"). In that action, Storm claimed that the contract between Kyivstar and E&Y for the provision of audit services had not been properly approved by Kyivstar's Board. The Ukrainian court immediately issued an injunction that, among other things, purported to prohibit E&Y from completing its audit of Kyivstar's 2006 financial statements.

67. Following the first E&Y case, the Alfa Group subsidiary Alpren filed two further actions against Kyivstar and E&Y. In both cases, the Ukrainian judges immediately issued sweeping injunctions purporting to bind Telenor and other entities who were not parties to the relevant actions. In the third case, the judge issued an injunction purporting to prohibit Kyivstar from providing any information, financial or

otherwise, to any third party and purporting to prevent any person, including Telenor, from consolidating Kyivstar's financial results.

68.    On August 1, 2007, the arbitration tribunal in the Kyivstar arbitration issued a unanimous award in favor or Telenor Mobile. Shortly thereafter, Altimo arranged for one of its executives to seek, and obtain, and injunction against its own subsidiary, Storm, to enjoin compliance with the arbitrators' award.

69.    Thereafter, an action was brought by EC Venture SA ("EC Venture"), a Swiss corporation, in a rural Ukrainian court, seeking an injunction against Storm's compliance with the arbitrators' award. The shares of EC Venture are issued in bearer form, and there is no record of its ownership, and it was in liquidation in Switzerland until shortly before its Ukrainian action was commenced. As is the case with Farimex's Siberian litigation, EC Vemture's case was brought based on documents that could have come only from Altimo or its subsidiaries and their officers.

70.    In a highly publicized ongoing dispute with BP over TNK. Alfa Group has resorted to the same abusive litigation tactics. There is a small Russian brokerage firm known as ZAO Tetlis Limited ("Tetlis"), whose only known principals are two former Alfa Group employees, and which claims a miniscule shareholding in TNK-BP, has sought and obtained sweeping injunctive relief against BP in a local Siberian court. It is widely reported in the press that Tetlis is controlled by Alfa Group and is acting for Alfa Group's benefit and under Alfa Group's control.

**COUNT I**
**Defendants Eco Telecom and Altimo Are Violating Their Arbitration**
**Agreements By Participating In The Collusive Siberian Litigation**

71.     Plaintiff repeats and repleads each allegation set forth in

Paragraphs 1 through 67, inclusive, and incorporates them by reference herein.

72.     Defendants Eco Telecom and Altimo could not themselves sue

Telenor East in the Khanty-Mansi Court, because they are signatories to the arbitration

clauses contained in the Shareholders Agreement and/or the Guarantee (as amended by

the Endorsement). Instead, Eco Telecom and Altimo are conducting such litigation

through Defendant Farimex. Farimex's litigation is for the interests of and under the

control of Alfa Group's affiliates including Altimo.

73.     If the relief sought by Farimex in the Siberian Litigation is granted,

there is a risk that the Khanty-Mansi Court will arrest Telenor East's shares in

VimpelCom and sell them at auction to satisfy Farimex's $3.8 billion damage claim. If

the relief sought by Farimex were granted, there is a possibility Eco Telecom could

acquire Telenor East's 29.9% stake in VimpelCom and thereby become the sole majority

shareholder of VimpelCom. Eco Telecom thus has a far greater stake in Farimex

prevailing in the Siberian Litigation than Farimex does.

74.     Eco Telecom beneficially owns approximately 44.00001% of

VimpelCom's voting shares, as compared to the 0.00002% held by Farimex. Although

Eco Telecom is nominally a defendant in the Siberian Litigation, it actually has a

complete identity of interests with the nominal plaintiff, Farimex. The same identity of

interests exists between Farimex and Altimo (which owns 100% of Eco Telecom).

75.    Defendants Eco Telecom and Altimo are circumventing their arbitration agreements with Telenor East by participating in the Siberian Litigation instead of abiding the outcome of the Second Geneva Arbitration.

76.    Unless enjoined by this Court, Eco Telecom's and Altimo's conduct will cause immediate and irreparable harm to Telenor East.  Telenor East has no adequate remedy at law.

## COUNT II
### Defendant Farimex Is Violating The Shareholders Agreement's Arbitration Clause, To Which It Is Bound As The Alter-Ego of Eco Telecom

77.    Plaintiff repeats and repleads each allegation set forth in Paragraphs 1 through 73, inclusive, and incorporates them by reference herein.

78.    Farimex is an affiliate of Eco Telecom and Altimo, as evidenced by its close ties to the Alfa Group both in terms of its personnel (its sole director is the first cousin of Alfa Group co-founder and Chairman of its Supervisory Board, Mikhail Fridman) and the effort and expense it is undertaking to advance Eco Telecom's interests in a remote Siberian court.

79.    In prosecuting the Siberian Litigation, Farimex is in fact acting as the agent and alter-ego of Eco Telecom and Altimo.  Farimex has no distinct corporate identity apart from Eco Telecom, as its conduct (as well as the domination and control over it exercised by the Alfa Group and Mikhail Fridman) demonstrates an abandonment of separateness between the two entities.

80.    In light of the foregoing, Farimex is bound by the terms of the arbitration clause contained in the Shareholders Agreement, and Telenor East is entitled to an order and judgment compelling Farimex to submit such claims to arbitration.

81.    Unless enjoined by this Court, Farimex's Siberian litigation will cause immediate and irreparable harm to Telenor East. Telenor East has no adequate remedy at law.

WHEREFORE, Telenor East demands judgment against the Defendants, as follows:

a.    that all Defendants, together with their officers, agents, servants, employees and attorneys, and all persons in active concert or participation with them, be restrained and enjoined from:

(1)    commencing, prosecuting, enforcing, causing the enforcement, attempting to enforce or causing the enforcement, or;

(2)    allowing, or failing to take steps to prevent, any other person, official or entity from enforcing or attempting to enforce;

in any manner whatsoever, direct or indirect, of any legal action, suit, or proceeding before any court or tribunal, whether in the Khanty-Mansi Autonomous Okrug of Russia or any other jurisdiction, that would (a) disrupt, delay or hinder, in any manner whatsoever, the arbitration proceedings between Eco Telecom and Telenor East arising out of or relating to the Shareholders Agreement, or (b) that seeks substantially similar relief to that sought in such arbitration;

b.    that Defendant Farimex be compelled to submit its dispute with Telenor East and Eco Telecom to arbitration, in accordance with the terms of the Shareholders Agreement; and

c.    awarding Telenor East such other relief as the Court deems just and proper.

Dated:    New York, New York
          June 20, 2008

ORRICK, HERRINGTON & SUTCLIFFE LLP

By: _Robert L. Sills_____

Robert L. Sills (RS 8896)
Jay K. Musoff (JM 8716)
David M. Fine (DF 4479)
666 Fifth Avenue
New York, New York 10103
Telephone: (212) 506-5000
Facsimile: (212) 506-5151

Peter S. O'Driscoll
ORRICK, HERRINGTON & SUTCLIFFE LLP
Tower 42, Level 35
25 Old Broad Street
London EC2N 1HQ
DX: 557 London/City
United Kingdom
Telephone: 011 44 20 7562 5000
Facsimile:  011 44 20 7628 0078

Attorneys for Plaintiff
Telenor East Invest AS

# EXHIBIT A

SHAREHOLDERS AGREEMENT NO. TE-2 DATED MAY 30, 2001

PAGE 1

SHAREHOLDERS AGREEMENT

dated as of May 30, 2001

between and among

TELENOR EAST INVEST AS,

and

ECO TELECOM LIMITED

and

OTHER HOLDERS OF CAPITAL STOCK OF OPEN JOINT STOCK COMPANY
"VIMPEL-COMMUNICATIONS" FROM TIME TO TIME

TELENOR

ECO TELECOM

SHAREHOLDERS AGREEMENT NO. TE-2 DATED MAY 30, 2001                PAGE 2 

# TABLE OF CONTENTS

**ARTICLE I    DEFINITIONS AND INTERPRETATION** ............................................................. 3
1.01    Definitions ............................................................................................................. 3
1.02    Interpretation ........................................................................................................ 3
**ARTICLE II    REPRESENTATIONS AND WARRANTIES** ................................................ 11
2.01    Organization of the Shareholders ...................................................................... 12
2.02    Authority ............................................................................................................. 12
2.03    No Conflicts ....................................................................................................... 12
2.04    Governmental Approvals and Filings ............................................................... 12
2.05    Legal Proceedings; Liability ............................................................................. 13
2.06    SEC Documents ................................................................................................. 13
2.07    Shareholding ...................................................................................................... 13
2.08    Eco Telecom's Shareholding ............................................................................. 14
**ARTICLE III    TRANSFERS** ................................................................................................. 14
3.01    Transfers ............................................................................................................. 15
3.02    Effect of Transfers ............................................................................................. 15
3.03    Endorsements by Future Shareholders .............................................................. 15
3.04    Notices Relating to Certain Transfers of Shares ............................................... 16
**ARTICLE IV    POST-CLOSING RIGHTS AND OBLIGATIONS** ................................... 16
4.01    Nomination of Directors .................................................................................... 16
4.02    Shareholder Capacity ......................................................................................... 16
4.03    Other Arrangements ........................................................................................... 17
**ARTICLE V    EFFECTIVENESS AND TERMINATION** ................................................. 17
**ARTICLE VI    MISCELLANEOUS** ..................................................................................... 18
6.01    Specific Performance ......................................................................................... 18
6.02    Further Assurances ............................................................................................ 18
6.03    Certain Events .................................................................................................... 19
6.04    Stop Transfer ...................................................................................................... 19
6.05    Entire Agreement ............................................................................................... 19
6.06    No Waiver ........................................................................................................... 19
6.07    Binding Agreement ............................................................................................ 19
6.08    Assignment ......................................................................................................... 19
6.09    Expenses ............................................................................................................. 19
6.10    Notice .................................................................................................................. 20
6.11    Amendment ......................................................................................................... 20
6.12    Invalid Provisions .............................................................................................. 21
6.13    Arbitration; Waiver of Sovereign Immunity ..................................................... 21
6.14    Governing Law ................................................................................................... 21
6.15    Counterparts ....................................................................................................... 23
                                                                                          23

EXHIBIT A          FORM OF ENDORSEMENT

SCHEDULE 1        SHARES

SCHEDULE 2        OTHER AGREEMENTS, UNDERTAKINGS AND ARRANGEMENTS RELATING
                  TO SHARES

SCHEDULE 3        INDEPENDENT DIRECTORS

TELENOR                    ECO TELECOM 

SHAREHOLDERS AGREEMENT dated as of May 30, 2001 between and among TELENOR EAST INVEST AS, a company organized and existing under the laws of Norway ("Telenor"), ECO TELECOM LIMITED a company organized and existing under the laws of Gibraltar ("Eco Telecom"), and such other holders of capital stock of the Company as shall be party hereto from time to time.

## WITNESSETH

WHEREAS, Open Joint Stock Company "Vimpel-Communications", an open joint stock company organized and existing under the laws of the Russian Federation (the "Company"), Telenor and Eco Telecom are parties to the Primary Agreement dated as of the date hereof (the "Primary Agreement"); and

WHEREAS, Telenor and Eco Telecom believe it is in the best interests of the Company that provision be made for the continuity and stability of the business and management of the Company;

NOW, THEREFORE, in consideration of the mutual covenants and obligations set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I  DEFINITIONS AND INTERPRETATION

1.01    Definitions

As used herein, the following terms shall have the following meanings:

"Account Bank" shall mean Citibank T/O (OOO), as the account bank under the Escrow Agreement.

"Account Bank and Overdraft Facility" shall mean the Account Bank and Overdraft Facility dated the date hereof between and among the Company, VIP-R, Eco Telecom and the Account Bank.

"Actions or Proceedings" shall mean any action, suit, proceeding or arbitration commenced, brought, conducted or heard by or before any Governmental or Regulatory Authority.

"ADSs" shall mean the Company's American Depositary Shares, each representing three quarters (3/4) of one (1) share of Common Stock, which are currently listed on the NYSE.

"Agreement" shall mean this Shareholders Agreement.

"Affiliate" shall mean, with respect to any Person, any other Person which directly or indirectly controls, or is under common control with, or is controlled by, such Person, including, if such Person is an individual, any relative or spouse of such Person, or any

TELENOR    ECO TELECOM


relative of such spouse of such Person, any one of whom has the same home as such Person, and also including any trust or estate for which any such Person or Persons specified herein, directly or indirectly, serves as a trustee, executor or in a similar capacity (including, without limitation, any protector or settlor of a trust) or in which such Person or Persons specified herein, directly or indirectly, has a substantial beneficial interest and any Person who is controlled by any such trust or estate. As used in this definition, "control" (including, with its correlative meanings, "controlled by" and "under common control with") shall mean, with respect to any Person, the possession, directly or indirectly, of power to direct or cause the direction of management or policies (whether through ownership of securities or partnership or other ownership interests, by Contract or otherwise) of such Person; provided, however, that for the purposes of this definition, neither the Company nor any of its Controlled Affiliates, nor VIP-R nor any of its Controlled Affiliates, shall be deemed Affiliates of any Shareholder.

"Alfa Bank" shall mean OAO "Alfa-Bank", an open joint stock company organized and existing under the Laws of the Russian Federation.

"Alfa Bank Guarantee" shall mean the Guarantee dated as of the date hereof, executed and delivered by Alfa Bank, as guarantor, in favor of the Company, as beneficiary.

"Assets and Properties" shall mean, with respect to any Person, all assets and properties of every kind, nature, character and description (whether real, personal or mixed, whether tangible or intangible, whether absolute, accrued, contingent, fixed or otherwise and wherever situated), including the goodwill related thereto, used, operated, owned or leased by such Person, including, without limitation, cash, cash equivalents, Investments, accounts and notes receivable, chattel paper, documents, instruments, general intangibles, real estate, equipment, inventory, goods and Intellectual Property.

"Bee Line Fund" shall have the meaning specified in the Primary Agreement.

"Board" shall mean the Board of Directors of the Company.

"Business Day" shall mean a day other than a Saturday, a Sunday or any day on which banks located in Moscow, Russia, Oslo, Norway, London, England or New York, New York are authorized or obliged to close.

"Change of Control" shall mean, with respect to any Shareholder or any Controlling Person of such Shareholder, (a) the sale or other disposition of all or substantially all of such Shareholder's or such Controlling Person's assets, in one or a series of related transactions, to any Person or Persons (other than a Controlling Person of such Shareholder or any Controlled Affiliate or Controlled Affiliates of such Controlling Person), (b) the sale or other disposition of more than fifty percent (50%) of the securities having ordinary voting power for the election of directors or other governing body of such Shareholder or Controlling Person, in one or a series of related transactions, to any Person or Persons (other than a Controlling Person of such Shareholder or any Controlled Affiliate or Controlled Affiliates of such Controlling Person), (c) the merger or consolidation of such Shareholder or Controlling Person with or into another Person or the merger of another Person into such Shareholder or Controlling Person with the effect that any Person or Persons other than the existing shareholders of such Shareholder or Controlling Person prior to such transaction own or



TELENOR



ECO TELECOM



control, directly or indirectly, more than fifty percent (50%) of the securities having ordinary voting power for the election of directors or other governing body of the Person surviving such merger, or the Person resulting from such consolidation, or (d) the liquidation or dissolution of such Shareholder or Controlling Person; provided, however, that a Change of Control shall not include (i) a bona fide underwritten public offering of the capital stock of any Shareholder or any Controlling Person of such Shareholder, or (ii) any of (A) the sale of all or substantially all of the assets of Telenor ASA, Telenor Communication AS, Telenor Mobile Communications AS or CTF Holdings, (B) the sale of more than fifty percent (50%) of the securities having ordinary voting power for the election of directors or other governing body of Telenor ASA, Telenor Communication AS, Telenor Mobile Communications AS or CTF Holdings, (C) the liquidation or dissolution of Telenor ASA, Telenor Communication AS, Telenor Mobile Communication AS or CTF Holdings or (D) any merger, consolidation, divestiture or de-merger to which Telenor ASA, Telenor Communication AS, Telenor Mobile Communications AS or CTF Holdings is a party.

"Charter" shall have the meaning specified in the Primary Agreement.

"Closing" shall have the meaning specified in the Primary Agreement.

"Closing Date" shall have the meaning specified in the Primary Agreement.

"Common Stock" shall mean shares of common stock of the Company, as defined in Section 6.1 of the Charter.

"Company" shall have the meaning specified in the first recital hereto.

"Contract" shall mean any agreement, letter of intent, lease, license, evidence of Indebtedness, mortgage, indenture, security agreement or other contract or understanding (whether written or oral), in each case, to the extent legally binding.

"Controlled Affiliate" shall mean, with respect to any Person, any Affiliate of such Person in which such Person owns or controls, directly or indirectly, more than fifty percent (50%) of the securities having ordinary voting power for the election of directors or other governing body thereof or more than fifty percent (50%) of the partnership or other ownership interests therein (other than as a limited partner).

"Controlling Person" shall mean, with respect to any Person, any other Person which owns or controls, directly or indirectly, more than fifty percent (50%) of the securities of such Person having ordinary voting power for the election of directors or other governing body of such first Person or more than fifty percent (50%) of the partnership or other ownership interests therein (other than as a limited partner of such first Person).

"CTF Holdings" shall mean CTF Holdings Limited, a company organized and existing under the Laws of Gibraltar.

"Director" shall mean a member of the Board.

"Dr. Zimin" shall mean Dr. Dmitri Borisovich Zimin, a Russian citizen.





"Eco Holdings" shall mean Eco Holdings Limited, a company organized and existing under the Laws of Gibraltar.

"Eco Shareholders" shall mean, collectively, Eco Telecom (which, for the avoidance of doubt, shall be deemed a Shareholder upon its execution and delivery of this Agreement) and any Permitted Transferee of Eco Telecom which becomes a party to this Agreement in accordance with Article III, and, individually, any of them.

"Eco Telecom" shall have the meaning specified in the preamble hereto.

"Eco Telecom Contribution Default" shall have the meaning specified in the VIP-R Primary Agreement.

"Eco Telecom Guarantee Agreement" shall mean the Guarantee Agreement dated as of the date hereof between and among CTF Holdings, Eco Holdings, Telenor, the Company and VIP-R.

"Eco Telecom VIP-R Preferred Stock Purchase Agreement" shall mean the Stock Purchase Agreement substantially in the form attached as Annex A to Schedule 2.07(a) to the VIP-R Primary Agreement, to be entered into at the Preferred Stock Closing Date by Eco Telecom and VIP-R.

"Eco Telecom Preferred Stock Purchase Agreement" shall the mean the Share Purchase Agreement dated as of the date hereof between Overture and Eco Telecom with respect to shares of Preferred Stock and shares of Common Stock.

"Eco Telecom Share Purchase Agreements" shall mean, collectively, the Share Purchase Agreement dated as of the date hereof between Eco Telecom and Dr. Zimin with respect to shares of Common Stock and the Eco Telecom Preferred Stock Purchase Agreement.

"Endorsement" shall mean an endorsement to this Agreement in the form of Exhibit A.

"Escrow Agent" shall mean Citibank, N.A., London Branch, as escrow agent under the Escrow Agreement.

"Escrow Agreement" shall mean the Escrow Agreement dated the date hereof between and among Eco Telecom, the Escrow Agent, the Account Bank, VIP-R and the Company.

"Existing Shareholders Agreement" shall mean the Shareholders Agreement dated as of December 1, 1998 between and among Telenor, Dr. Zimin, Glavsotkom, the Bee Line Fund, Augie K. Fabela, II and Geneva Investment Trust I, L.L.C.

"Final Date" shall have the meaning specified in the Primary Agreement.

"Glavsotkom" shall have the meaning specified in the Primary Agreement.

TELENOR                           ECO TELECOM




SHAREHOLDERS AGREEMENT NO. TE-2 DATED MAY 30, 2001                                    PAGE 7

"GMS" shall mean the general meeting of the shareholders (*obschee sobraniye aktsionerov*) of the Company, as defined in Article 9 of the Charter.

"Governmental or Regulatory Authority" shall mean any court, tribunal, arbitrator, legislature, government, ministry, committee, inspectorate, authority, agency, commission, official or other competent authority of the Russian Federation, any other country or any state, as well as any county, city or other political subdivision of any of the foregoing.

"Indebtedness" shall have the meaning specified in the Primary Agreement.

"Independent" shall mean (a) any Person who is not an employee, officer, director or other Affiliate (but who may be a consultant and/or former employee) of any Shareholder, any Controlling Person of such Shareholder or any Controlled Affiliate of such Controlling Person or (b) any Person listed in Schedule 3.

"Intellectual Property" shall mean patents and patent rights, licenses, inventions, copyrights and copyright rights, know-how (including trade secrets and other unpatented and/or unpatentable proprietary or confidential information, systems or procedures), trademarks and trademark rights, service marks and service mark rights, trade names and trade name rights, service names and service name rights, brand names, processes formulae, trade dress, business and product names, logos, slogans, industrial models, processes, designs, methodologies, software programs (including all source codes) and related documentation, technical information, manufacturing, engineering and technical drawings, and all pending applications for and registrations of patents, trademarks, service marks and copyrights.

"Investments" shall have the meaning specified in the Primary Agreement.

"Laws" shall mean all laws, decrees, resolutions, instructions, statutes, rules, regulations, acts, ordinances and other pronouncements having the effect of law or regulation of the Russian Federation, any other country or any state, as well as any county, city or other political subdivision of any of the foregoing.

"Licenses" shall mean all licenses, permits, certificates of authority, authorizations, approvals, registrations, franchises and similar consents granted or issued by any Governmental or Regulatory Authority including, without limitation, all Telecom Licenses.

"Lien" shall mean any mortgage, pledge, assessment, security interest, lease, lien, adverse claim, levy, charge or other encumbrance of any kind, or any conditional sale Contract, title retention Contract or other Contract to give any of the foregoing.

"Material Adverse Effect" shall mean, with respect to any Person, a material adverse effect on or with respect to the business, assets, prospects, financial condition or results of operations of such Person and its Subsidiaries, taken as a whole, or on such Person's ability to perform its obligations under this Agreement or any other Principal Agreement to which it is a party.

"Option Agreement" shall mean the Option Agreement dated as of the date hereof between Eco Telecom and Telenor.



TELENOR                              ECO TELECOM

"Order" shall mean any writ, judgement, decree, injunction or similar order of any Governmental or Regulatory Authority.

"Overture" shall mean Overture Limited, an exempted company limited by shares organized and existing under the Laws of Bermuda.

"Permitted Transferee" shall mean, with respect to any Shareholder, any Controlling Person of such Shareholder, or any Controlled Affiliate of any such Controlling Person or Shareholder.

"Person" shall mean any natural person, corporation, general partnership, simple partnership, limited partnership, limited liability partnership, limited liability company, proprietorship, other business organization, trust, union, association or Governmental or Regulatory Authority, whether incorporated or unincorporated.

"Plurality Shareholder" shall have the meaning specified in Section 4.01(a).

"Preferred Stock" shall mean, collectively, the shares of preferred stock of the Company, as defined in the Charter.

"Preferred Stock Closing Date" shall have the meaning specified in the VIP-R Primary Agreement.

"Primary Agreement" shall have the meaning specified in the first recital hereto.

"Principal Agreements" shall mean this Agreement, the Primary Agreement, the Escrow Agreement, the Account Bank and Overdraft Facility, the Option Agreement, the Zimin Principal Agreements, the Registration Rights Agreement, the Eco Telecom Guarantee Agreement, the Alfa Bank Guarantee, the Telenor Guarantee Agreement, the Undertaking Letters, the VIP/Eco Telecom Share Purchase Agreement, the VIP-R Primary Agreement, the VIP-R Shareholders Agreement, the VIP-R Registration Rights Agreement, the Termination Agreement, the Supplemental Agreements, the Eco Telecom VIP-R Preferred Stock Purchase Agreement and the Trademark Agreements.

"Registrar" shall mean Closed Joint Stock Company "National Registry Company" (*Natsionalnaya Registratsionnaya Kompaniya*), a closed joint stock company organized under the Laws of the Russian Federation and the duly appointed shareholder registrar of the Company, or any successor thereto.

"Registration Rights Agreement" shall mean the Registration Rights Agreement dated as of the date hereof between and among the Company, Telenor and Eco Telecom.

"SEC" shall mean the Securities and Exchange Commission of the United States of America, or any successor thereto.

"SEC Documents" shall have the meaning specified in Section 2.06(a).



"Securities Act" shall mean the United States Securities Act of 1933, as amended, and the rules and regulations of the SEC promulgated thereunder.

"Shareholder" shall mean any holder of Shares who is a party to this Agreement.

"Shares" shall mean shares of Common Stock or Preferred Stock, or ADSs, as the case may be.

"Significant Bee Line Names" shall have the meaning specified in the Primary Agreement.

"Specified Percentage" shall mean twenty-five percent (25%) plus one (1) share of the issued and outstanding shares of voting capital stock of the Company.

"Supplemental Agreements" shall mean, collectively, the Supplemental Agreements, each substantially in the forms attached as Exhibit A to the VIP-R Primary Agreement, to be entered into as of the Closing in respect of the Zimin Preferred Stock Agreements.

"Telenor" shall have the meaning specified in the preamble hereto.

"Telenor Guarantee Agreement" shall mean the Guarantee Agreement dated as of the date hereof between and among Telenor ASA, Eco Telecom, the Company and VIP-R.

"Telenor Shareholders" shall mean, collectively, Telenor and any Permitted Transferees of Telenor who become a party to this Agreement in accordance with Section 3.02, and, individually, any of them.

"Telenor Share Purchase Agreement" shall mean the Share Purchase Agreement dated as of the date hereof between Telenor and Overture.

"Termination Agreement" shall mean the Termination Agreement dated as of the date hereof between and among Telenor, Telenor Communication AS, the Company, VimpelCom B.V., VimpelCom Finance B.V., VC Limited, Dr. Zimin, Glavsotkom and the Bee Line Fund.

"Trademark Agreements" shall mean, collectively, the License Agreements dated the date hereof between the Company and VIP-R listed on Schedule 1.01(c) to the Primary Agreement and relating to the licensing by the Company to VIP-R of certain rights to use the Significant Bee Line Names.

"Transfer" shall mean any direct or indirect sale, exchange, transfer (including, without limitation, any transfer by gift or operation of law, or any transfer of an economic interest in any derivative security of any Share), assignment, distribution or other disposition, or issuance or creation of any option or any voting proxy, voting trust or other voting agreement in respect of any Person or instrument (including, without limitation, any of the Shares), whether in a single transaction or a series of related transactions, including without limitation, (a) the direct or indirect enforcement or foreclosure of any Lien or (b) any Change of Control; provided that nationalization, expropriation, confiscation, bankruptcy (other than any bankruptcy initiated by the petition of any Shareholder or any Affiliate of such

 



Shareholder), arrest or any similar Action or Proceeding initiated by any Governmental or Regulatory Authority in respect of any Person or instrument shall not constitute a Transfer.

"UNCITRAL Rules" shall have the meaning specified in Section 7.13.

"Undertaking Letters" shall mean, collectively, the letter agreement dated the date hereof between Eco Telecom and the Company relating to certain obligations of Eco Telecom and the letter agreement dated the date hereof between Telenor and the Company relating to certain obligations of Telenor and, individually, any of them.

"VIP/Eco Telecom Share Purchase Agreement" shall mean the Share Purchase Agreement substantially in the form attached as Exhibit F to the VIP-R Primary Agreement, to be entered into at the Preferred Stock Closing Date by Eco Telecom and VIP-R.

"VIP-R" shall mean Closed Joint Stock Company "VimpelCom-Region", a closed joint stock company organized and existing under the Laws of the Russian Federation, and its legal successors.

"VIP-R Primary Agreement" shall mean the Primary Agreement dated as of the date hereof between and among Eco Telecom, Telenor, the Company and VIP-R.

"VIP-R Registration Rights Agreement" shall mean the Registration Rights Agreement dated as of the date hereof between and among Eco Telecom, Telenor, the Company and VIP-R.

"VIP-R Shareholders Agreement" shall mean the Shareholders Agreement dated as of the date hereof between and among Eco Telecom, Telenor, the Company and VIP-R.

"Zimin Common Call Option Agreement" shall mean the Call Option Agreement substantially in the form attached as Exhibit A to the Zimin Preferred Call Option Agreement, to be entered into following the Closing by Eco Telecom and Overture with respect to shares of Common Stock.

"Zimin Common Pledge Agreement" shall mean the Pledge Agreement substantially in the form attached as Exhibit A to the Zimin Preferred Pledge Agreement, to be entered into following the Closing by Eco Telecom and Overture with respect to shares of Common Stock.

"Zimin Preferred Call Option Agreement" shall mean the Call Option Agreement substantially in the form of Exhibit A to the Eco Telecom Preferred Stock Purchase Agreement, to be entered into at the Closing by Eco Telecom and Overture with respect to shares of Preferred Stock.

"Zimin Preferred Pledge Agreement" shall mean the Pledge Agreement substantially in the form attached as Exhibit B to the Eco Telecom Preferred Stock Purchase Agreement, to be entered into at the Closing by Eco Telecom and Overture with respect to shares of Preferred Stock.

TELENOR

ECO TELECOM



"Zimin Preferred Stock Agreements" shall mean, collectively, the Share Purchase Agreement dated as of the date hereof between Dr. Zimin and Overture, the Share Purchase Agreement No. C-П-1 dated April 13, 1998 between Closed Joint Stock Company "Sota-100" and Dr. Zimin, the Share Purchase Agreement No. C-П-2 dated April 13, 1998 between Closed Stock Company "Sota-100" and Dr. Zimin, the Share Purchase Agreement No. КБ-П-1 dated April 13, 1998 between Closed Stock Company "KB Impuls-TV" and Dr. Zimin, the Share Purchase Agreement No. КБ-П-2 dated April 13, 1998 between Closed Stock Company "KB Impuls-TV" and Dr. Zimin, the Share Swap Agreement dated July 26, 1996 between the Issuer and Closed Joint Stock Company "Sota-100" and the Share Swap Agreement dated July 26, 1996 between the Issuer and Closed Joint Stock Company "KB Impuls-TV".

"Zimin Principal Agreements" shall mean, collectively, the Zimin Share Purchase Agreements, the Zimin Common Pledge Agreement, the Zimin Preferred Pledge Agreement, the Zimin Common Call Option Agreement, the Zimin Preferred Call Option Agreement and the Zimin Surety Agreement.

"Zimin Share Purchase Agreements" shall mean collectively the Eco Telecom Share Purchase Agreements and the Telenor Share Purchase Agreement.

"Zimin Surety Agreement" shall mean the Surety Agreement dated as of the date hereof between Eco Telecom and Dr. Zimin.

1.02    Interpretation

Unless the context of this Agreement otherwise requires, the following rules of interpretation shall apply to this Agreement:

(a)    the singular shall include the plural, and the plural shall include the singular;

(b)    words of any gender shall include the other gender;

(c)    the words "hereof", "herein", "hereby", "hereto" and similar words refer to this entire Agreement and not to any particular Section or any other subdivision of this Agreement;

(d)    a reference to any "Article", "Section", "Schedule" or "Exhibit" is a reference to a specific Article or Section of, or Schedule or Exhibit to, this Agreement;

(e)    a reference to any law, statute, regulation, notification or statutory provision shall include any amendment, modification or re-enactment thereof, any regulations promulgated thereunder from time to time, and any interpretations thereof from time to time by any regulatory or administrative authority;

(f)    a reference to any agreement, instrument, contract or other document shall include any amendment, amendment and restatement, supplement or other modification thereto;

 



SHAREHOLDERS AGREEMENT NO. TE-2 DATED MAY 30, 2001                    PAGE 12

(g)    a reference to any Person shall include such Person's successors and permitted assigns under any agreement, instrument, contract or other document; and

(h)    whenever this Agreement refers to a number of days, such number shall refer to calendar days unless Business Days are specified.

## ARTICLE II    REPRESENTATIONS AND WARRANTIES

Each Shareholder party hereto on the date hereof hereby represents and warrants as of the date hereof (and each Person who subsequently becomes a party to this Agreement by executing an Endorsement, represents and warrants as of the date on which such Person executes such Endorsement) that:

2.01    <u>Organization of the Shareholders</u>

If not a natural Person, such Shareholder is duly organized and validly existing under the Laws of its jurisdiction of organization, with corporate power and authority to carry on its business as it is currently being conducted and to own, lease and operate its Assets and Properties.

2.02    <u>Authority</u>

(a)    Such Shareholder has full power and authority to enter into this Agreement and to perform its obligations hereunder. The execution and delivery of this Agreement by such Shareholder has been duly and validly authorized and, if such Shareholder is not a natural Person, no other corporate action on the part of such Shareholder, its board of directors or its shareholders is necessary therefor.

(b)    This Agreement has been duly and validly executed and delivered by such Shareholder and constitutes the legal, valid and binding obligation of such Shareholder, enforceable against such Shareholder in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws affecting creditors' rights and remedies generally or by general equitable principles (whether applied by a court of law or equity).

2.03    <u>No Conflicts</u>

The execution, delivery and performance by such Shareholder of this Agreement, the compliance by such Shareholder with all of the provisions hereof and the consummation by such Shareholder of the transactions contemplated hereby:

(a)    if such Shareholder is not a natural Person, will not conflict with or constitute a breach of any of the terms or provisions of, or a default under its charter, memorandum of association, articles of association, certificate of incorporation, by-laws or other like constitutive documents, as the case may be;

(b)    will not conflict with or constitute a breach of any Contract or License to which such Shareholder is a party or by which it or any of its Assets and Properties is bound,

TELENOR            ECO TELECOM 



SHAREHOLDERS AGREEMENT NO. TE-2 DATED MAY 30, 2001                                    PAGE 13

in each case, as in effect on the date hereof or, with respect to any Person that subsequently becomes a party to this Agreement, as of the date such Person becomes a party hereto; and

(c)    will not violate or conflict with any Order or Law applicable to such Shareholder, in each case, as in effect on the date hereof or, with respect to any Person that subsequently becomes a party to this Agreement, as of the date such Person becomes a party hereto.

2.04    Governmental Approvals and Filings

The execution, delivery and performance by such Shareholder of this Agreement, the compliance by such Shareholder with all of the provisions hereof and the consummation by such Shareholder of the transactions contemplated hereby will not require any consent, approval, authorization, other Order or action of, or filing with or notice to, any Governmental or Regulatory Authority, except for such consents, approvals, authorizations or other Orders as have been obtained and which are in full force and effect on the date of this Agreement or, with respect to any Person that subsequently becomes a party to this Agreement, as of the date such Person becomes a party hereto.

2.05    Legal Proceedings; Liability

(a)    To the knowledge of such Shareholder, there are no Actions or Proceedings pending to which such Shareholder is a party or to which any of the Shares it owns or controls, beneficially or otherwise, is subject, which would, or would reasonably be expected to, result in the issuance of an Order which questions the validity of this Agreement or which would, or would reasonably be expected to, result in the issuance of an Order which would have a Material Adverse Effect, and, to the knowledge of such Shareholder, no such Actions or Proceedings are threatened.

(b)    There are no facts or circumstances known to such Shareholder that would reasonably be expected to give rise to any Action or Proceeding that would be required to be disclosed pursuant to clause (a) above.

2.06    SEC Documents

(a)    Such Shareholder has filed all reports, schedules, forms, statements and other material documents, if any, required to be filed by such Shareholder with the SEC in connection with such Shareholder's or its Affiliates' beneficial ownership or control of any Shares prior to giving effect to the execution of this Agreement (collectively, and in each case including all exhibits and schedules thereto and documents incorporated by reference therein, the "SEC Documents").

(b)    After giving effect to all amendments thereto but prior to giving effect to the execution of this Agreement and the other Principal Agreements, if any, to which such Shareholder is a party, no SEC Document filed by such Shareholder contains any untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading.

TELENOR                                            ECO TELECOM
                               



SHAREHOLDERS AGREEMENT NO. TE-2 DATED MAY 30, 2001                    PAGE 14

## 2.07 Shareholding

Each Shareholder hereby represents and warrants as of the date of (and after giving effect to) the consummation of its purchase of Shares pursuant to the Primary Agreement and the relevant Zimin Principal Agreements to which it is a party, and each Person who subsequently becomes a party to this Agreement by executing an Endorsement hereby represents and warrants, as of the date on which such Person executes such Endorsement, that:

(a)     such Shareholder is the record holder and beneficial owner of the Shares described opposite its name on Schedule 1 or on its Endorsement, as the case may be;

(b)     the Shares described opposite its name on Schedule 1, or on its Endorsement, as the case may be, constitute all of the shares of capital stock of the Company owned of record or beneficially by such Shareholder;

(c)     unless otherwise provided in Section 2.08, except for any rights of such Shareholder's spouse, if any, arising by operation of law, no Person other than such Shareholder has sole power of disposition and sole voting power with respect to all of the Shares described opposite such Shareholder's name on Schedule 1, or on its Endorsement, as the case may be, and there are no restrictions on any such rights, other than such restrictions on transfer as arise under applicable United States federal securities laws, Russian federal securities laws, and the terms and conditions of this Agreement and the other Principal Agreements; and

(d)     its Shares are (i) now held or will, upon issuance, be held, in each case, free and clear of all Liens, proxies, voting trusts or agreements, understandings or arrangements whatsoever except for (A) during the period from the date hereof up to the Closing, the Existing Shareholders Agreement and the other Existing Agreements referred to (and defined in) the Termination Agreement, (B) those disclosed in Schedule 2, and (C) the terms and conditions of this Agreement and the other Principal Agreements, and (ii) unless they are ADSs, uncertificated.

## 2.08 Eco Telecom's Shareholding

Eco Telecom hereby represents and warrants as of the date of (and after giving effect to) the consummation of its purchase of Shares pursuant to the Primary Agreement and the relevant Zimin Principal Agreements to which it is a party, that no Person other than Eco Telecom (together with its Controlling Persons) has power of disposition and voting power with respect to any of the Shares described opposite Eco Telecom's name on Schedule 1, and there are no restrictions on any such rights, other than such restrictions on transfer as arise under applicable United States federal securities laws, Russian federal securities laws, and the terms and conditions of this Agreement and the other Principal Agreements.



# ARTICLE III  TRANSFERS

### 3.01    Transfers

Each Shareholder covenants and agrees that such Shareholder will comply with all of its obligations under Section 2.01 of the Registration Rights Agreement, as if the provisions of said Section 2.01 were set forth in full herein.

### 3.02    Effect of Transfers

From and after the occurrence of the Closing:

(a)    In the event of any Transfer of Shares by a Shareholder to a Permitted Transferee of such Shareholder, such Permitted Transferee shall receive and hold any and all Shares so transferred subject to the terms and conditions of this Agreement, the Registration Rights Agreement and Section 7.04 of the Primary Agreement and all of the rights and obligations, if any, of the transferor hereunder and thereunder, and shall forthwith execute and deliver to the other Shareholders an Endorsement.  Each Shareholder hereby undertakes to cause each of its Permitted Transferees to which Shares are so transferred to execute and deliver an Endorsement to each of the other Shareholders.

(b)    In the event of any Transfer of Shares by one or more Shareholders of the Specified Percentage (or any greater number) of Shares to a single transferee or a group of transferees which are Controlled Affiliates of the same Controlling Person, such transferee(s) shall receive and hold any and all Shares so transferred subject to the terms and conditions of this Agreement, the Registration Rights Agreement and Section 7.04 of the Primary Agreement and all of the rights and obligations, if any, of the transferor hereunder and thereunder, and each such transferee (unless at the time of such transfer it is a Shareholder that has executed and delivered an Endorsement) shall forthwith execute and deliver to the other Shareholders an Endorsement or Endorsements, as applicable.  Each Shareholder hereby undertakes to cause, as a condition precedent to the effectiveness of any such Transfer subject to this Section 3.02(b), each of its transferees (other than any Shareholder that has previously executed and delivered an Endorsement) to execute and deliver an Endorsement to each of the other Shareholders.

(c)    A Shareholder which effects a Transfer of all of such Shareholder's Shares in accordance with the terms of this Agreement shall, after giving effect to such Transfer, cease to be a party to, or be bound by the terms of, this Agreement from and after the date of such Transfer.

(d)    In the event of any Transfer of Shares (i) in an amount less than the Specified Percentage by a Shareholder to any Person who is not a Permitted Transferee of such Shareholder, or (ii) by one or more Shareholders to a single transferee or group of transferees who do not, individually or together with its (or their) Controlling Person or Controlled Affiliates of such Controlling Person, own or control, directly or indirectly, a number of Shares equal to or greater than the Specified Percentage, such Person shall not be entitled to any rights, or be subject to any obligations, under this Agreement.

(e)    Without prejudice to any other rights or remedies of any party to this Agreement, if any Shareholder Transfers any Shares to any Person in violation of this

 



Section 3.02, then any transferee of such Shares shall receive and hold any and all Shares so transferred without any of the rights, but subject to all of the obligations, set forth in this Agreement, the Registration Rights Agreement and Section 7.04 of the Primary Agreement.

### 3.03    Endorsements by Future Shareholders

The term "Shareholders" as used in this Agreement shall include any and all Persons (a) agreeing to be bound as a "Shareholder" hereunder by signing this Agreement or an Endorsement, and (b) required to execute and deliver an Endorsement pursuant to the terms of this Agreement.

### 3.04    Notices Relating to Certain Transfers of Shares

Without prejudice to any other provision herein or in any of the other Principal Agreements pursuant to which any Person is required to deliver notice, the parties hereto agree that, from and after the occurrence of the Closing:

(a)    if, as a result of any Transfer of Shares, the Eco Shareholders shall, in the aggregate, beneficially own less than the Specified Percentage of Shares, then Eco Telecom shall, as soon as practicable after such Transfer, deliver written notice of such occurrence to each of the other Shareholders; and

(b)    if, as a result of any Transfer of Shares, the Telenor Shareholders shall, in the aggregate, beneficially own less than the Specified Percentage of Shares, then Telenor shall, as soon as practicable after such Transfer, deliver written notice of such occurrence to each of the other Shareholders.

## ARTICLE IV    POST-CLOSING RIGHTS AND OBLIGATIONS

### 4.01    Nomination of Directors

From and after the occurrence of the Closing:

(a)    So long as the Telenor Shareholders and the Eco Shareholders each beneficially own at least the Specified Percentage of Shares, then the Telenor Shareholders and the Eco Shareholders shall each nominate up to four (4) candidates for election to the Board, with at least one (1) candidate in each such group of four (4) candidates being an Independent; provided that if either the Telenor Shareholders or the Eco Shareholders beneficially own more than forty-four percent (44%) but not more than fifty percent (50%) of the voting capital stock of the Company (a "Plurality Shareholder"), none of the candidates nominated by such Plurality Shareholder is required to be an Independent. In the event of an Eco Telecom Contribution Default, Eco Telecom shall cause such number of the four (4) directors nominated for election to the Board by Eco Telecom to resign from the Board with immediate effect so that Eco Telecom's remaining nominees on the Board will be only those whom it could elect based on cumulative voting at such time (without taking into account any extraordinary rights).

TELENOR

ECO TELECOM



(b)      So long as the Telenor Shareholders beneficially own at least the Specified Percentage of Shares, then the Telenor Shareholders shall nominate one (1) additional candidate for election to the Board, who shall be an Independent and who shall, so long as the Eco Shareholders beneficially own at least the Specified Percentage of Shares, be approved by Eco Telecom.

(c)      Upon not less than ninety (90) days' prior written notice from Telenor or Eco Telecom, respectively, that it wishes to cause an amendment to the Charter to be adopted that would include its name (and/or any of the Telenor Shareholders' or Eco Shareholders' respective names) in the Charter in accordance with Article 15 of the Law on Foreign Investments, the Telenor Shareholders or the Eco Shareholders, as the case may be, shall cause the directors nominated by them to propose such an amendment at the next GMS.

4.02    Shareholder Capacity

No Person executing this Agreement who is, or who becomes during the term hereof, a Director makes any agreement or understanding herein in his or her capacity as such Director, and the agreements set forth herein shall in no way restrict any Director in the exercise of his or her fiduciary duties as a Director. Each Shareholder executes and delivers this Agreement solely in his, her or its capacity as the record and beneficial owner of such Shareholder's Shares.

4.03    Other Arrangements

(a)      Except for (i) the agreements and arrangements specified in Schedule 2, (ii) during the period from the date hereof up to the Closing, the Existing Shareholders Agreement and the other Existing Agreements referred to (and defined in) the Termination Agreement, and (iii) the terms and conditions of this Agreement and the other Principal Agreements, no Shareholder shall grant any proxy or enter into or agree to be bound by any understanding or any voting trust with respect to any Shares, nor shall any Shareholder enter into any shareholders agreement or arrangement of any kind (whether written or oral) with any Person with respect to any Shares, including, without limitation, any agreement, understanding or arrangement with respect to the nomination of any Director, or the acquisition, ownership, Transfer or other disposition or voting of Shares, nor shall any Shareholder act, for any reason, as a member of a group or in concert with any other Person in connection with the nomination of any Director, or the acquisition, Transfer or other disposition or voting of Shares, in any manner which is inconsistent with any obligation of such Shareholder under this Agreement or any other Principal Agreement, provided that each Shareholder shall be permitted to Transfer its Shares in accordance with the terms of this Agreement and the Registration Rights Agreement.

(b)      Without prejudice to any other rights or remedies of any party to this Agreement, if any representation or warranty made by any Shareholder in Section 2.07 is shown to have been false or misleading when made or confirmed, or if any Shareholder violates any provision of Article III or Section 4.03(a) hereof or of Section 2.01 of the Registration Rights Agreement, the rights of such Shareholder under this Agreement and the Registration Rights Agreements shall terminate forthwith until such violation has been cured (if capable of cure) in a manner satisfactory to the other Shareholders, but such Shareholder



TELENOR                                    ECO TELECOM



SHAREHOLDERS AGREEMENT NO. TE-2 DATED MAY 30, 2001                    PAGE 18

shall continue to be bound by all of its obligations hereunder and under the Registration Rights Agreement.

## ARTICLE V   EFFECTIVENESS AND TERMINATION

This Agreement shall take effect on the date hereof and remain in effect until the earliest of:

(a)    the date on which all of the Shareholders party hereto agree in writing to the termination of this Agreement;

(b)    the date on which the Telenor Shareholders or any transferee of the Specified Percentage (or a greater number) of Shares pursuant to a Transfer by the Telenor Shareholders made in accordance with Article III collectively beneficially own, in the aggregate, less than twenty-five percent (25%) or more than fifty percent (50%) of the then issued and outstanding shares of voting capital stock of the Company;

(c)    the date on which the Eco Shareholders or any transferee of the Specified Percentage (or a greater number) of Shares pursuant to a Transfer by the Eco Shareholders made in accordance with Article III, having once attained the Specified Percentage, thereafter, collectively beneficially own, in the aggregate, less than twenty-five percent (25%) or more than fifty percent (50%) of the then issued and outstanding shares of voting capital stock of the Company;

(d)    the date on which a meeting of the shareholders of the Company is held at which a vote of such shareholders is conducted concerning the transactions contemplated by this Agreement and the other Principal Agreements and such shareholders fail to approve such transactions as are required to be approved by such shareholders;

(e)    the date on which an Eco Telecom Contribution Default shall have occurred; and

(f)    at midnight (Moscow time) on the Final Date if the Closing has not occurred by such time.

## ARTICLE VI   MISCELLANEOUS

6.01   Specific Performance

The Shareholders hereby declare that it is impossible to measure in money the damages that will accrue to a party hereto by reason of a failure to perform any of the obligations under this Agreement. Therefore, if any Shareholder shall, in accordance with Section 6.13, institute any proceeding to enforce specifically the provisions hereof, any Shareholder against whom such proceeding is brought hereby waives the claim or defense therein that the Shareholder instituting such proceeding has an adequate remedy at law or in damages, and the Shareholder against whom such proceeding is brought shall not urge in any such proceeding the claim or defense that such remedy at law or in damages exists.

TELENOR           ECO TELECOM 

6.02   Further Assurances

From time to time, at any Shareholder's reasonable request and without further consideration, each Shareholder shall execute and deliver such additional documents and take all such further action as may be reasonably necessary or desirable to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated by this Agreement.

6.03   Certain Events

Each Shareholder agrees that this Agreement and such Shareholder's obligations hereunder shall attach to such Shareholder's Shares and shall be binding upon any Person to whom legal or beneficial ownership of such Shares shall pass to the extent permitted by law, including, without limitation, such Shareholder's heirs, guardians, administrators or successors or spouse, as a result of any divorce.

6.04   Stop Transfer

Each Shareholder agrees with, and covenants to, the other Shareholders that such Shareholder shall not request that the Company or the Registrar register the Transfer (book-entry or otherwise) of any of such Shareholder's Shares, unless such Transfer is made in compliance with this Agreement and the other Principal Agreements.

6.05   Entire Agreement

This Agreement and the other Principal Agreements supersede all other prior discussions and agreements among the parties (and, after giving effect to the Closing, will supersede all other prior agreements to which any Shareholder is a party on the date hereof) with respect to the subject matter hereof and thereof, and contain the sole and entire agreement among the parties with respect to the subject matter hereof and thereof.

6.06   No Waiver

No failure on the part of any party hereto to exercise and no delay in exercising, and no course of dealing with respect to, any right, power, or privilege under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege under this Agreement preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

6.07   Binding Agreement

This Agreement shall, to the extent specifically set forth herein, be binding upon the successors and permitted assigns and Permitted Transferees of each party hereto.

6.08   Assignment

Except as expressly provided herein, no party hereto may assign any of its rights under this Agreement without the prior written consent of each of the other parties hereto.

TELENOR                           ECO TELECOM



6.09     Expenses

Each party to this Agreement shall pay its own expenses and costs incidental to its execution and delivery of this Agreement

6.10     Notice

All notices and other communications provided for herein (including, without limitation, any modifications of, or waivers or consents under, this Agreement) shall be given or made by facsimile or by hand in writing and transmitted by facsimile or courier and delivered to the "Address for Notices" specified below or at such other address as shall be designated by such Shareholder in a notice to each other Shareholder party hereto:

If to Telenor, to:

Telenor East Invest AS
Universitetsgaten 2
N-0130 Oslo
Norway

Facsimile No.: +47-22-77-91-59
Attn: Henrik Torgersen

With a copy to:

Advokatene i Telenor
Universitetsgaten 2
N-0130 Oslo
Norway

Facsimile No.: +47-22-11-44-61
Attn: Bjørn Hogstad

If to Eco Telecom, to

Eco Telecom Limited
Suite 2, 4 Irish Place
Gibraltar

Facsimile No.: +350-41988
Attn: Franz Wolf

With a copy to:

OOO Alfa-Eco
21, Novy Arbat
121019 Moscow
Russia



TELENOR



ECO TELECOM

Facsimile No.: +7095-201-5914
Attn: Stanislav Shekshnya

and a copy to:

Herbert Smith CIS Legal Services
24, Korobeinikov Pereulok
119034 Moscow
Russian Federation

Facsimile No.: +7095-363-6501
Attn: Vladimir Afonkin

Except as otherwise provided in this Agreement, all such communications shall be deemed to have been duly given and shall be effective when transmitted by facsimile, personally delivered or, in the case of any notice delivered by courier, upon receipt, in each case, given or addressed as aforesaid.

6.11    Amendment

This Agreement may be amended, supplemented or modified only by a written instrument duly executed by or on behalf of each party hereto.

6.12    Invalid Provisions

If any provision contained in this Agreement or any other document executed in connection herewith is or shall become invalid, illegal or unenforceable in any jurisdiction, the invalidity, illegality or unenforceability of such provision in such jurisdiction shall not affect or impair the validity, legality or enforceability of (a) any other provision of this Agreement or any such other document in such jurisdiction or (b) such provision or any other provision of this Agreement or any such other document in any other jurisdiction.

6.13    Arbitration; Waiver of Sovereign Immunity

(a)    Any and all disputes and controversies arising under, relating to or in connection with this Agreement shall be settled by arbitration by a panel of three (3) arbitrators under the United Nations Commission on International Trade Law (UNCITRAL) Arbitration Rules then in force (the "UNCITRAL Rules") in accordance with the following terms and conditions:

(i)    In the event of any conflict between the UNCITRAL Rules and the provisions of this Agreement, the provisions of this Agreement shall prevail.

(ii)    The place of the arbitration shall be Geneva, Switzerland.

(iii)    Where there is only one claimant party and one respondent party, each shall appoint one arbitrator in accordance with the UNCITRAL Rules, and the two arbitrators so appointed shall appoint the third (and presiding) arbitrator in accordance with the UNCITRAL Rules within thirty (30) days from the appointment of the second arbitrator. In





the event of an inability to agree on a third arbitrator, the appointing authority shall be the International Court of Arbitration of the International Chamber of Commerce, acting in accordance with such rules as it may adopt for this purpose. Where there is more than one claimant party, or more than one respondent party, all claimants and/or all respondents shall attempt to agree on their respective appointment(s). In the event that all claimants and all respondents cannot agree upon their respective appointment(s) within thirty (30) Business Days of the date of the notice of arbitration, all appointments shall be made by the Chairman of the International Court of Arbitration of the International Chamber of Commerce.

(iv)    The English language shall be used as the written and spoken language for the arbitration and all matters connected to the arbitration.

(v)    The arbitrators shall have the power to grant any remedy or relief that they deem just and equitable and that is in accordance with the terms of this Agreement, including specific performance, and including, but not limited to, injunctive relief, whether interim or final, and any such relief and any interim, provisional or conservatory measure ordered by the arbitrators may be specifically enforced by any court of competent jurisdiction. Each party hereto retains the right to seek interim, provisional or conservatory measures from judicial authorities and any such request shall not be deemed incompatible with the agreement to arbitrate or a waiver of the right to arbitrate.

(vi)    The award of the arbitrators shall be final and binding on the parties to this Agreement.

(vii)    The award of the arbitrators may be enforced by any court of competent jurisdiction and may be executed against the person and assets of the losing party in any competent jurisdiction.

(b)    Except for arbitration proceedings pursuant to Section 6.13(a), no action, lawsuit or other proceeding (other than the enforcement of an arbitration decision, an action to compel arbitration or an application for interim, provisional or conservatory measures in connection with the arbitration) shall be brought by or between the parties to this Agreement in connection with any matter arising out of or in connection with this Agreement.

(c)    Each Shareholder irrevocably appoints CT Corporation System, located on the date hereof at 111 Eighth Avenue, 13th Floor, New York, New York 10011, USA, as its true and lawful agent and attorney to accept and acknowledge service of any and all process against it in any judicial action, suit or proceeding permitted by Section 6.13(b), with the same effect as if such party were a resident of the State of New York and had been lawfully served with such process in such jurisdiction, and waives all claims of error by reason of such service, provided that the party effecting such service shall also deliver a copy thereof on the date of such service to the other parties by facsimile as specified in Section 6.10. Each Shareholder will enter into such agreements with such agent as may be necessary to constitute and continue the appointment of such agent hereunder. In the event that any such agent and attorney resigns or otherwise becomes incapable of acting, the affected party will appoint a successor agent and attorney in New York reasonably satisfactory to each other party, with like powers. Each party hereby irrevocably submits to the non-exclusive jurisdiction of the United States District Court for the Southern District of New York and of any New York state court sitting in New York City, in connection with any such action, suit

TELENOR 

ECO TELECOM 

or proceeding, and agrees that any such action, suit or proceeding may be brought in such court, provided, however, that such consent to jurisdiction is solely for the purpose referred to in this Section 6.13 and shall not be deemed to be a general submission to the jurisdiction of said courts of or in the State of New York other than for such purpose. Each party hereby irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such action, suit or proceeding brought in such a court and any claim that any such action, suit or proceeding brought in such a court has been brought in an inconvenient forum. Nothing herein shall affect the right of any party to serve process in any other manner permitted by Law or to commence legal proceedings or otherwise proceed against any other party in any other jurisdiction in a manner not inconsistent with Section 6.13(b).

(d)     Each Party hereto hereby represents and acknowledges that it is acting solely in its commercial capacity in executing and delivering this Agreement and each of the other Principal Agreements to which it is a party and in performing its obligations hereunder and thereunder, and each such Party hereby irrevocably waives with respect to all disputes, claims, controversies and all other matters of any nature whatsoever that may arise under or in connection with this Agreement or any of the other Principal Agreements and any other document or instrument contemplated hereby or thereby, all immunity it may otherwise have as a sovereign, quasi-sovereign or state-owned entity (or similar entity) from any and all proceedings (whether legal, equitable, arbitral, administrative or otherwise), attachment of assets, and enforceability of judicial or arbitral awards.

6.14    Governing Law

This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, United States of America, without giving effect to any conflicts of laws principles thereof which would result in the application of the laws of another jurisdiction.

6.15    Counterparts

This Agreement may be executed in any number of counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.

IN WITNESS WHEREOF, the parties hereto have executed this Shareholders Agreement as of the date first above written.

TELENOR EAST INVEST AS

By _____

Tron Østby
Attorney-in-Fact


ECO TELECOM LIMITED

By _____

Serge Barychkov
Attorney-in-Fact

SHAREHOLDERS AGREEMENT NO. TE-2 DATED MAY 30, 2001

EXHIBIT A

## ENDORSEMENT

The undersigned shareholder of Open Joint Stock Company "Vimpel-Communications" (the "Company") hereby agrees to the terms and conditions of the Shareholders Agreement dated as of May 30, 2001 (the "Shareholders Agreement") between and among Telenor East Invest AS, Eco Telecom Limited and certain other shareholders of the Company party thereto from time to time, to which this Endorsement is attached, and (a) agrees to be fully bound by the terms and conditions of the Shareholders Agreement and Section 7.04 of the Primary Agreement (as defined in the Shareholders Agreement) as if such shareholder were an original signatory thereto, (b) hereby makes as of the date hereof, for the benefit of each of the other parties to the Shareholders Agreement, each of the representations and warranties set forth in Article II of the Shareholders Agreement, (c) represents that it owns the beneficial interest in the number of shares of capital stock or ADSs of the Company specified below and (d) agrees to deliver to each other party to the Shareholders Agreement, as soon as practicable (and in any event not later than seven (7) Business Days after the date hereof), an original copy of this Endorsement.

[Name of Shareholder]

By _____
    Name:
    Title:

Type of Shares/ADSs:

_____

Number of Shares:

_____

TELENOR

ECO TELECOM



SHAREHOLDERS AGREEMENT NO. TE-2 DATED MAY 30, 2001

SCHEDULE 1

SHARES

| Name of Shareholder | Type of Shares | Number of Shares |
|---|---|---|
| Telenor East Invest AS | Common Stock | 11,689,713 |
| Eco Telecom Limited | Preferred Stock | 6,426,600 |
| | Common Stock | 5,263,102 |

TELENOR

ECO TELECOM

SHAREHOLDERS AGREEMENT NO. TE-2 DATED MAY 30, 2001



SCHEDULE 2

### OTHER AGREEMENTS, UNDERTAKINGS
### AND ARRANGEMENTS RELATING TO SHARES

## TELENOR EAST INVEST AS

1.    Letter agreement dated May 30, 2001 between and among Eco Telecom, Telenor, the Company, Dr. Zimin and Overture relating to the Preferred Stock.

2.    Letter agreement dated May 30, 2001 between and among Telenor, the Company, VimpelCom Finance B.V., Glavsotkom, the Bee Line Fund, and Dr. Zimin relating to the termination of the letter agreements referred to therein.

## ECO TELECOM LIMITED

1.    Letter agreement dated May 30, 2001 between and among Eco Telecom, Telenor, the Company, Dr. Zimin and Overture relating to the Preferred Stock.

2.    Letter agreement dated May 30, 2001 between Dr. Zimin and Eco Telecom relating to Dr. Zimin's agreement not to nominate any candidate for election to the Board under certain conditions.

TELENOR

ECO TELECOM

SHAREHOLDERS AGREEMENT NO. TE-2 DATED MAY 30, 2001

SCHEDULE 3

## INDEPENDENT DIRECTORS

Terje Thon

TELENOR

ECO TELECOM

# EXHIBIT B

# GUARANTEE AGREEMENT

THIS AGREEMENT (this "Agreement") dated as of May 30, 2001, by and among CTF HOLDINGS LIMITED, a company organized and existing under the laws of Gibraltar (the "Limited Guarantor") and ECO HOLDINGS LIMITED, a company organized and existing under the laws of Gibraltar (the "General Guarantor" and, together with the Limited Guarantor, the "Guarantors"), in favor of, as applicable, OPEN JOINT STOCK COMPANY "VIMPEL-COMMUNICATIONS", an open joint stock company organized and existing under the laws of the Russian Federation ("VIP"), CLOSED JOINT STOCK COMPANY "VIMPELCOM-REGION", a closed joint stock company organized and existing under the laws of the Russian Federation ("VIP-R") and TELENOR EAST INVEST AS, a company organized and existing under the laws of Norway ("Telenor East Invest AS", and, together with VIP and VIP-R, collectively, the "Beneficiaries" and each, individually, a "Beneficiary").

## WITNESSETH:

WHEREAS, (a) Eco Telecom Limited, a company organized and existing under the laws of Gibraltar ("Eco Telecom"), Telenor East Invest AS and VIP are parties to the Primary Agreement dated as of the date hereof (the "VIP Primary Agreement") pursuant to which each of Telenor East Invest AS and Eco Telecom has agreed to purchase certain shares of voting capital stock in VIP, (b) Telenor East Invest AS and Eco Telecom are parties to the Shareholders Agreement dated as of the date hereof (the "VIP Shareholders Agreement") and (c) Telenor East Invest AS, Eco Telecom and VIP are parties to the Registration Rights Agreement dated as of the date hereof (the "VIP Registration Rights Agreement", and, together with the VIP Primary Agreement and the VIP Shareholders Agreement, collectively, the "VIP Agreements") pursuant to which VIP has agreed to grant each of Telenor East Invest AS and Eco Telecom certain registration rights with respect to their ownership of shares of common stock in VIP;

WHEREAS, Eco Telecom, Telenor East Invest AS, VIP and VIP-R are parties to (a) the Primary Agreement dated as of the date hereof (the "VIP-R Primary Agreement") pursuant to which each of Telenor East Invest AS, VIP and Eco Telecom has agreed, or has the right, to subscribe for and purchase shares of voting capital stock in VIP-R, (b) the Shareholders Agreement dated as of the date hereof (the "VIP-R Shareholders Agreement") and (c) the Registration Rights Agreement dated as of the date hereof (the "VIP-R Registration Rights Agreement", and, together with the VIP-R Primary Agreement and the VIP-R Shareholders Agreement, collectively, the "VIP-R Agreements") pursuant to which VIP-R has agreed to grant each of Telenor East Invest AS, Eco Telecom and VIP certain registration rights with respect to their ownership of shares of common stock in VIP-R;

WHEREAS, Eco Telecom, VIP, VIP-R, Citibank, N.A. and Citibank T/O (OOO) are parties to that certain Escrow Agreement (the "Escrow Agreement"), dated as of the date hereof (the Escrow Agreement, together with the VIP Agreements and the VIP-R Agreements, collectively, the "Transaction Agreements");

WHEREAS, Eco Telecom is an affiliate of the Guarantors; and

| CTF HOLDINGS | ECO HOLDINGS | VIMPELCOM | VIMPELCOM-R | TELENOR |
|---|---|---|---|---|

WHEREAS, to induce each of VIP, VIP-R and Telenor East Invest AS to enter into and perform their obligations under the Transaction Agreements to which each is a party, the Guarantors have agreed to enter into and perform its obligations under this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## ARTICLE I
## DEFINITIONS AND INTERPRETATION

1.1    Unless otherwise defined herein, terms defined in the VIP Primary Agreement are used herein as therein defined, and the rules of interpretation set forth in Section 1.02 thereof shall apply to this Agreement, as if set forth in full herein, *mutatis mutandis*.

## ARTICLE II
## GUARANTEE

2.1.    The General Guarantor hereby guarantees to VIP, Telenor East Invest AS and VIP-R, as the case may be, the due, complete and timely performance and/or fulfillment by Eco Telecom of each and every obligation of Eco Telecom under each of the Transaction Agreements other than the payment obligations of Eco Telecom arising under Section 2.02 of the VIP Primary Agreement and Article II of the VIP-R Primary Agreement (such obligations of Eco Telecom, other than the payment obligations of Eco Telecom arising under Section 2.02 of the VIP Primary Agreement and Article II of the VIP-R Primary Agreement, are collectively referred to herein as "General Obligations").

2.2.    The Limited Guarantor hereby guarantees to VIP, Telenor East Invest AS and VIP-R, as the case may be, the due, complete and timely performance and/or fulfillment by Eco Telecom of the following obligations of Eco Telecom: (i) Section 7.04 of the VIP Primary Agreement, (ii) Article II (Transfers), Section 5.02 (Non-Compete) and Section 5.03 (Debt Acquisition) of the VIP Registration Rights Agreement, (iii) Article III (Transfers) of the VIP Shareholders Agreement, and (iv) Article IV (Transfers), Section 5.03 (Debt Acquisition) and Section 6.02 (Non-Compete) of the VIP-R Shareholders Agreement (all such obligations are collectively referred to herein as "Limited Obligations", and all Limited Obligations and General Obligations are collectively referred to herein as "Obligations").

2.3.    It is understood and agreed that, subject to Sections 2.4 and 2.6 below, nothing herein shall require either Guarantor to perform, or cause to be performed, any obligation under circumstances in which Eco Telecom would not be required, pursuant to the terms of the relevant Transaction Agreement, to perform such obligation by reason of a breach or misrepresentation by any other party to the relevant Transaction Agreement or the failure of any condition to such performance to be satisfied. It is also understood and agreed that such guarantees are continuing guarantees and that, subject to the preceding sentence, the General Obligations of the General Guarantor and the Limited Obligations of the Limited Guarantor are and shall be absolute under any and all circumstances.

| CTF HOLDINGS | ECO HOLDINGS | VDXPELCOM | VDXPELCOM-R | TELENOR |
|---|---|---|---|---|

2.4.    Each Guarantor hereby agrees that its liability hereunder shall be unaffected by (a) any amendment or modification of the provisions of the Transaction Agreements unless such amendment or modification increases the amount of the Obligation or is executed by the Guarantor, (b) any extension of time for performance required thereby, (c) except as expressly provided herein, the release of, or unenforceability against, Eco Telecom or any other Person from performance or observance of any of the Obligations by operation of law or otherwise (other than by payment or performance, to the full extent required thereby), whether made with or without notice to such Guarantor, or (d) any bankruptcy, insolvency, reorganization, arrangement, assignment for the benefit of creditors, receivership or trusteeship affecting Eco Telecom or any other Person, or any of their respective successors or assigns, whether or not any notice thereof is given to such Guarantor.

2.5.    Each Guarantor hereby waives any and all legal requirements that any Beneficiary shall commence any arbitration or institute any action or proceedings at law or in equity against the other Guarantor, Eco Telecom or any other Person, or exhaust its remedies against the other Guarantor, Eco Telecom or any other Person, in respect of any of the Transaction Agreements, as a condition precedent to bringing an action against such Guarantor under this Agreement.

2.6.    The Obligations shall be deemed not to have been observed or performed, and the Guarantors' obligations in respect thereof shall continue and not be discharged, to the extent that any observance or performance thereof by Eco Telecom is recovered from or paid over by or for the account of any Beneficiary for any reason, including as a preference or fraudulent transfer or by virtue of any subordination (whether present or future or contractual or otherwise) of the Obligations, whether such recovery or payment over is effected by any judgment, decree or order of any court or governmental agency, by any plan of reorganization or by settlement or compromise by any Beneficiary (provided that the Guarantors have given consent, which the Guarantors shall not unreasonably withhold or delay, to any such settlement or compromise) of any claim for any such recovery or payment over. The General Guarantor hereby expressly agrees that it shall be liable hereunder with respect to any General Obligation whenever such a recovery or payment over thereof occurs. The Limited Guarantor hereby expressly agrees that it shall be liable hereunder with respect to any Limited Obligation whenever such a recovery or payment over thereof occurs.

2.7.    Each Guarantor hereby waives notice of acceptance of this Agreement by any Beneficiary and of presentment for payment, demand, protest, notice of demand, of protest and of dishonor, notices of default and of nonpayment and all other notices and demands of every kind and description now or hereafter provided by any statute or rule of law.

2.8.    Each Guarantor hereby waives any right or claim of right to cause a marshaling of Eco Telecom's or any other Person's assets or to cause any Beneficiary to proceed against any security for the Obligations before proceeding against the Guarantor.

| CTF HOLDINGS | ECO HOLDINGS | VIMPELCOM | VIMPELCOM-R | TELENOR |
|---|---|---|---|---|

## ARTICLE III
## CERTAIN COVENANTS

3.1    Without prejudice to the generality of Article II, each Guarantor hereby agrees:

(a)    to cause Eco Telecom, and any other Controlled Affiliate of such Guarantor which is a successor to or permitted assign of all or any part of Eco Telecom's obligations under the VIP Primary Agreement, the VIP Registration Rights Agreement, the VIP Shareholders Agreement and/or the VIP-R Shareholders Agreement, to perform and comply with Eco Telecom's and such other Controlled Affiliate's respective obligations under Section 7.04 of the VIP Primary Agreement, Article II (Transfers), Section 5.02 (Non-Compete) and Section 5.03 (Debt Acquisition) of the VIP Registration Rights Agreement, Article III (Transfers) of the VIP Shareholders Agreement and/or Article IV (Transfers of Securities), Section 5.03 (Debt Acquisition) and Section 6.02 (Non-Compete) of the VIP-R Shareholders Agreement, as the case may be, provided that this Article III(a) shall not release Eco Telecom or any such other Controlled Affiliate from any of their respective obligations thereunder;

(b)    not to take or permit any of its Controlled Affiliates to take any action which would be prohibited by any such Section or Article if such Guarantor or any such Controlled Affiliate were an original signatory to any such Agreement as a "Purchaser" or "Shareholder", in each case to the extent provided therein;

(c)    to comply with, and cause each of its Controlled Affiliates to comply with, the obligations of Eco Telecom under any such Section or Article as if such Guarantor or any such Controlled Affiliate were an original signatory to such Agreement in place of Eco Telecom, in each case to the extent provided therein; and

(d)    to cause the transferee (the "Transferee") of the General Guarantor's entire direct or indirect interest in either of VIP or VIP-R to execute and deliver to each Beneficiary an endorsement ("Endorsement") to this Agreement in the form of Exhibit A as a condition to any such transfer.

3.2    VIP shall use reasonable efforts to notify the Limited Guarantor as soon as reasonably practicable upon obtaining knowledge of any breach of the covenants set forth in the preceding Section 3.1; provided, that the liability of the Guarantors in connection with any such breach shall not be affected by any failure by VIP to provide such notice.

3.3    Upon receipt by each Beneficiary of a duly executed Endorsement from the Transferee, the General Guarantor shall be automatically released from any liability under this Agreement.

| CTF HOLDINGS | ECO HOLDINGS | VIMPELCOM | VIMPELCOM-R | TELENOR |
|---|---|---|---|---|

## ARTICLE IV
## TERM

4.1    This Agreement and each Guarantor's obligations hereunder shall take effect on the date hereof and remain in effect until the date which is one year after the date on which all of the Transaction Agreements are terminated.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES

5.1.    Each Guarantor hereby represents and warrants to each Beneficiary as follows:

(a)    Organization. Such Guarantor is a company duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation or formation.

(b)    Capacity and Authority. Such Guarantor has all requisite corporate or other power and authority to execute and deliver this Agreement and to perform its obligations hereunder.   The execution and delivery by such Guarantor of this Agreement, and the performance by such Guarantor of its obligations hereunder, have been duly authorized by such Guarantor, and no other corporate or other action on the part of such Guarantor is required.   This Agreement has been duly executed and delivered by such Guarantor and constitutes the valid and binding obligation of such Guarantor, enforceable against such Guarantor in accordance with its terms, except as the same may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect, affecting the enforcement of creditors' rights generally.

(c)    Validity of Agreement. The execution, delivery and performance of this Agreement by such Guarantor does not and will not (i) conflict with, or result in a breach of any provision of, such Guarantor's charter or other constitutive documents, or (ii) conflict with, result in a breach of any provision of, or constitute a default under, any agreement or instrument by which such Guarantor or any of its assets or properties is bound, or (iii) conflict with, or result in a breach or violation of any law, regulation, decree or order by which such Guarantor or any of its assets or properties is bound, or (iv) require any authorization, consent, order, permit or approval of, or notice to, or filing, registration or qualification with, any governmental, administrative, regulatory or judicial authority; except, in the case of clauses (ii), (iii) and (iv) above, where such conflicts, breaches, defaults or violations or such failure to obtain or make any such authorizations, consents, orders, permits, approvals, notices, filings, registrations or qualifications would not have a material adverse effect on such Guarantor or the ability of such Guarantor to perform its obligations hereunder.

(d)    Legal Proceedings. There are no actions, suits, proceedings or arbitrations pending or, to the knowledge of such Guarantor, threatened, against such Guarantor or any of its assets or properties that could reasonably be expected to result in the issuance of any writ, judgment, decree, injunction or similar order of any governmental or regulatory authority

| CTF HOLDINGS | ECO HOLDINGS | VIMPELCOM | VIMPELCOM-R | TELENOR |
|---|---|---|---|---|

restraining, enjoining or otherwise prohibiting or making illegal the execution, delivery or performance by such Guarantor of this Agreement.

## ARTICLE VI
## LIMITED RECOURSE FOR CERTAIN OBLIGATIONS

6.1.    Limited Recourse for General Obligations.  Each of the parties to this Agreement acknowledges and agrees that the maximum amount payable by the General Guarantor in respect of all claims under this Agreement by all Beneficiaries shall be limited to an aggregate of One Hundred and Sixty Million U.S. Dollars (US$160,000,000) less the sum of (x) any amounts up to US$160,000,000 paid by Eco Telecom to the Beneficiaries in damages or as the result of a settlement of any claim arising from any failure to duly, completely and timely perform and/or fulfill any obligation under any of the Transaction Agreements and (y) any amounts paid by the Limited Guarantor to any Beneficiary hereunder, and that the Beneficiaries will have no further recourse to the General Guarantor hereunder.

6.2.    Limited Recourse for Limited Obligations.  Each of the parties to this Agreement acknowledges and agrees that the maximum amount payable by the Limited Guarantor under this Agreement shall be limited to One Hundred and Sixty Million U.S. Dollars (US$160,000,000) less the sum of (x) any amounts up to US$160,000,000 paid by Eco Telecom to the Beneficiaries in damages or as the result of a settlement of any claim arising from any failure to duly, completely and timely perform and/or fulfill any obligation under any of the Transaction Agreements and (y) any amounts paid by the General Guarantor to any Beneficiary under this Agreement, and that the Beneficiaries will have no further recourse to the Limited Guarantor hereunder.

## ARTICLE VII
## MISCELLANEOUS PROVISIONS

7.1.    Notices.  All notices, requests and other communications hereunder must be in writing and will be deemed to have been duly given only if delivered personally or by facsimile transmission or sent by courier to the parties at the following addresses or facsimile numbers:

If to the General Guarantor, to:

Eco Holdings Limited
Suite 2, 4 Irish Place
Gibraltar
Attn: Franz Wolf

Facsimile No.:    +350 41988

| CTF HOLDINGS | ECO HOLDINGS | VIMPELCOM | VIMPELCOM-R | TELENOR |
|---|---|---|---|---|

with a copy to:

OOO Alfa-Eco
21, Novy Arbat
121019 Moscow
Russian Federation
Attn: Stanislav Shekshnya

Facsimile No.: +7 095 201 5914

and a copy to:

. Herbert Smith CIS Legal Services
. 24, Korobeinikov Pereulok
119034 Moscow
Russian Federation
Attn: Vladimir Afonkin

Facsimile No.: +7 095 363 6501

If to the Limited Guarantor, to:

CTF Holdings Limited
Suite 2, 4 Irish Place
Gibraltar
Attn: Franz Wolf

Facsimile No.: +350 41988

with a copy to:

OOO Alfa-Eco
21, Novy Arbat
121019 Moscow
Russian Federation
Attn: Stanislav Shekshnya

Facsimile No.: +7 095 201 5914

| CTF HOLDINGS | ECO HOLDINGS | VD-OPELCOM | VD-OPELCOM-R | TELENOR |
|---|---|---|---|---|

and a copy to:

Herbert Smith CIS Legal Services
24, Korobeinikov Pereulok
119034 Moscow
Russian Federation
Attn: Vladimir Afonkin

Facsimile No.: +7 095 363 6501

If to VIP, to:

OAO "Vimpel-Communications"
10 Ulitsa 8-Marta
Building 14
125083 Moscow
Russian Federation
Attn: Chief Executive Officer

Facsimile No.: +7 095 755 3682

with a copy to:

Akin, Gump, Strauss, Hauer & Feld, L.L.P.
7 Gasheka Street, Ducat Place II
123056 Moscow
Russian Federation
Attn: Melissa J. Schwartz

Facsimile No.: +7 095 974 2412

If to VIP-R, to:

ZAO "VimpelCom-Region"
10 Ulitsa 8-Marta
Building 14
125083 Moscow
Russian Federation
Attn: General Counsel

Facsimile No.: +7 095 755 3682

| CTF HOLDINGS | ECO HOLDINGS | VIMPELCOM | VIMPELCOM-R | TELENOR |
|---|---|---|---|---|

with a copy to:

Akin, Gump, Strauss, Hauer & Feld, L.L.P.
7 Gasheka Street, Ducat Place II
123056 Moscow
Russian Federation
Attn: Melissa J. Schwartz

Facsimile No.: +7 095 974 2412;

and a copy to:

Herbert Smith CIS Legal Services
24, Korobeinikov Pereulok,
119034 Moscow
Russian Federation
Attn: Vladimir Afonkin

Facsimile No.: +7 095 363 6501

If to Telenor East Invest AS, to:

Telenor East Invest AS
Keysers Gate 13
N-0130 Oslo
Norway
Attn: Henrik Torgersen

Facsimile No.: +47 22 77 91 59

with a copy to:

Advokatene i Telenor
Universitatsgaten 2
N-0130 Oslo
Norway
Attn: Bjørn Hogstad

Facsimile No.: +47 22 11 44 61

All such notices, requests and other communications will (a) if delivered personally against receipt to the address as provided in this Section 7.1, be deemed given upon delivery, (b) if delivered by facsimile transmission to the facsimile number as provided in this Section 7.1, be deemed given upon receipt, and (c) if delivered by courier in the manner described above to the address as provided in this Section 7.1, be deemed given upon confirmed receipt (in each case

| CTF HOLDINGS | ECO HOLDINGS | VIMPELCOM | VIMPELCOM-R | TELENOR |
|---|---|---|---|---|

regardless of whether such notice, request or other communication is received by any other Person to whom a copy of such notice is to be delivered pursuant to this Section 7.1). Any party from time to time may change its address, facsimile number or other information for the purpose of notices to that party by giving written notice specifying such change to the other parties hereto.

7.2.    Entire Agreement.    This Agreement, together with the Transaction Agreements, supersedes all prior discussions and agreements between the parties with respect to the subject matter hereof and thereof, and contains the sole and entire agreement between the parties hereto and thereto with respect to the subject matter hereof and thereof.

7.3.    Waiver.  Any term or condition of this Agreement may be waived at any time by the party that is entitled to the benefit thereof, but no such waiver shall be effective unless set forth in a written instrument duly executed by or on behalf of the party waiving such term or condition. No waiver by any party of any term or condition of this Agreement, in any one or more instances, shall be deemed to be or construed as a waiver of the same or any other term or condition of this Agreement on any future occasion.

7.4.    Amendment.  This Agreement may be amended, supplemented or modified only by a written instrument duly executed by or on behalf of each party hereto.

7.5.    No Third Party Beneficiary.  The terms and provisions of this Agreement are intended solely for the benefit of each party hereto and their respective successors or permitted assigns, and it is not the intention of the parties to confer third party beneficiary rights upon any other Person.

7.6.    No Assignment; Binding Effect.  Neither this Agreement nor any right, interest or obligation hereunder may be assigned or transferred by any party hereto without the prior written consent of the other parties hereto and any attempt to do so will be void. Subject to the preceding sentence, this Agreement is binding upon, inures to the benefit of and is enforceable by the parties hereto and their respective successors and permitted assigns.

7.7.    Headings.  The headings contained in this Agreement are for convenience of reference only, and do not form a part hereof and in no way interpret or construe the provisions hereof.

7.8.    No Joint Venture.  Nothing contained herein shall be construed to constitute a joint venture or an agency or partnership relationship among any of the parties hereto.

7.9.    Arbitration; Consent to Jurisdiction; Service of Process; Waiver of Sovereign Immunity.

(a)    Any and all disputes and controversies arising under, relating to or in connection with this Agreement shall be settled by arbitration by a panel of three (3) arbitrators under the United Nations Commission on International Trade Law (UNCITRAL) Arbitration

| CTF HOLDINGS | ECO HOLDINGS | VIMPELCOM | VIMPELCOM-R | TELENOR |
|---|---|---|---|---|

Rules then in force (the "UNCITRAL Rules") in accordance with the following terms and conditions:

(i)      In the event of any conflict between the UNCITRAL Rules and the provisions of this Agreement, the provisions of this Agreement shall prevail.

(ii)     The place of the arbitration shall be Geneva, Switzerland.

(iii)    Where there is only one claimant party and one respondent party, each shall appoint one arbitrator in accordance with the UNCITRAL Rules, and the two arbitrators so appointed shall appoint the third (and presiding) arbitrator in accordance with the UNCITRAL Rules within thirty (30) days from the appointment of the second arbitrator. In the event of an inability to agree on a third arbitrator, the appointing authority shall be the International Court of Arbitration of the International Chamber of Commerce, acting in accordance with such rules as it may adopt for this purpose. Where there is more than one claimant party, or more than one respondent party, all claimants and/or all respondents shall attempt to agree on their respective appointment(s). In the event that all claimants and all respondents cannot agree upon their respective appointments(s) within thirty (30) Business Days of the date of the notice of arbitration, all appointments shall be made by the International Court of Arbitration of the International Chamber of Commerce.

(iv)     The English language shall be used as the written and spoken language for the arbitration and all matters connected to the arbitration.

(v)      The arbitrators shall have the power to grant any remedy or relief that they deem just and equitable and that is in accordance with the terms of this Agreement, including specific performance, and including, but not limited to, injunctive relief, whether interim or final, and any such relief and any interim, provisional or conservatory measure ordered by the arbitrators may be specifically enforced by any court of competent jurisdiction. Each party hereto retains the right to seek interim, provisional or conservatory measures from judicial authorities and any such request shall not be deemed incompatible with the agreement to arbitrate or a waiver of the right to arbitrate.

(vi)     The award of the arbitrators shall be final and binding on the parties to this Agreement.

(vii)    The award of the arbitrators may be enforced by any court of competent jurisdiction and may be executed against the person and assets of the losing party in any competent jurisdiction.

(b)      Except for arbitration proceedings pursuant to Section 7.9(a), no action, lawsuit or other proceeding (other than the enforcement of an arbitration decision, an action to compel arbitration or an application for interim, provisional or conservatory measures in connection with the arbitration) shall be brought by or between the parties to this Agreement in connection with any matter arising out of or in connection with this Agreement.

| CTF HOLDINGS | ECO HOLDINGS | VIMPELCOM | VIMPELCOM-R | TELENOR |
|---|---|---|---|---|

(c)    Each party hereto irrevocably appoints CT Corporation System, located on the date hereof at 111 Eighth Avenue, 13th Floor, New York, New York 10011, USA, as its true and lawful agent and attorney to accept and acknowledge service of any and all process against it in any judicial action, suit or proceeding permitted by Section 7.9(b), with the same effect as if such party were a resident of the State of New York and had been lawfully served with such process in such jurisdiction, and waives all claims of error by reason of such service, provided that the party effecting such service shall also deliver a copy thereof on the date of such service to the other parties by facsimile as specified in Section 7.1. Each party to this Agreement will enter into such agreements with such agent as may be necessary to constitute and continue the appointment of such agent hereunder. In the event that any such agent and attorney resigns or otherwise becomes incapable of acting, the affected party will appoint a successor agent and attorney in New York reasonably satisfactory to each other party, with like powers. Each party hereby irrevocably submits to the non-exclusive jurisdiction of the United States District Court for the Southern District of New York and of any New York state court sitting in New York City, in connection with any such action, suit or proceeding, and agrees that any such action, suit or proceeding may be brought in such court, provided, however, that such consent to jurisdiction is solely for the purpose referred to in this Section 7.9 and shall not be deemed to be a general submission to the jurisdiction of said courts of or in the State of New York other than for such purpose. Each party hereby irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such action, suit or proceeding brought in such a court and any claim that any such action, suit or proceeding brought in such a court has been brought in an inconvenient forum. Nothing herein shall affect the right of any party to serve process in any other manner permitted by Law or to commence legal proceedings or otherwise proceed against any other party in any other jurisdiction in a manner not inconsistent with Section 7.9(b).

(d)    Each of the Guarantors and Beneficiaries hereby represents and acknowledges that it is acting solely in its commercial capacity in executing and delivering this Agreement and each of the other Principal Agreements to which it is a party and in performing its obligations hereunder and thereunder, and each of the Guarantors and Beneficiaries hereby irrevocably waives with respect to all disputes, claims, controversies and all other matters of any nature whatsoever that may arise under or in connection with this Agreement or any of the Principal Agreements and any other document or instrument contemplated hereby or thereby, all immunity it may otherwise have as a sovereign, quasi-sovereign or state-owned entity (or similar entity) from any and all proceedings (whether legal, equitable, arbitral, administrative or otherwise), attachment of assets, and enforceability of judicial or arbitral awards.

7.10.   Invalid Provisions. If any provision in this Agreement or any other document executed in connection herewith is or shall become invalid, illegal or unenforceable in any jurisdiction, the invalidity, illegality or unenforceability of such provision in such jurisdiction shall not affect or impair the validity, legality or enforceability of (i) any other provision of this Agreement or any such other document in such jurisdiction or (ii) such provision or any other provision of this Agreement or any such other document in any other jurisdiction.

CTF HOLDINGS    ECO HOLDINGS    VIMPELCOM    VIMPELCOM-R    TELENOR

7.11.   Governing Law.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, United States of America, without giving effect to any conflicts of laws principles thereof which would result in the application of the laws of another jurisdiction.

7.12.   Counterparts.    This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which constitute one and the same instrument

7.13.   Expenses.  Each party shall pay its own expenses and costs incidental to its negotiation, execution, delivery and performance of this Agreement.

[Remainder of Page Intentionally Blank; Signature Pages Follow]

| CTF HOLDINGS | ECO HOLDINGS | VIMPELCOM | VIMPELCOM-R | TELENOR |
|---|---|---|---|---|

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by each party hereto as of the day and year first above written.

The Limited Guarantor:

CTF HOLDINGS LIMITED

By _____
Name: Nigel J. Robinson
Title: Attorney-in-Fact

The General Guarantor:

ECO HOLDINGS LIMITED

By _____
Name: Serge Barychkov
Title: Attorney-in-Fact

The Beneficiaries:

OPEN JOINT-STOCK COMPANY
"VIMPEL-COMMUNICATIONS"

By _____
Name: Dmitri B. Zimin
Title: President

By _____
Name: Vladimir M. Bychenkov
Title: Chief Accountant

GUARANTEE AGREEMENT NO. CEVRT-9 DATED MAY 30, 2001                    PAGE 15 OF 16

CLOSED JOINT-STOCK COMPANY
"VIMPELCOM-REGION"

By _____
Name: Maurice Worsfold
Title: Attorney-in-Fact

By _____
Name: Galina V. Nesterova
Title: Chief Accountant


TELENOR EAST INVEST AS

By _____
Name: Tron Østby
Title: Attorney-in-Fact

e 20785

EXHIBIT TO GUARANTEE AGREEMENT NO. TVE-9 DATED MAY 30, 2001

EXHIBIT A

ENDORSEMENT

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the undersigned transferee (the "Transferee") of the direct or indirect interest of Eco Holdings Limited (the "General Guarantor") in Open Joint Stock Company "Vimpel-Communications" ("VIP") or Closed Joint Stock Company "VimpelCom-Region" ("VIP-R") hereby (i) represents and warrants that it is a Controlled Affiliate of the Limited Guarantor, and (ii) agrees for the benefit of the hereinafter defined Beneficiaries to be fully bound by the terms and conditions of the Guarantee Agreement (the "Guarantee Agreement"), dated as of May 30, 2001, by and among the General Guarantor, CTF Holdings Limited, VIP, VIP-R and Telenor East Invest AS (the parties to the Guarantee Agreement other than the General Guarantor being the "Beneficiaries") as if the Transferee were an original signatory to the Guarantee Agreement as the General Guarantor.

[Name of Transferee]

_____

By _____
   Name:
   Title:

CTF HOLDINGS     ECO HOLDINGS     VIMPELCOM     VIMPELCOM-R

               S.B.

# EXHIBIT C

# Altimo Holdings & Investments Limited

4 Irish Place, Gibraltar          Tel: +350 41977; Fax: +350 41988; Email: ctfh@ctfh.gi

Telenor East Invest AS
Snaroyveien 30
N-1331 Fornebu
Norway
Attn.: Jan Edvard Thygesen
CC:   Henrik Torgersen
Facsimile No.: +47 67 89 48 18

CC:  Advokatene i Telenor
Universitatsgaten 2
N-0130 Oslo
Norway
Attn.: Bjorn Hogstad
Facsimile No.: +47 22 11 44 61

By fax and by post

20 March 2007

Dear Mr. Thygesen and Mr. Torgersen:

Pursuant to the Guarantee Agreement dated 30 May 2001 by and among CTF HOLDINGS LIMITED, ECO HOLDINGS LIMITED, OPEN JOINT STOCK COMPANY "VIMPEL-COMMUNICATIONS" and TELENOR EAST INVEST AS, and the Interim Award dated 25 January 2007 in the UNCITRAL arbitration captioned Telenor East Invest AS v. Eco Telecom Limited, et. al, we hereby provide you with the Endorsement executed by Altimo Holdings & Investments Limited dated 19 March 2007.

The original copy of the Endorsement was sent by express mail to your address (as stated above).

Kind regards,

Franz Wolf
Director

Enclosures: 1 page.

Registered address: P.O. Box 3339, Geneva Place, 333 Waterfront Drive, Road Town, Tortola, British Virgin Islands

JOURNAL

```
TIME : 20/03/2007 15:38
NAME : CTF HOLDINGS GIBRALT
FAX  : 0035041988
TEL  : 0035041977
SER.# : 000B5J213293
```

| NO. | DATE | TIME | FAX NO./NAME | DURATION | PAGE(S) | RESULT | COMMENT | |
|-----|------|------|--------------|----------|---------|--------|---------|---|
| #089 | 20/03 | 10:14 | | 02:26 | 04 | OK | TX | |
| #091 | 20/03 | 10:18 | | 01:11 | 05 | OK | TX | ECM |
| #092 | 20/03 | 10:28 | | 03:23 | 03 | OK | TX | |
| #094 | 20/03 | 10:32 | | 01:12 | 03 | OK | TX | |
| #093 | 20/03 | 10:44 | | 00 | 00 | BUSY | TX | |
| #095 | 20/03 | 10:48 | | 00 | 00 | BUSY | TX | |
| | 20/03 | 11:04 | | 33 | 01 | OK | RX | ECM |
| | 20/03 | 11:14 | | 48 | 01 | OK | RX | ECM |
| | 20/03 | 15:27 | | 06:56 | 10 | OK | RX | ECM |
| #098 | 20/03 | 15:36 | 004767894818 | 31 | 02 | OK | TX | ECM |
| | 20/03 | 15:37 | | 25 | 00 | ERROR | RX | |

```
CV  : COVERPAGE
POL : POLLING
RET : RETRIEVAL
PC  : PC-FAX
```

# ENDORSEMENT

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the undersigned transferee (the "**Transferee**") of the direct or indirect interest of Eco Holdings Limited (the "**General Guarantor**") in Open Joint Stock Company "Vimpel-Communications" ("**VIP**") or Closed Joint Stock Company "VimpelCom-Region" (**VIP-R**") hereby (i) represents and warrants that it is a Controlled Affiliate of the Limited Guarantor, and (ii) agrees for the benefit of the hereinafter defined Beneficiaries to be fully bound by the terms and conditions of the Guarantee Agreement (the "**Guarantee Agreement**"), dated as of May 30, 2001, by and among the General Guarantor, CTF Holdings Limited, VIP, VIP-R, and Telenor East Invest AS (the parties to the Guarantee Agreement other than the General Guarantor being the "**Beneficiaries**") as if the Transferee were an original signatory to the Guarantee Agreement as the General Guarantor.

**For and on behalf of Altimo Holdings & Investments Limited**

By _____

Name: Franz Wolf
Title: Director
Date: 19 March 2007

# EXHIBIT D

**In an ad hoc arbitration pursuant to UNCITRAL Rules**

**BETWEEN:**

## ECO TELECOM LIMITED
### (Gibraltar)

<u>**Claimant**</u>

**AND**

## TELENOR EAST INVEST AS
### (Norway)

<u>**Respondent**</u>

---

## NOTICE OF ARBITRATION

---

**21 March 2008**

Dominic Pellew
Lovells CIS
22 Voznesensky Pereulok
Moscow
125009 Russia
Tel: +7 495 933 3000
Fax: +7 495 933 3001

Ronald S. Rolfe
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York
New York 10019, USA
Tel: +1 212 474 1714
Fax: +1 212 474 3700

**Attorneys for Claimant**

1.   This Notice of Arbitration is submitted pursuant to Article 3 of the Arbitration Rules of the United Nations Commission on International Trade Law (the **"UNCITRAL Rules"**). Claimant claims damages from Respondent for breach of a shareholders' agreement concluded between Claimant and Respondent on 30 May 2001 (the **"Shareholders Agreement"**) and under applicable law governing the duties of shareholders and corporate directors. The Shareholders Agreement is attached at **Annex 1**.

## A.   THE PARTIES

2.   Claimant in this Arbitration is Eco Telecom Limited (**"Eco Telecom"**).

3.   Eco Telecom is a company incorporated under the laws of Gibraltar. Its address is Suite 2, 4 Irish Place, Gibraltar.

4.   Eco Telecom is represented in this arbitration by:

> Dominic Pellew
> Lovells CIS
> 22 Voznesensky Pereulok
> Moscow
> 125009 Russia
> Tel: +7 495 933 3000
> Fax: +7 495 933 3001

and

> Ronald S. Rolfe
> Cravath, Swaine & Moore LLP
> Worldwide Plaza
> 825 Eighth Avenue
> New York
> New York 10019, USA
> Tel: +1 212 474 1714
> Fax: +1 212 474 3700

5.    Respondent in this Arbitration is Telenor East Invest AS ("**Telenor**").

6.    Telenor is a company incorporated under the laws of Norway. Its address is Universitetsgaten 2, N-0130 Oslo, Norway, Facsimile number +47 22 77 91 59, attn. Henrik Torgensen. This Notice of Arbitration is being delivered by courier to this address, and sent to this fax number.

**B.    ARBITRATION CLAUSE**

7.    This claim is submitted in accordance with Section 6.13 of the Shareholders Agreement (at Annex 1). Section 6.13 provides, in summary, that any and all disputes arising under, relating to or in connection with the Shareholders Agreement shall be resolved by ad hoc arbitration under UNCITRAL rules by three (3) arbitrators, and the legal seat of the arbitration shall be Geneva, Switzerland.

**C.    CONTRACT**

8.    The present claim arises under, relates to or is in connection with the Shareholders Agreement (at Annex 1).

**D.    GENERAL NATURE OF CLAIM**

9.    The claim relates to the purchase by Open Joint-Stock Company Vimpelcom ("**Vimpelcom**") of 100% of the issued share capital of a Ukrainian mobile telephone company, Closed Joint-Stock Company Ukrainian Radiosystems ("**URS**"), in November 2005. Vimpelcom is a Russian telecommunications company majority owned by Eco Telecom and Telenor. Vimpelcom is currently one of the largest mobile operators in Russia. Its market value is close to US$ 30 billion. Vimpelcom's ADRs are traded on the New York Stock Exchange. The Shareholders Agreement imposes certain rights and obligations on Telenor and Eco Telecom relating to the management of Vimpelcom's affairs.

10. Eco Telecom asserts claims against Telenor for acting in bad faith in violation of the Shareholders Agreement and applicable law by causing its nominated directors on the board of directors of Vimpelcom, by agreement, direction or otherwise, to violate their fiduciary duties to Vimpelcom and the shareholders by blocking the purchase by Vimpelcom of URS. As a result of Telenor's actions, the purchase was delayed by approximately one year, i.e. from November 2004 to November 2005. Had the purchase been completed in November 2004, the present value of URS, and hence of Vimpelcom and of Eco Telecom's stake in Vimpelcom, would be significantly higher than it is.

11. Telenor blocked the purchase for its own commercial reasons — because it did not want Vimpelcom to acquire a business that competed with Closed Joint-Stock Company Kyivstar, a Ukrainian cellular provider, in which companies affiliated to Telenor have a majority interest. Kyivstar competes for the leading position on the Ukrainian market, and its fair market value has been assessed at around US$ 10 billion. This motive was in direct contradiction to the interests of Vimpelcom, to the interests of Vimpelcom's other shareholders and to the interests of Eco Telecom as a major shareholder of Vimpelcom.

12. The actions of Telenor violated the Shareholders Agreement and the duty of good faith that is implied in that agreement and caused the directors, by agreement, direction or otherwise, to violate applicable law governing their fiduciary duties and responsibilities as directors of Vimpelcom. Telenor is directly responsible for these breaches and for violation of its own duties to Vimpelcom and the other shareholders, including Eco Telecom.

### E.   RELIEF SOUGHT

13. Eco Telecom seeks damages equal to the economic value lost to it as shareholder of Vimpelcom resulting from the delay in the acquisition, which is presently estimated to be approximately US$ 1 billion. Eco Telecom also seeks its legal fees in this arbitration, as well as interest on all the above sums.

**F.    ARBITRATOR**

14.    Eco Telecom will nominate an arbitrator in accordance with Section 6.13 of the
Shareholders Agreement and the UNCITRAL Arbitration Rules.


Dated: March 21, 2008

By:    _D. Pellew_ _____
       Dominic Pellew

Lovells CIS                          Ronald S. Rolfe
Voznesensky Pereulok, 22             Cravath, Swaine & Moore LLP
5th Floor                            Worldwide Plaza
Usadba Center                        825 Eighth Avenue
Moscow, 125009                       New York
Russia                               New York 10019, USA
Telephone:  +7 495 933 3000          Tel: +1 212 474 1714
Facsimile: +7 495 933 3001           Fax: +1 212 474 3700

*Attorneys for Claimant*

# EXHIBIT E

Арбитражный суд Ханты-Мансийского
Автономного Округа
628012, Тюменская область, ХМАО,
г. Ханты-Мансийск, ул. Ленина, 54/1

**Истец:** **Компания «ФЭРИМЕКС ПРОДАКТС,
ИНК.»**
рег.номер компаний БВО: 1054174
FARIMEX PRODUCTS, INC
Sea Meadow House, Blackburne Highway, PO
Box 116, Road Town, Tortola, British Virgin
Islands
адрес для направления корреспонденции:
105005, г. Москва, Денисовский пер., д. 23,
стр. 6, для адвоката
**Черного Дмитрия Сергеевича**

**Ответчики:** **1. Компания «ЭКО ТЕЛЕКОМ ЛИМИТЕД»**
Номер инкорпорации: 79038
10/5 Интернешнл Комешл Сентэ
Кэйсмэйтс Сквэ, Гибралтар
**ECO TELECOM LIMITED**
Incorporation Number: 79038
10/5 International Commercial Center
Casemates Square, Gibraltar

**2. Компания «Алтимо Холдингс энд
Инветсментс Лтд.»**
рег.номер компаний БВО: 178274
Сьют 2, 4 Айриш Плэйс, Гибралтар
**Altimo Holdings & Investments Ltd.**
BVI Company Number: 178274
Mailing Address: Suite 2, 4 Irish Place, Gibraltar

**3. Компания «АВЕНЮ ЛИМИТЕД»**
рег.номер компаний БВО: 437584
Женева Плейс, 2-й этаж, 333 Вотефронт
Драйв, Роуд Таун, Британские Виргинские
острова
**AVENUE LIMITED**
BVI Company Number: 437584
Geneva Place, 2nd Floor, #333 Waterfront Drive,
Road Town, Tortola, British Virgin Islands

**4. Компания «ДЖЭНАУ ПРОПЕРТИЗ
ЛИМИТЕД»**
рег.номер компаний БВО: 233325
Женева Плейс, 2-й этаж, 333 Вотефронт
Драйв, Роуд Таун, Британские Виргинские
острова
**JANOW PROPERTIES LIMITED**
BVI Company Number: 233325

2

Geneva Place, 2nd Floor, #333 Waterfront Drive,
Road Town, Tortola, British Virgin Islands

**5. Компания «СЭНТЭЛ ЛИМИТЕД»**
рег.номер компаний БВО: 437587
Женева Плейс, 2-й этаж, 333 Вотефронт
Драйв, Роуд Таун, Британские Виргинские
острова
**SANTEL LIMITED**
BVI Company Number: 437587
Geneva Place, 2nd Floor, #333 Waterfront Drive,
Road Town, Tortola, British Virgin Islands

**6. Компания «Телепор Ист Инвест АС»**
**TELENOR EAST INVEST AS**
Представительство на территории России:
125047, Москва, ул. Садово-Кудринская д. 32,
стр.1,
тел.: (495) 937 95 88, факс (495) 937 95 89,
e-mail: telenor.moskva@telenor.com

**7. ОАО «ЦТ-Мобайл»**
628611, ХМАО, г. Нижневартовск,
ул. Кузоваткина, д. 14

Третьи лица:    **1. ОАО «Вымпел – Коммуникации»**
127083, г. Москва, ул. Восьмого Марта, д.10,
стр.14,
тел.: +7(495) 725-0700,  факс: +7(909) 991-7903

**2. Михаил Фридман, гражданин Российской
Федерации**
127083, г. Москва, ул. Восьмого Марта, д.10,
стр.14

**3. Алексей Резникович,** гражданин
Российской Федерации
127083, г. Москва, ул. Восьмого Марта, д.10,
стр.14

**4. Арве Йохансен (Arve Johansen),**
гражданин Королевства Норвегии
127083, г. Москва, ул. Восьмого Марта, д.10,
стр.14

**5. Фритьеф Рюстен (Fridtjof Rusten),**
гражданин Королевства Норвегии
127083, г. Москва, ул. Восьмого Марта, д.10,
стр.14

**6. Хенрик Торгерсен (Henrik Torgersen),**

3

гражданин Королевства Норвегии.
127083, г. Москва, ул. Восьмого Марта, д.10, стр.14

Цена иска: 3 797 818 500 долларов США
Госпошлина: 100 000 рублей

*Примечание: к настоящему исковому заявлению приложено ходатайство о принятии обеспечительных мер (приложение № 29)*

## Исковое заявление
### о взыскании убытков

Истец, Компания «ФЭРИМЕКС ПРОДАКТС, ИНК.» (далее - «Истец») является владельцем 25 000 американских депозитарных расписок, выпущенных на акции ОАО «Вымпел – Коммуникации» (далее - ОАО «ВымпелКом», «Общество») – приложение № 5. Согласно разъяснениям Федеральной службы по финансовым рынкам Российской Федерации, условия возникновения и обращения американских депозитарных расписок - ADR, имеющих присвоенный в установленном иностранным правом порядке идентификационный номер ценных бумаг ISIN (International Security Identification Number) и удостоверяющих права на акции российских эмитентов, соответствуют совокупности признаков эмиссионной ценной бумаги, указанной в ст. 2 Федерального закона от 22.04.1996 N 39-ФЗ «О рынке ценных бумаг». Следовательно, указанные депозитарные расписки в соответствии с законодательством Российской Федерации являются эмиссионными ценными бумагами иностранных эмитентов (Письмо ФСФР от 29.08.2005 N 05-ВГ-03/13719), удостоверяющими имущественные и неимущественные права Истца на акции ОАО «ВымпелКом».

Настоящий иск заявляется в связи с недобросовестным осуществлением прав и ненадлежащим исполнением Ответчиками обязанностей, лежащих на акционерах российских акционерных обществ, и направлен на взыскание с Ответчиков убытков, причиненных их противоправными действиями (бездействием).

### 1. Обстоятельства дела.

Первый ответчик – компания «Эко Телеком Лимитед» (Eco Telecom Limited, далее «Эко Телеком» или «Ответчик 1») является компанией, зарегистрированной на Гибралтаре с адресом местонахождения 10/5 International Commercial Center, Casemates

4

Square, Gibraltar. Ответчик 1 является владельцем 44 % голосующих акций ОАО «ВымпелКом». Согласно прилагаемой выписке из Реестра Компаний Гибралтара (приложение № 8), директором Ответчика 1 является Марина Кушнарева.

Второй ответчик – компания «Алтимо Холдингс энд Инвестментс Лтд.» (Altimo Holdings & Investments Ltd., далее «Алтимо» или «Ответчик 2») является компанией, зарегистрированной на Британских Виргинских Островах, с местонахождением по адресу: Suite 2, 4 Irish Place, Gibraltar. Телефон компании 011-350-41977. Согласно сообщению Алтимо, которое компания делала для Комиссии по ценным бумагам США (приложение № 9), а также исходя из выписки из Реестра Компаний Гибралтара в отношении Ответчика 1, она является 100% акционером компании Эко Телеком Лимитед (Eco Telecom Limited), которой в свою очередь принадлежит 44 % голосующих акций ОАО «ВымпелКом». Директорами Ответчика 2 являются Джеффри Пирс Хеми (Geoffrey Piers Hemy), гражданин Великобритании, Джорджиа Каридес (Georgia Karydes), гражданин Кипра, Ольга Кичатова, гражданка России, Марина Кушнарева, гражданка России, Франц Вольф (Franz Wolf), гражданин Германии.

Согласно информации, указанной на сайтах Алтимо и Консорциума «Альфа-Групп», куда входит Алтимо (далее «Альфа-Консорциум»), Ответчик 2 является акционером таких компаний, как ОАО «ВымпелКом» и ОАО «МегаФон» (приложения № 11, 12) - протоколы нотариального осмотра сайтов). Обе компании зарегистрированы на территории РФ. Как указывалось выше, фактически Алтимо является косвенным акционером ОАО «ВымпелКом». Алтимо также не является непосредственным акционером ОАО «МегаФон». Согласно размещенному на сайте ОАО «МегаФон» списку аффилированных лиц ОАО «МегаФон», непосредственным акционером ОАО «МегаФон» со стороны Алтимо является Открытое акционерное общество «ЦТ-Мобайл», которое владеет 25,1% голосующих акций ОАО «Мегафон» (приложение № 13 - протокол нотариального осмотра сайта). В свою очередь, согласно выписке из единого государственного реестра юридических лиц по ОАО «ЦТ-Мобайл» (приложение № 17), учредителями (акционерами) ОАО «ЦТ-Мобайл» являются три зарегистрированных на Британских Виргинских островах международные деловые компании: «Авсню Лимитед», «Джэнау Пропертиз Лимитед» и «Сэптэл Лимитед». Местонахождением ОАО «ЦТ-Мобайл» является: 628611, Ханты-Мансийский Автономный Округ, г. Нижневартовск, ул. Кузоваткина, д. 14. Законодательство Британских Виргинских островов не дает права получать информацию об акционерах международных деловых компаний без согласия акционеров такой компании (приложение № 21). По этой причине Истец не имеет возможности представить прямые доказательства того, что Алтимо является 100 %

5

акционером указанных выше трех международных деловых компаний. Тем не менее, информация, содержащаяся на сайтах Альфа-Консорциума и Алтимо, содержит косвенные доказательства, подтверждающие, что Алтимо владеет 100 % акций вышеуказанных международных деловых компаний. В частности, на обоих сайтах обозначено, что Алтимо владеет 25,1 % акций ОАО «МегаФон», то есть указанная доля акций, находящихся во владении, совпадает с долей акций, указанных в списке аффилированных лиц ОАО «МегаФон», как принадлежащих ОАО «ЦТ-Мобайл».

Третий ответчик – международная деловая компания «Авеню Лимитед», рег. номер 437584 (далее «Ответчик 3»), зарегистрирована на Британских Виргинских островах, с адресом местонахождения: Женева Плейс, 2-й этаж, 333 Вотефронт Драйв, Роуд Таун, Британские Виргинские острова. Согласно выписке из единого государственного реестра юридических лиц по ОАО «ЦТ-Мобайл», Ответчик 3 является учредителем (акционером) ОАО «ЦТ-Мобайл» (приложение № 17).

Четвертый ответчик - международная деловая компания «Джэнау Пропертиз Лимитед» рег. номер 233325 (далее «Ответчик 4»), зарегистрирована на Британских Виргинских островах с адресом местонахождения: Женева Плейс, 2-й этаж, 333 Вотефронт Драйв, Роуд Таун, Британские Виргинские острова. Согласно выписке из единого государственного реестра юридических лиц по ОАО «ЦТ-Мобайл», Ответчик 4 является учредителем (акционером) ОАО «ЦТ-Мобайл» (приложение № 17).

Пятый ответчик - международная деловая компания «Сэнтэл Лимитед» рег. номер 437587 (далее «Ответчик 5»), зарегистрирована на Британских Виргинских островах, с адресом местонахождения: Женева Плейс, 2-й этаж, 333 Вотефронт Драйв, Роуд Таун, Британские Виргинские острова. Согласно выписке из единого государственного реестра юридических лиц по ОАО «ЦТ-Мобайл», Ответчик 5 является учредителем (акционером) ОАО «ЦТ-Мобайл» (приложение № 17).

Шестой ответчик - компания «Теленор Ист Инвест АС» (далее «Теленор» или «Ответчик 6») - является юридическим лицом, созданным в соответствии с законодательством Норвегии (приложение № 10). Ответчик является собственником 17 254 579 обыкновенных именных бездокументарных акций ОАО «ВымпелКом» или 33,6 % размещенных обыкновенных акции ОАО «ВымпелКом».

6

Важным обстоятельством в свете заявленных по настоящему иску требований является то, что Ответчик 2 и Ответчик 6 являются также основными акционерами ЗАО «Киевстар GSM», ведущего оператора мобильной радиотелефонной связи на Украине. Согласно данным сайта Альфа-Консорциум, Алтимо владеет 43,48 % ЗАО «Киевстар GSM» (приложения № 12, 16 - стр.2 и 7). При этом группа компаний, в которую входит Ответчик 6, являлась и продолжает являться владельцем 56,5 % обыкновенных акций ЗАО «Киевстар GSM». Согласно собственным данным Теленора, доступным на его Интернет-сайте, доля ЗАО «Киевстар GSM» на украинском рынке мобильной связи составляет 43% (приложения № 14, 16- стр.1 и 6).

Седьмой ответчик – ОАО «ЦТ-Мобайл» (далее «Ответчик 7»), юридическое лицо, созданное по законодательству Российской Федерации. Согласно выписке из единого государственного реестра юридических лиц по ОАО «ЦТ-Мобайл», Ответчик 7 полностью подконтролен Ответчикам 3 – 5, поскольку они в совокупности владеют 100 % голосующих акций ОАО «ЦТ-Мобайл» (приложение № 17).

Согласно Уставу ОАО «ВымпелКом» (п. 10.2.) Совет директоров состоит из 9 членов (приложение № 6). В соответствии с п. 10.6. Устава голосование по наиболее важным вопросам повестки дня Совета директоров Общества осуществляется не менее чем двумя третями от числа всех членов Совета директоров, а в ряде случаев (приобретение или продажа долей участия в других обществах, п. 10.5.11. Устава) указанные вопросы подлежат одобрению не менее, чем 80 процентами от общего числа голосов членов Совета директоров Общества. Таким образом, два члена Совета директоров Общества могут «заблокировать» принятие любого решения, подпадающего под положения п. 10.6 Устава.

В период с 2004 года по настоящее время членами Совета директоров ОАО «ВымпелКом» (далее – «СД» или «Совет директоров») от Алтимо являлись Михаил Фридман и Алексей Резникович. При этом на сайте Алтимо указано, что Алексей Резникович является главным управляющим директором Алтимо (приложение № 11). Фактически г-н Резникович осуществляет в отношении Алтимо те же функции, что и единоличный исполнительный орган для российского акционерного общества. Как будет показано ниже, в действительности Алексей Резникович является основным лицом, принимающим решения в отношении Алтимо и формирующим позицию Алтимо, в том числе в отношении компаний, в которых Ответчик 2 прямо или косвенно владеет пакетами акций.

7

С июня 2004 года по июнь 2005 года членами Совета директоров ОАО «ВымпелКом» от Теленор были г-да Арве Йохансен, Йо Лундер, Хенрик Торгерсен. Господин Тун являлся независимым кандидатом от Теленор (приложение № 7).

С лета 2005 года по лето 2006 года от Теленора были избраны в Совет директоров ОАО «ВымпелКом» г-да Арве Йохансен, Хенрик Торгерсен, Фритьоф Рюстен. Господин Йо Лундер являлся независимым кандидатом от Теленор (приложение № 7).

В июне 2004 года Совет директоров ОАО «ВымпелКом» утвердил стратегию развития компании, которая предполагала активный выход ОАО «ВымпелКом» на рынки стран СНГ, в том числе на рынок Украины. Уже в конце 2004 года руководство ОАО «ВымпелКом» представило на рассмотрение Совета директоров вариант проникновения на рынок Украины путем приобретения закрытого акционерного общества «Украинские радиосистемы» (далее – ЗАО «УРС», «УРС»). Далее руководство ОАО «ВымпелКом» представляло различные варианты реализации вышеуказанной стратегии на Украине, в т.ч. представляющееся перспективным приобретение ОАО «ВымпелКом» компании ЗАО «Киевстар GSM». Как видно из протокола Заседания СД ОАО «ВымпелКом» от 24 мая 2006 года, ОАО «ВымпелКом» вынужден был отозвать свое предложение о покупке ЗАО «Киевстар GSM», поскольку Ответчик 2 и Ответчик 6 не смогли согласовать между собой условия продажи указанной компании.

Позиция Истца по данному вопросу заключается в том, что Алтимо и Теленор не продали акции ЗАО «Киевстар GSM» ОАО «ВымпелКом», поскольку им было выгоднее сохранить акции данной компании в своей собственности.

При этом Ответчики всячески блокировали попытки ОАО «ВымпелКом» выйти на рынок Украины иным путем, например, посредством приобретения ОАО «ВымпелКом» 100% акций ЗАО «УРС» (далее – «Сделка»).

Так, члены Совета директоров ОАО «ВымпелКом» от Теленор последовательно голосовали «против» одобрения Сделки, действуя не в интересах ОАО «ВымпелКом», а в интересах номинировавшего их акционера - Теленор и украинской дочерней компании Теленора – ЗАО «Киевстар GSM».

В частности, вопрос о возможном выходе ОАО «ВымпелКом» на рынок телекоммуникаций Украины начал обсуждаться с осени 2004 года, когда члены Совета директоров ОАО «ВымпелКом» выразили принципиальное согласие на рассмотрение этого вопроса (Протокол Заседания СД № 9 от 6 октября 2004 года – приложение № 7).

8

На заседании СД 4 ноября 2004 года (Протокол Заседания СД № 11 от 4 ноября 2004 года – приложение № 7) членам СД был представлен подробный проект возможного приобретения украинской компании, который включал, кроме прочего, анализ затрат, рисков и прибыльности проекта. В ходе обсуждения представленного проекта выяснилось, что члены СД от Теленор достаточно скептически настроены на данное предложение. В частности, г-н Торгерсен, отметил, «что распространение деятельности Общества на территорию Украины, возможно, преждевременно, ввиду того, что необходимо изучить и использовать возможность совместной деятельности с уже действующими в Украине операторами», явно намекая на владение группой Теленор долей в Киевстаре, одном из ведущих операторов Украины. При этом члены СД от Теленор не принимали во внимание, что компания ЗАО «УРС» уже являлась действующим оператором на Украине. Тот же г-н Торгерсен утверждал, что, возможно, руководство Общества (ОАО «ВымпелКом») превышает полномочия, предлагая Совету директоров рассматривать приобретения на данной стадии, забывая, что на предыдущих заседаниях СД сам Совет уполномочивал руководство Общества развивать стратегию Общества по расширению его деятельности на Украине.

В ходе обсуждения по проекту на заседании от 15 декабря 2004 года (Протокол Заседания СД № 12 от 15 декабря 2004 года – приложение № 7) были привлечены представители компании Бейкер Боттс ЛЛП, которые прокомментировали процедурные моменты одобрения сделки по УРС, в частности заметив, что «каждый член СД должен будет рассмотреть вопрос о возможности приобретения по существу, оставив в стороне свои собственные интересы, равно и интересы каждого конкретного акционера, и при принятии решения о том, одобрять данное приобретение или нет, действовать разумно и осмотрительно, руководствуясь исключительно интересами Общества». Также представители Бейкер Боттс ЛЛП отметили, что поскольку требования по количеству голосов для одобрения таких сделок в соответствии с Уставом Общества довольно высоки, поэтому «любые два директора могут блокировать многие важные сделки или проекты, предлагаемые к реализации Обществом». При этом г-да Лундер и Тун высказывались «за» заключение опционного соглашения с целью получения исключительных и некоторых других прав.

Далее, 4 февраля 2005 года членами СД принят к сведению очередной доклад по сделке о приобретении УРС (Протокол Заседания СД № 1 от 4 февраля 2005 года приложение № 7).

Основное рассмотрение вопроса о приобретении ЗАО «УРС» проходило на заседании СД 22 апреля 2005 года (Протокол Заседания СД № 2 от 22 апреля 2005 года –

9

приложение № 7). Генеральный директор ОАО «ВымпелКом» Александр Изосимов сообщил членам СД, что с акционерами ЗАО «УРС» были подписаны опционные соглашения, период осуществления исключительных прав по которым скоро истекает, и что цена значительно увеличилась с момента начала переговоров. Членам СД предоставили также альтернативные сценарии данной сделки и сообщили, что время работает против ОАО «ВымпелКом».

Необходимо заметить, что на протяжении всех заседаний СД, когда происходило обсуждение приобретения УРС, почти все директора, за исключением членов СД от Теленор, замечали, что промедление с решением о приобретении ЗАО «УРС» может существенно повлиять на стоимость этого актива и призывали принимать решение более оперативно.

Г-н Торгерсен решил не поддерживать проект, основываясь главным образом на наличии сильной конкурентной среды на Украине, а также считая предложенный проект слишком оптимистичным; и в отличие от других директоров посчитал проработку проекта недостаточной. Однако при этом г-н Торгерсен отметил, что «они [Теленор] готовы поддержать и другие приобретения, в том числе и на Украине, но такие приобретения должны повышать прибыльность общества для акционеров Общества».

Г-н Йохансен в обоснование отказа поддержать сделку заявил только то, что компания УРС является четвертой, а не третьей компанией на Украине и такое приобретение не будет благоприятным для ОАО «ВымпелКом».

Г-н Тун заявил, что сейчас приобретение является рискованным, и лучше было бы выйти на украинский рынок через частный акционерный капитал или посредством иной стратегии.

Г-н Лундер заявил о слиянии ОАО «ВымпелКом» и ЗАО «Киевстар GSM», как о лучшем способе выхода ОАО «ВымпелКом» на Украину.

Торгерсен, Тун и Йохансен голосовали «против» решения о приобретении ОАО «ВымпелКом» контроля над УРС.

В интервью, данном 24 мая 2005 года украинской «ИнвестГазете», представитель Теленор на Украине, Сигмунд Эккхоуген, сделал следующее заявление по поводу Сделки: «Мы считаем, что это неудачное бизнес-решение. В первую очередь, интересы "Альфы" и Telenor представлены в "Киевстаре", поэтому становиться собственником еще одного украинского оператора, с нашей точки зрения, неправильно. Во-вторых, мы полагаем, что «УРС» не стоит тех денег, о которых шла речь…» (приложение № 19 - страница 17)

На заседании СД 14 июня 2005 года членам СД был представлен альтернативный проект проникновения на рынок Украины, а именно посредством приобретения

10

миноритарного пакета акций в УРС при условии приобретения мажоритарного пакета акций фондами прямых инвестиций. Такой проект должен был существенно уменьшить риски Общества, и соответственно, данный проект отражал пожелания членов СД об альтернативах приобретения УРС, высказанные на предыдущих заседаниях.

Генеральный директор Общества г-н Изосимов также сообщил, что ОАО «ВымпелКом» подало заявление в украинский антимонопольный орган и Обществом получены запросы на предоставление дополнительной информации. Антимонопольный орган сообщил, что от Теленора поступило требование указать его в качестве заинтересованного лица (но ОАО «ВымпелКом» при этом не получало уведомлений об этом от Теленор). В этом же заявлении указывалось, что если ОАО «ВымпелКом» приобретет УРС, то УРС, Киевстар и Голден Телеком окажутся под совместным контролем, что может послужить причиной отказа в одобрении возможной сделки. Таким образом, Теленор намеренно совершал действия, которые бы препятствовали получению скорейшего одобрения антимонопольного органа.

В ходе очередного обсуждения сделки г-н Тун выразил озабоченность по поводу доходов от данного инвестирования. Г-н Торгерсен выразил озабоченность по поводу предполагаемых показателей среднего дохода из расчета на одного абонента, требований по капитальным затратам, конкурентной среды на украинском рынке. В отличие от членов СД от Теленор, члены СД от Альфы – г-н Фридман и г-н Резникович – поддерживали предложенную структуру сделки, хотя и считали, что будет потеря в стоимости по сравнению с приобретением 100% участия, но поскольку они являлись членами СД, «они считают, что данное приобретение в интересах Общества» (Протокол Заседания СД № 5 от 14 июня 2005 года, стр. 3 – приложение № 7).

На указанном заседании СД решение о приобретении до 40% акций УРС принято не было, поскольку он было блокировано голосами «против» г-д Торгерсена и Йохансена.

Вопрос о приобретении УРС выносился на обсуждение членов СД и 15 августа 2005 года после первого несостоявшегося ввиду отсутствия кворума внеочередного общего собрания акционеров. Членам СД было предложено проголосовать по двум следующим вопросам: поддержка распространения ОАО «ВымпелКом» на Украине и поручение руководству принимать все необходимые меры к получению заключений о справедливости оценки у одного или двух международных банков. Решение не было принято, поскольку было блокировано г-ном Йоханесом (Протокол Заседания СД № 7 от 15 августа 2005 года, стр. 4-5 – приложение № 7).

14 сентября 2005 года состоялось Внеочередное общее собрание акционеров ОАО «ВымпелКом» (далее «ВОСА»), которое приняло решение об одобрении Сделки как

11

сделки с заинтересованностью. Акционеры примерно по 51,2% выпущенных голосующих акций Общества проголосовали «за» принятие решения об одобрении приобретения Обществом всех выпущенных акций УРС (приложение № 22).

16 сентября 2005 года члены СД обсуждали на своем заседании вопросы Внеочередного общего собрания акционеров и приобретения УРС, включая заявления о справедливости оценки. Председатель СД, независимый директор г-н Хэйнс, специально подчеркнул на заседании, что решение ВОСА от 14 сентября 2005 года является действительным до тех пор, пока его не признает недействительным российский суд, а пока «все директора обязаны исполнять свои фидуциарные обязательства в качестве директоров ОАО «ВымпелКом», а не действовать в качестве представителей какого-либо отдельного акционеров, и попросил проводить обсуждение руководствуясь этим принципом» (Протокол Заседания СД № 8 от 16 сентября 2005, стр. 3 – приложение № 7). Затем г-н Хэйнс объяснил, что он и Генеральный директор получили письма от Теленор, «которые содержали большое количество заявлений и угроз предъявления исков» (Протокол Заседания СД № 8 от 16 сентября 2005, стр. 4, приложение № 7). Членам СД не предлагалось голосовать «за» сделку с УРС, а предлагалось выразить поддержку Генеральному директору Общества и подтвердить повторно, что он должен выполнять решения ВОСА. И снова все члены СД от Теленор, г-да Йохансен, Торгерсен и Рюстен проголосовали «против» такого решения, и оно не было принято (Протокол Заседания СД № 8 от 16 сентября 2005 года, стр. 10 – приложение № 7).

11 ноября 2005 года Генеральный директор ОАО «ВымпелКом» заключил сделку по приобретению 100% акций УРС.

Уже после совершения указанной сделки, начиная с конца января 2006 года Ответчик 6 развернул активную судебную кампанию, подав сразу три иска в Арбитражный суд г. Москвы, связанных с приобретением ОАО «ВымпелКом» акций УРС: 1) о признании недействительным решения внеочередного общего собрания акционеров от 14.09.2005 открытого акционерного общества об одобрении сделки, в совершении которой имеется заинтересованность (сделка по приобретению ОАО «ВымпелКом» 100% акций ЗАО «Украинские радиосистемы»); 2) о признании недействительным решения единоличного исполнительного органа по приобретению ЗАО «Украинские радиосистемы» (иск лично к г-ну Изосимову А.В.) и 3) о признании сделки недействительной и применении последствий её недействительности (сделка по приобретению ОАО «ВымпелКом» 100 % акций ЗАО «Украинские радиосистемы»).

Данные иски прошли все инстанции российских судов (до Высшего Арбитражного Суда РФ, включительно), и все инстанции подтвердили законность решения

12

внеочередного общего собрания акционеров, законность решения единоличного исполнительного органа по приобретению УРС, а также законность самой сделки по приобретению УРС (приложение № 22).

Указанные судебные разбирательства, растянувшиеся во времени на протяжении почти двух лет (последние разбирательства состоялись осенью 2007 года) существенно ограничивали возможности ОАО «ВымпелКом» по управлению компанией УРС, препятствовали принятию более оперативных стратегических решений по развитию компании УРС, наносили ущерб имиджу самого Общества, а также усиливали разобщенность между акционерами Общества, и, как следствие, препятствовали принятию единогласных решений по стратегическому развитию самого Общества.

Кроме того, применительно к Теленору необходимо указать, что в настоящее время в *самих стратегиях развития ОАО «ВымпелКом» и Теленор заложен потенциал для многочисленных конфликтов интересов ОАО «ВымпелКом» и Теленор*. Как указано в «Стратегии» Теленор (приложения № 14, 16 - стр.3 и 8), одной из целей Теленор является усиление позиций Теленор как международного оператора мобильной связи: «*Мы намерены продолжать укрепление нашей мобильной индустриализации в сфере мобильной связи за счет получения контроля над выбранными компаниями-операторами мобильной связи. Контроль важен для нас для получения выгоды от международных совместных усилий, например, в отношении масштабов поставок, для разработки новых услуг и внедрения наилучших практик, для улучшения эксплуатационной эффективности и повышения нашей общей доходности. Мы намерены управлять нашими не стратегическими инвестициями как финансовыми инвестициями, а также отказываться от деятельности в сфере международной мобильной связи в случаях, когда мы не можем получить контроль по прошествии времени*».

В свою очередь, на втором месте среди стратегических целей ОАО «ВымпелКом», после получения максимальной прибыли на российском рынке, поставлена цель *роста бизнеса на территории СНГ*, достигаемая в том числе через приобретения компаний на существующих рынках (приложения № 15, 16 - стр.5 и 10).

Таким образом, не обладая контролем над ОАО «ВымпелКом», Теленор рассматривает свои инвестиции в ОАО «ВымпелКом» как «финансовые инвестиции», которые являются в стратегии Теленор второстепенными в сравнении со «стратегическими инвестициями» в компании, над которыми осуществляется контроль.

На практике, как полагает Истец, это означает, что если на каком-то рынке СНГ появляется потенциальный объект для приобретения или возникает ситуация, когда ОАО «ВымпелКом» намеревается приобрести долю в местном операторе, Теленор всегда,

13

в первую очередь, будет думать о собственной цели, направленной на установление контроля Теленор над какой-либо компанией на том же рынке СНГ. Любой конфликт целей, будет разрешаться в пользу Теленора, учитывая вышеупомянутое положение ст. 10.6 Устава ОАО «ВымпелКом». Данное положение является действенным инструментом, посредством которого Теленор в последние годы обеспечивает защиту своих собственных интересов при принятии стратегических решений ОАО «ВымпелКом».

Таким образом, данный иск является следствием лишь одного из эпизодов существующего конфликта стратегических целей ОАО «ВымпелКом» и Теленора.

Отсутствие активного обсуждения Советом директоров ОАО «ВымпелКом» других вариантов выхода ОАО «ВымпелКом» на украинский рынок мобильной связи также свидетельствует о том, что и директора со стороны Алтимо не были заинтересованы в скорейшем начале работы ОАО «ВымпелКом» на перспективном украинском рынке.

В частности, на заседании Совета директоров 24 мая 2006 года Генеральный директор ОАО «ВымпелКом» г-н Изосимов уведомил директоров об отзыве предложения ОАО «ВымпелКом» о покупке ЗАО «Киевстар GSM» по причине отсутствия прогресса в переговорах между Теленором и Альфа Консорциумом (Алтимо) в отношении «договора о рыночном разделе».

В результате указанных выше действий представителей интересов Ответчиков выход ОАО «ВымпелКом» на украинский рынок состоялся с опозданием на 1 год.

Вместе с тем, более раннее начало работы ОАО «ВымпелКом» на Украине, как показали последующие события, привело бы к увеличению рыночной стоимости ОАО «ВымпелКом» и способствовало бы усилению ОАО «ВымпелКом» на российском рынке в ущерб позициям другой компании, в которой Алтимо также является косвенным крупным акционером – ОАО «МегаФон». Также необходимо отметить, что Алтимо являлась и продолжает оставаться крупнейшим после Теленора акционером ЗАО «Киевстар GSM». Таким образом, со стороны Алтимо существовал «двойной» конфликт интересов, который был разрешен не в пользу ОАО «ВымпелКом».

Таким образом, дальнейшее успешное развитие бизнеса ОАО «ВымпелКом» в СНГ находится под угрозой, поскольку описанные ситуации могут повторяться и в будущем. Истец полагает, что принимая во внимание существующие и продолжающие действовать положения российского законодательства и Устава ОАО «ВымпелКом», единственным реальным средством защиты интересов ОАО «ВымпелКом» и Истца, как акционера ОАО «ВымпелКом», является предъявление к Ответчикам солидарно требования о взыскании

14

убытков, понесенных ОАО «ВымпелКом» и его миноритарными акционерами вследствие недобросовестных и незаконных действий Ответчиков.

### 2. Подсудность данного иска

Согласно ч. 3 ст. 36 и подп. 1 ч. 1 ст. 247 АПК РФ иск к иностранному юридическому лицу может быть предъявлен по месту нахождения имущества такого лица.

Как указывалось выше, Ответчикам 3 – 5 в совокупности принадлежит 100% акции ОАО «ЦТ-Мобайл», зарегистрированного на территории Ханты-Мансийского Автономного Округа. В арбитражной практике существует правовая позиция, в силу которой в подобном случае местом нахождения имущества является место регистрации соответствующего юридического лица, в котором имеется имущественная доля или акции (Постановление Десятого арбитражного апелляционного суда от 18.04.2005 № 10АП-1697/04-ГК, Постановлением ФАС ЗСО от 17 февраля 2004 года по делу № Ф04/820-64/А75-2004 – приложение № 20). Соответственно, местом нахождения имущества Ответчиков 3-5 является место регистрации ОАО «ЦТ-Мобайл», а именно: Ханты-Мансийский Автономный Округ, г. Нижневартовск, ул. Кузоваткина 14.

При наличии нескольких иностранных ответчиков, Истец может осуществить свое право на обращение с иском в суд и обратиться в соответствии со п. 2, 3 и п.7 ст. 36 АПК РФ по месту нахождения одного из ответчиков (Постановление ФАС ДО от 25 апреля 2006 года по делу № Ф03-А80/06-1/3 – приложение № 20).

Воспользовавшись указанным правом, Истец определил подсудность данного иска по месту нахождения имущества Ответчиков 3-5.

### 3. Адрес для уведомления Ответчика 6.

В соответствии с ч. 1 ст. 121 АПК РФ лица, участвующие в деле, и иные участники арбитражного процесса извещаются арбитражным судом о времени и месте судебного заседания путем направления копии судебного акта не позднее чем за пятнадцать дней до начала судебного заседания или проведения процессуального действия, если иное не предусмотрено АПК РФ.

Согласно ч. 5 ст. 121 АПК РФ иностранные лица извещаются арбитражным судом по правилам, установленным гл. 12 АПК РФ, если иное не предусмотрено АПК РФ или международным договором Российской Федерации.

В силу ст. 152 АПК РФ дело должно быть рассмотрено арбитражным судом первой инстанции и решение принято в срок, не превышающий месяца со дня вынесения определения суда о назначении дела к судебному разбирательству, если АПК РФ не установлено иное.

15

Между тем, исходя из правил ч. 2 ст. 253 АПК РФ дела с участием иностранных лиц, если эти лица или их органы управления, филиалы, представительства либо их представители, уполномоченные на ведение дела, находятся не проживают на территории Российской Федерации, рассматриваются в сроки, установленные АПК РФ.

В этой связи Истец обращает внимание суда на следующие обстоятельства. Согласно приложению № 14 к исковому заявлению Telenor Russia AS является представительством компании Теленор в России. Информация, подтверждающая регистрацию данного представительства на территории РФ по адресу: 123001, Москва, ул. Садово-Кудринская д. 32, стр.1, также содержится в приложении № 14 к исковому заявлению. Как указано на интернет сайте представительства (приложение № 14), представительство отвечает за поддержку инвестиций Теленора в российскую телекоммуникационную отрасль, а также за поиск новых возможностей для бизнеса. Важнейшая задача представительства в Москве – поддержание контактов с местными органами власти, деловыми партнерами, прессой и аналитиками. Также на сайте представительства Теленора отмечается, что Теленор действует в России через две компании, в которых владеет долями. Это «Вымпелком» и «Голден Телеком». Теленор имеет трех представителей в Совете директоров ОАО «Вымпелком». Как указано на стр. 14 иска, акционером ОАО «Вымпелком» и лицом, номинирующим директоров в СД ОАО «Вымпелком» на самом деле является Ответчик 6 – компания «Теленор Ист Инвест АС». Таким образом, на указанном интернет сайте имеется подтверждение того, что именно компания «Теленор Ист Инвест АС» имеет свое представительство на территории России или же указанное представительство осуществляет представительские функции и для компании «Теленор Ист Инвест АС».

Глава представительства Теленор, Кьелл Мортен Йонсен, на указанном интернет сайте назван как «Старший Вице-Президент Теленор» или «Старший Вице-президент подразделения компании «Теленор» по Центральной и Восточной Европе». Он также является членом Совета Директоров ОАО «Вымпелком». Исходя из списка компаний, содержащемся в приложении № 14 к иску, образующем группу Теленор, «подразделением компании «Теленор» по Центральной и Восточной Европе» является именно компания «Теленор Ист Инвест АС»

Исходя из интервью, данном Шелль (Кьелл) Мортен Йонсеном газете «Ведомости» (№ 229(2003) от 04.12.2007 - приложение № 28), можно сделать вывод, что деятельность г-на Йонсена и московского представительства компании «Теленор» относится именно к деятельности компании «Теленор Ист Инвест АС»: в интервью г-н Йонсен представлял позицию именно компании «Теленор Ист Инвест АС» по поводу конфликта вокруг приобретения ЗАО «Украинских радиосистем».

25 марта 2008 г. на вышеуказанном сайте была представлена информация об арбитражном процессе между компаниями «Эко Телеком» и «Теленор Ист Инвест» в Женеве. Несмотря на то, что данный процесс не имеет отношения к компании «Теленор Раша», в качестве контактного лица для получения дальнейшей информации была указана менеджер по внешним связям московского представительства «Теленор Раша» Евгения

16

Чередкова. Данное обстоятельство также указывает на тот факт, что московское представительство «Теленор Раша» осуществляет представительские функции и для компании «Теленор Ист Инвест».

Таким образом, Истец исходит из того, что у суда есть все основания полагать, что органы управления, филиалы, представительства либо представители компании «Теленор Ист Инвест АС», уполномоченные на ведение дела, находятся или проживают на территории Российской Федерации и, как следствие, у суда имеются основания для рассмотрения дела в сроки, установленные в ст. 152 АПК РФ, с направлением извещения о месте и времени судебного заседания по адресу в России.

Аналогичная правовая позиция относительно толкования ч. 2 ст. 253 АПК РФ сложилась и в судебной практике. Арбитражные суды исходят из того, что по смыслу указанной нормы, в случае если иностранные лица, их органы управления, филиалы или их представители находятся (проживают) на территории Российской Федерации, то вопросы, связанные с их надлежащим уведомлением о назначении дела к слушанию, решаются в общем порядке, установленном АПК РФ (приложение № 27).

**4. Действия членов Совета директоров Общества в интересах Ответчика 6.**

Результаты голосования на заседаниях Совета директоров Общества по одобрению Сделки подтверждают тот факт, что члены Совета директоров ОАО «ВымпелКом», выдвинутые от Теленора, согласовывали свою позицию при голосовании на Совете директоров ОАО «ВымпелКом» с позицией Теленора, как юридического лица (действовали по прямому указанию должностных лиц Теленора или же сами занимали высшие должности в органах управления Теленора: г-н Арве Йохансен с 1999 г. является Старшим Исполнительным Вице-Президентом компании «Теленор Ист Инвест АС»; Фритьеф Рюстен с января 2003 г. является Старшим Вице-Президентом компании «Теленор Ист Инвест АС».

Истец также считает, что бездействие директоров от Алтимо и Теленора по вопросу возможного приобретения ОАО «ВымпелКом» ЗАО «Киевстар GSM» также объясняется тем, что данное приобретение было невыгодно Алтимо и Теленор.

Перечисленные члены Совета директоров, голосуя при принятии решений Советом директоров, действовали в интересах и по указанию акционера, выдвинувшего их в Совет директоров ОАО «ВымпелКом», следовательно, являлись представителями последнего в силу абз. 2 п. 1 ст. 182 Гражданского кодекса РФ (далее – «ГК РФ»), их полномочие следовало из обстановки, в которой совершалось голосование.

17

Так, например, в аналогичной ситуации голосования по указаниям акционера, согласно п. 17 и 22 постановления Правительства РФ от 3 декабря 2004 г. № 738 «Об управлении находящимися в федеральной собственности акциями открытых акционерных обществ и использовании специального права на участие Российской Федерации в управлении открытыми акционерными обществами («золотой акции»)» члены совета директоров прямо называются «представителями интересов Российской Федерации в совете директоров» и осуществляют голосование по вопросам повестки дня заседания совета директоров на основании письменных директив Федерального агентства по управлению федеральным имуществом.

В соответствии с нормами Федерального закона «Об акционерных обществах» (далее – «ФЗ об АО») член совета директоров при осуществлении своих прав и исполнении обязанностей должен действовать только в интересах общества, осуществлять свои права и исполнять обязанности в отношении общества добросовестно и разумно. Таким образом, член  совета директоров должен действовать самостоятельно, а не руководствоваться указаниями акционера.

Однако, члены Совета директоров ОАО «ВымпелКом», выдвинутые от Теленора, голосуя на собраниях Совета директоров при одобрении Сделки, действовали не в интересах ОАО «ВымпелКом», а в интересах Теленора, как его представители и, как следствие, их действия должны непосредственно создавать, изменять и прекращать гражданские права и обязанности их представляемого – Теленора в соответствии с п. 1 ст. 182 ГК РФ.

Всё вышеперечисленное свидетельствует о том, что Ответчик 6, действуя через лояльных ему членов Совета директоров ОАО «ВымпелКом» - его представителей, предпринимал различные действия (бездействия), основной целью которых являлось не допустить совершения Сделки. После совершения указанной Сделки Ответчиком 6 был предпринят комплекс мер, направленных на оспаривание совершенной Сделки и сопутствующих ее совершению решений органов Общества. Все перечисленные действия Ответчика противоречат интересам Общества, а также совершены в нарушение требований добросовестности и разумности, в результате чего Обществу причинены убытки.

Поскольку иск к перечисленным выше физическим лицам предъявлен в связи с осуществлением ими функций членов Совета директоров ОАО «ВымпелКом», то извещение их должно производиться по месту нахождения данного органа управления Общества. Таким образом, лицам, входившим и входящим в состав членов Совета директоров ОАО «ВымпелКом» и являющимся ответчиками по настоящему иску,

18

уведомления должны направляться по адресу - 127083 г. Москва, ул. Восьмого Марта, д.10, стр.14.

**5. Ответчик 2 фактически контролирует Ответчиков 3 – 5, 7 и действовал в их интересах**

Как видно из фактических обстоятельств дела, г-н Резникович, являясь высшим должностным лицом Алтимо, действуя в качестве члена Совета директоров ОАО «ВымпелКом», проводил решения, принятые на уровне Алтимо. Такие действия осуществлялись от имени группы лиц Альфа Консорциума, так, как если бы на деле действовало только одно юридическое лицо. Алтимо в течение более чем одного года участвовала в затягивании процесса одобрения Сделки и не давала ОАО «ВымпелКом» осуществить иные возможности по выходу на украинский рынок, в том числе через приобретение ОАО «ВымпелКом» компании ЗАО «Киевстар GSM».

Алтимо через своего представителя в Совете директоров ОАО «ВымпелКом» действовала в интересах Ответчиков 3-5, 7 которые косвенным образом, через ОАО «ЦТ-Мобайл» владеют акциями ОАО «МегаФон». Кроме того, Алтимо заблокировала сделку по приобретению ОАО «ВымпелКом» компании ЗАО «Киевстар GSM». Действия по воспрепятствованию ОАО «ВымпелКом» выходу на украинский рынок не позволили ОАО «ВымпелКом» увеличить свою рыночную стоимость как минимум на 3 797 818 500 долларов США. Компания, обладающая большей рыночной стоимостью способна привлекать большее финансирования для осуществления своей деятельности, в т.ч. на территории России. Увеличение финансовых возможностей ОАО «ВымпелКом» на российском рынке могло нанести ущерб позициям ОАО «МегаФон», что в свою очередь, негативно отразилось бы на стоимости акции ОАО «МегаФон», которыми косвенно владеют три вышеуказанные компании Британских Виргинских островов.

Истец полагает, что полный контроль Ответчиков 2, 3 – 5 над ОАО «ЦТ-Мобайл», с одной стороны, и полный контроль Алтимо над такими Ответчиками, с другой стороны, лишает Ответчиков 3 – 5, 7 возможности заявлять какие-либо возражения об отсутствии ответственности за действия (бездействия) Алтимо.

В силу статьи 403 ГК РФ должник отвечает за неисполнение или ненадлежащее исполнение обязательств третьими лицами, на которых было возложено исполнение, если законом не установлено, что ответственность несет являющееся непосредственным исполнителем третье лицо.

19

**6. Ответчиком 6 нарушена обязанность действовать в интересах Общества добросовестно и разумно.**

Ответчик 6 является держателем крупного пакета акций Общества, составляющего 33,6 % размещенных обыкновенных акций ОАО «ВымпелКом». Таким образом, Ответчик располагает широкими фактическими возможностями оказывать существенное влияние на деятельность Общества, а также на принимаемые Обществом решения, что подкреплено предоставленными законодательством правами акционера.

Располагая правами в части управления Обществом, акционер несет соответствующую им обязанность действовать в интересах Общества, не злоупотреблять принадлежащими ему правами акционера.

В силу п. 1 ст. 53 ГК РФ юридическое лицо приобретает гражданские права и принимает на себя гражданские обязанности через свои органы, действующие в соответствии с законом, иными правовыми актами и учредительными документами. Акционер, осуществляющий права управления и контроля через органы общества, подчиняется требованиям, установленным для лиц, входящих в органы Общества, то есть действовать в интересах общества, осуществлять свои права и исполнять обязанности добросовестно и разумно (п. 1 ст. 71 ФЗ об АО).

В п. 1 ст. 71 ФЗ об АО указывается не только на отдельные органы акционерного общества (единоличный исполнительный орган), но и на отдельных лиц, непосредственно участвующих в волеобразовании того или иного органа общества (члены совета директоров, члены коллегиального исполнительного органа), то есть участвующими в выработке и принятии управленческих решений, принимаемых конкретными органами общества в рамках установленной компетенции.

В соответствии с п. 1 ст. 47 ФЗ об АО высшим органом управления общества является общее собрание акционеров. Лицами, участвующими в волеобразовании, для общего собрания акционеров являются сами акционеры, при этом каждый конкретный акционер косвенно оказывает влияние на принятие любого решения общества, поскольку все иные органы, включая совет директоров общества избираются акционерами.

Таким образом, акционер, состоящий в обязательственных правоотношениях с обществом (абз. 2 п. 2 ст. 48 ГК РФ, абз. 1 п. 1 ст. 2 ФЗ об АО), не только наделяется правами в отношении общества, но на него также законодательно возлагается обязанность действовать в интересах общества, осуществлять свои права и исполнять обязанности в отношении общества добросовестно и разумно.

Ответчик 6, осуществляя свои права акционера в ОАО «ВымпелКом», нарушил общую обязанность, предусмотренную ст. 10 ГК РФ, не злоупотреблять

20

предоставленными ему правами, в рассматриваемом случае – не злоупотреблять предоставленными ему правами крупного акционера в ущерб интересов ОАО «ВымпелКом» и иных его акционеров.

Ответчиком 6 осуществлялось принадлежащее ему право на участие в управлении ОАО «ВымпелКом» для создания ситуации, при которой Общество более года было лишено возможности выхода на перспективный украинский рынок мобильной связи, присутствие на котором являлось абсолютно обоснованным и выгодным для Общества решением.

В данном случае Ответчик своими действиями, выразившимися в голосовании «против», и бездействием (необеспечение возможностей для развития Общества) реализовывал намерение ограничить конкуренцию на украинском рынке и действовал очевидным образом не в интересах ОАО «ВымпелКом» и его акционеров, а в интересах контролируемого Ответчиком сотового оператора на Украине – ЗАО «Киевстар GSM», чем причинил Обществу и его акционерам серьезные убытки.

7. Ответчик 6, являясь крупным акционером Общества, нарушил свои обязанности, чем причинил Обществу и его акционерам убытки.

Как установлено в п. 2 ст. 48 ГК РФ в связи с участием в образовании имущества юридического лица его учредители (участники) могут иметь обязательственные права в отношении этого юридического лица. К юридическим лицам, в отношении которых их участники имеют обязательственные права, относятся, в том числе, хозяйственные общества. Акционерные общества относятся к хозяйственным обществам (п. 3 ст. 66 ГК РФ). Таким образом, между акционером, с одной стороны, и акционерным обществом, с другой, с момента приобретения акции устанавливаются правоотношения. В случаях, когда акционер злоупотребляет принадлежащими ему правами, акционерное общество наделяется правами требования против акционера, становящегося обязанной стороной перед акционерным обществом.

Действующее гражданское законодательство Российской Федерации не содержит специальных положений касательно ответственности акционеров перед обществом. Однако крупный акционер, обеспечивший избрание в органы управления обществом своих представителей, становится лицом, на которого законом возлагается обязанность действовать в интересах общества, участником которого он является, - аналогично тому, как подобная обязанность возлагается на всех лиц, входящих в органы управления обществом (п. 1 ст. 71 ФЗ об АО), а в случае нарушения указанной обязанности акционер несет перед обществом ответственность. Так, Ответчиком 6 в порядке реализации

21

предоставленных ему прав акционера неоднократно допускались нарушения требований о добросовестности и разумности при непосредственном совершении действий, не соответствующих интересам Общества (посредством голосования либо отказа в голосовании на общих собраниях акционеров), так и косвенным образом, давая соответствующие указания о голосовании членам совета директоров, представляющим интересы данного акционера.

Согласно п. 1 ст. 15 ГК РФ лицо, право которого нарушено, может требовать полного возмещения причиненных ему убытков.

Как установлено в п. 4 ст. 6 ФЗ об АО общество признается зависимым, если другое (преобладающее) общество имеет более 20 процентов голосующих акций первого общества. Таким образом, ОАО «ВымпелКом» является зависимым обществом Ответчика 6, являющегося собственником 33,6 % размещенных обыкновенных акции ОАО «ВымпелКом». Согласно п. 3 ст. 6 ФЗ об АО акционеры дочернего общества вправе требовать возмещения основным обществом (товариществом) убытков, причиненных по его вине дочернему обществу. Диспозиция п. 1 ст. 6 ГК РФ допускает применение гражданского законодательства по аналогии. Вследствие того, что отношения касательно дочерних и зависимых обществ являются сходными, положения п. 3 ст. 6 ФЗ об АО могут быть применены и к рассматриваемым отношениям по аналогии, то есть акционеры зависимого общества могут требовать возмещения убытков по правилам п. 3 ст. 6 ФЗ об АО.

Убытки дочернего общества считаются причиненными по вине основного общества (товарищества) только в случае, когда основное общество (товарищество) использовало имеющееся у него право и (или) возможность в целях совершения дочерним обществом действия, заведомо зная, что вследствие этого дочернее общество понесет убытки. Как следует из прилагаемых к настоящему исковому заявлению документов, сделка по приобретению акций ЗАО «УРС» в полном объеме была подготовлена уже в ноябре 2004 года. Собственники акций ЗАО «УРС» были готовы продать акции, отсутствовали какие-либо иные препятствия для совершения Сделки, кроме отсутствовавшего одобрения Совета директоров ОАО «ВымпелКом». При этом руководство ОАО «ВымпелКом» неоднократно информировало директоров общества, что просрочка в заключении Сделки приводит к ее удорожанию.

Между тем, в течение сентября – ноября 2005 года члены Совета директоров ОАО «ВымпелКом» от Теленора не давали своего согласия на Сделку даже при наличии решения внеочередного общего собрания акционеров ОАО «ВымпелКом» об одобрении сделки, что является недобросовестным и неразумным поведением со стороны членов

22

Совета директоров с учетом имевших место обстоятельств, которые, в свою очередь, требовали значительно более быстрых действий по выходу ОАО «ВымпелКом» на украинский рынок мобильной связи.

Таким образом, Истец, являясь акционером зависимого от Ответчика 6 общества, ОАО «ВымпелКом», вправе требовать возмещения преобладающим обществом (Ответчиком 6) убытков, причиненных по его вине зависимому обществу.

**8. Ответчики, являясь крупными акционерами Общества, злоупотребили своими правами на участие в управлении ОАО «ВымпелКом», чем причинили вред Обществу и его акционерам.**

Согласно ст. 31 ФЗ об АО акционеры - владельцы обыкновенных акций общества могут участвовать в общем собрании акционеров с правом голоса по всем вопросам его компетенции, а также имеют право на получение дивидендов, а в случае ликвидации общества - право на получение части его имущества. Нормой п. 1 ст. 53 ФЗ об АО предусматривается, что акционеры или акционер, являющиеся в совокупности владельцами не менее чем 2 процентов голосующих акций общества, вправе внести вопросы в повестку дня годового общего собрания акционеров и выдвинуть кандидатов в совет директоров (наблюдательный совет) общества, коллегиальный исполнительный орган, ревизионную комиссию (ревизоры) и счетную комиссию общества. Наряду с правом голосовать на общем собрании акционеров, данное положение образует так называемое *право акционера на участие в управлении акционерным обществом.*

Кроме указанных положений, применительно к ОАО «ВымпелКом» действует п. 10.6. Устава ОАО «ВымпелКом», согласно которому голосование по наиболее важным вопросам повестки дня Совета директоров общества осуществляется не менее чем двумя третями от числа всех членов Совета директоров, а в ряде случаев (приобретение или продажа долей участия в других обществах, п. 10.5.11. Устава) указанные вопросы подлежат одобрению не менее, чем 80 процентов от общего числа голосов членов Совета директоров общества. Таким образом, в ситуации, когда члены Совета директоров, номинированные Алтимо и Теленором действуют фактически как их представители, такими представителями акционеров может быть заблокировано любое решение Совета директоров.

Диспозиция ст. 10 ГК РФ устанавливает пределы осуществления гражданских прав, запрещая злоупотребление правом в какой-либо форме, в частности действия, имеющей свой целью ограничение конкуренции или злоупотребление доминирующим положением на рынке. Ответчики не должны были злоупотреблять предоставленными ими правами

23

акционеров в ущерб ОАО «ВымпелКом» и использовать свои права на участие в управлении ОАО «ВымпелКом» для создания ситуации, при которой Общество более чем в течение года было лишено возможности выхода на украинский рынок мобильной связи. Как полагает Истец, Ответчик 6 также не должен был создавать ситуацию с искусственной задержкой инициирования судебных споров по поводу приобретения ЗАО «УРС», вследствие чего ОАО «ВымпелКом» было существенно ограничено в возможности оперативно управлять и развивать ЗАО «УРС». В данном случае Ответчик 6 пытался ограничить конкуренцию на украинском рынке и действовал очевидным образом не в интересах ОАО «ВымпелКом», а в интересах собственного оператора на Украине – ЗАО «Киевстар GSM».

Как следует из прилагаемых к настоящему исковому заявлению документов, сделка по приобретению акций ЗАО «УРС» в полном объеме была подготовлена уже в ноябре 2004 г. Между тем, в течение сентября – ноября 2005 года члены Совета директоров ОАО «ВымпелКом» от Теленора не давали своего согласия на Сделку даже при наличии решения внеочередного общего собрания акционеров ОАО «ВымпелКом» об одобрении сделки, что является недобросовестным и неразумным поведением со стороны членов Совета директоров с учетом имевших место обстоятельств.

Согласно правовой позиции Конституционного Суда РФ, выраженной в Постановлении Конституционного Суда РФ от 21.04.2003 №6-П Гражданский кодекс Российской Федерации – в соответствии с вытекающими из Конституции Российской Федерации основными началами гражданского законодательства (п. 1 ст. 1 ГК РФ) – не ограничивает гражданина в выборе способа защиты нарушенного права. Граждане и юридические лица в силу статьи 9 ГК РФ вправе осуществить этот выбор по своему усмотрению (*Решение Арбитражного Суда г. Москвы от 22.03.2006 г. по делу А40-69739/05-1-362. Решение было вынесено по иску ОАО «НК «Роснефть», ООО «Байкалфинансгрупп» к ОАО «Юганскнефтегаз» и др. Решение было обжаловано в апелляционной и кассационной инстанции - обе инстанции поддержали решение Арбитражного суда г. Москвы. Текст постановления суда кассационной инстанции прилагается - приложение № 20*).

Изложенная выше правовая позиция по судебному толкованию ст. 10 ГК РФ образует самостоятельное юридическое основание для привлечения Ответчиков к ответственности за причиненные убытки (ст. 15 ГК РФ).

Злоупотребление Ответчиком 6 своими правами, использование им принадлежащих прав по управлению Обществом не в интересах самого Общества является неправомерным действием, причиняющим вред имуществу юридического лица.

24

Согласно п. 1 ст. 1064 ГК РФ вред, причиненный имуществу юридического лица, подлежит возмещению в полном объеме лицом, причинившим вред. Бремя доказывания отсутствия вины в действиях Ответчика лежит на самом Ответчике (п. 2 ст. 1064 ГК РФ).

Все Ответчики, действуя исключительно в собственных интересах, предпринимали действия, направленные на воспрепятствование своевременному выходу на украинский рынок мобильной связи ОАО «ВымпелКом» путем прямого блокирования принятия соответствующих решений на СД ОАО «ВымпелКом» и бездействий, выразившихся в отказе обсуждать альтернативные варианты проникновения ОАО «ВымпелКом» на украинский рынок, в т.ч. через приобретение ЗАО «Киевстар GSM ».

Ответчик 6, являясь крупным акционером ОАО «ВымпелКом», действовал во вред указанного Общества, создавая препятствия в совершении Сделки. Своими действиями, направленными на обеспечение своих интересов (которые реализовывались на Украине через ЗАО «Киевстар GSM»), противоречащих интересам Общества, Ответчик причинял последнему вред, подлежащий согласно п. 1 ст. 1064 ГК РФ взысканию в полном объеме.

И в случае прямого применения ст. 10 ГК РФ и в случае применения ст. 1064 ГК РФ Истец, являясь акционером ОАО «ВымпелКом», с учетом вышеизложенной правовой позиции Конституционного Суда РФ вправе осуществить выбор средства правовой защиты и потребовать возмещения убытков в пользу ОАО «ВымпелКом» через заявление настоящего иска.


Отказ Ответчика 1, Ответчика 2 и Ответчика 6 осуществить сделку по приобретению ОАО «ВымпелКом» компании ЗАО «Киевстар GSM» или осуществить проникновение на украинский рынок мобильной связи иным образом не позволило ОАО «ВымпелКом» значительно увеличить свою рыночную стоимость. Ответчик 6, действуя через своих представителей в Совете директоров ОАО «ВымпелКом», нарушил обязанность действовать в интересах ОАО «ВымпелКом», реализовал свои права во вред Общества и его акционеров, недобросовестно и неразумно в части создания препятствий при одобрении Сделки. Указанные действия ответчиков причинили ОАО «ВымпелКом» убытки в размере 3 797 818 500 (три миллиарда семьсот девяносто семь миллионов восемьсот восемнадцать тысяч пятьсот) долларов.

В результате просрочки в приобретении ОАО «ВымпелКом» украинской компании ЗАО «УРС» на срок одного года и созданной Ответчиком 6 правовой неопределенности в отношении правомерности данной Сделки (многочисленные судебные процессы в России и за рубежом в 2005 и 2006 г.) работа ОАО «ВымпелКом» на Украине началась только в

25

апреле 2006 г. Если бы Сделка была своевременно заключена, активная деятельность ОАО «ВымпелКом» на Украине могла начаться в ноябре 2004 г.

Средняя стоимость одного абонента ОАО «ВымпелКом» на декабрь 2007 года составляла 400 долларов США, а стоимость (цена, которую заплатило ОАО «ВымпелКом») одного абонента ЗАО «УРС» на ноябрь 2005 года -1100 долларов США, таким образом, средняя стоимость абонента ЗАО «УРС» равна 750 долларов США ((400+1100)/2).

Если бы ОАО «ВымпелКом» вышло на рынок сотовой связи Украины через ЗАО «УРС» в 2004 году, то количество абонентов увеличилось бы на 5 063 758 человек. Учитывая среднюю цену одного абонента, стоимость ОАО «ВымпелКом» составила бы на 3 797 818 500 долларов США больше, чем сейчас: 750 (средняя стоимость 1 абонента) * 5 063 758 (количество упущенных абонентов).

Указанная сумма и есть убытки, которые были причинены ОАО «ВымпелКом» в результате недобросовестных действий Ответчиков.

Таким образом, в случае своевременного заключения Сделки и своевременного начала работы ОАО «ВымпелКом» на украинском рынке в настоящее время стоимость 100% процентов акций ОАО «ВымпелКом» была бы на 3 797 818 500 долларов выше.

На основании изложенного, руководствуясь ст.ст. 4, 36, 125, 126, 130 Арбитражного процессуального кодекса Российской Федерации,

## ПРОСИМ:

взыскать солидарно с компании «Эко Телеком Лимитед», «Алтимо Холдингс энд Инветсментс Лтд.», «Авеню Лимитед», «Джэнау Пропертиз Лимитед», «Сэнтэл Лимитед», ОАО «ЦТ-Мобайл», «Теленор Ист Инвест АС» в пользу ОАО «Вымпел-Коммуникации» причиненные убытки в размере 3 797 818 500 (три миллиарда семьсот девяносто семь миллионов восемьсот восемнадцать тысяч пятьсот) долларов и 100 000 (сто тысяч) рублей госпошлины.

Руководствуясь положениями статей 125, 126 АПК РФ, прикладываем к настоящему исковому заявлению следующие документы:

1. Документы, подтверждающие направление копии искового заявления лицам, участвующим в деле (п. 1 ст. 126 АПК РФ);

2. Документ, подтверждающий уплату государственной пошлины (п. 2 ст. 126 АПК РФ) (*в соответствии с Информационным Письмом ВАС РФ № 118 от 29.05.2007*);

26

3. Нотариально заверенная копия Учредительного договора и Устава Истца, а также Свидетельства о перерегистрации (Memorandum and Articles of association, Certificate of re-registration) с переводом документа;

4. Нотариально заверенная копия документа, подтверждающего полномочия директора Истца (Certificate of Incumbency) с переводом документа;

5. Справка о состоянии счета депо депозитария;

6. Копия Устава ОАО «Вымпел - Коммуникации»;

7. Копии протоколов Заседания Совета директоров ОАО «ВымпелКом» за период октябрь 2004 – сентябрь 2005 года (№ 9 от 06.10.2004, № 11 от 04.11.2004, № 12 от 15.12.2004, №1 от 04.02.2005, № 2 от 22.04.2005, № 5 от 14.06.2005, № 7 от 15.08.05, № 8 от 16.09.2005, № 3 от 24.05.2006) (п. 3 ст. 126 АПК РФ);

8. Выписка из Реестра Компаний Гибралтара (с нотариально заверенным переводом);

9. Протокол осмотра письменных доказательств № 1580429 от 26.03.2008 (сообщение Алтимо от 18.01.2008 для Комиссии по ценным бумагам США (п. 3 ст. 126 АПК РФ) с нотариально удостоверенным переводом части информации);

10. Документы, подтверждающие юридический статус Теленор (п. 3 ст. 126 АПК РФ);

11. Протокол осмотра письменных доказательств № 1580430 от 26.03.2008 (нотариального осмотра сайта Алтимо (п. 3 ст. 126 АПК РФ));

12. Протокол осмотра письменных доказательств № 1580431 от 26.03.2008 (нотариального осмотра сайта Консорциума «Альфа-групп» (п. 3 ст. 126 АПК РФ));

13. Протокол осмотра письменных доказательств № 1580432 от 26.03.2008 (нотариального осмотра сайта ОАО «МегаФон» (п. 3 ст. 126 АПК РФ));

14. Протокол осмотра письменных доказательств № 1580428 от 26.03.2008 (нотариального осмотра сайта Теленор (п. 3 ст. 126 АПК РФ));

15. Протокол осмотра письменных доказательств № 1580426 от 26.03.2008 (нотариального осмотра сайта ОАО «ВымпелКом» (п. 3 ст. 126 АПК РФ));

16. Нотариально заверенный перевод информации с Интернет-сайтов компании Теленор и ОАО «ВымпелКом»;

17. Выписка из ЕГРЮЛ по ОАО «ЦТ-Мобайл» от 26.02.2008 (п. 3 ст. 126 АПК РФ);

18. Информационное Письмо ВАС РФ № 118 от 29.05.2007;

19. Украинская «ИнвестГазета» № 21 от 24.05.2005 (п. 3 ст. 126 АПК РФ);

20. Судебная практика (п. 3 ст. 126 АПК РФ);

21. Выдержка из нормативного акта из законодательства БВО (International business companies act of British Virgin Islands) (п.3. ст. 126 АПК РФ) с переводом;

27

22. Судебные акты, вынесенные по результатам рассмотрения исков Теленор (п. 3. ст. 126 АПК РФ);

23. Свидетельство зарегистрированного агента на Алтимо (с переводом);

24. Свидетельство зарегистрированного агента на компанию «Джэнау Пропертиз Лимитед» (с переводом);

25. Свидетельство зарегистрированного агента на компанию «Авеню Лимитед» (с переводом);

26. Свидетельство зарегистрированного агента на компанию «Сэнтэл Лимитед» (с переводом);

27. Судебная практика по ст. 253 АПК РФ;

28. Копия статьи из газеты «Ведомости» (№ 229(2003) от 04.12.2007);

29. Заявление о принятии обеспечительных мер (с приложением документа, подтверждающего уплату госпошлины в размере 1000 рублей);

30. Нотариально заверенная копия доверенности на представителя Истца (п. 5 ст. 126 АПК РФ).


Во исполнение требований пп. 8,9 ч. 2 ст. 125 АПК РФ, сообщаем, что необходимость соблюдения претензионного или иного досудебного порядка при предъявлении настоящего иска не предусмотрено ни законодательством Российской Федерации, ни уставными документами ОАО «ВымпелКом»; мер по обеспечению имущественных интересов Истца до предъявления иска арбитражным судом не принимались.   В связи с этим в указанном случае не требуется предоставления документов, предусмотренных пп. 6,7 ст. 126 АПК РФ.


Представитель Компании «Фэрамекс Продактс, Инк.»
по доверенности, адвокат                                                Д.С. Черный

**Business Court for the Khanty-Mansi Autonomous Okrug**
54/1 Lenin Street, Khanty-Mansiysk
Khanty-Mansi Autonomous Okrug, Tyumen Region 628012

| | |
|---|---|
| **Plaintiff:** | **FARIMEX PRODUCTS, INC.**<br>BVI company number: 1054174<br>Sea Meadow House, Blackburne Highway<br>PO Box 116, Road Town, Tortola<br>British Virgin Islands<br>Mailing address:<br>23 Denisovsky Pereulok, Building 6, Moscow 105005<br>Attn: Dmitri Sergheevich Chernyi, an attorney-at-law |
| **Defendants:** | **1. ECO TELECOM LIMITED**<br>Incorporation number: 79038<br>10/5 International Commercial Center<br>Casemates Square, Gibraltar |

**2. Altimo Holdings & Investments Ltd.**
BVI company number: 178274
Suite 2, 4 Irish Place, Gibraltar

**3. AVENUE LIMITED**
BVI company number: 437584
Geneva Place, 2nd floor, #333 Waterfront Drive,
Road Town, [Tortola,] British Virgin Islands

**4. JANOW PROPERTIES LIMITED**
BVI company number: 233325
Geneva Place, 2nd floor, #333 Waterfront Drive,
Road Town, [Tortola,] British Virgin Islands

**5. SANTEL LIMITED**
BVI company number: 437587
Geneva Place, 2nd floor, #333 Waterfront Drive,
Road Town, [Tortola,] British Virgin Islands

**6. TELENOR EAST INVEST AS**
Representative in Russia:
32 Sadovo-Kudrinskaya Street, Building 1, Moscow 125047
Tel.: (495) 937 9588, fax: (495) 937 9589
E-mail: telenor.moskva@telenor.com

**7. Open Joint Stock Company ("OAO") CT-MOBILE**
14 Kuzovatkin Street, Nizhnevartovsk,
Khanty-Mansi Autonomous Okrug, 628611

**Third Parties: 1. OAO Vimpel-Communications**
10, 8th March Street, Building 14, Moscow 127083
Tel.: +7 (495) 725 0700, fax: +7 (909) 991 7903

**2. Mikhail Fridman, a citizen of the Russian Federation**
10, 8th March Street, Building 14, Moscow 127083

**3. Alexei Reznikovich, a citizen of the Russian Federation**
10, 8th March Street, Building 14, Moscow 127083

**4. Arve Johansen, a citizen of the Kingdom of Norway**
10, 8th March Street, Building 14, Moscow 127083

**5. Fridtjof Rusten, a citizen of the Kingdom of Norway**
10, 8th March Street, Building 14, Moscow 127083

**6. Henrik Torgersen, a citizen of the Kingdom of Norway**
10, 8th March Street, Building 14, Moscow 127083

**Amount of claim: US$3,797,818,500**
Official fee: 100,000 Russian rubles

*Note: a request for interim relief (Exhibit 29) is attached to this statement of claim*

## STATEMENT OF CLAIM
### for Damages

The plaintiff, FARIMEX PRODUCTS, INC. (hereinafter, the **"Plaintiff"**) is the owner of 25,000 American Depositary Receipts for shares in OAO Vimpel-Communications (hereinafter, **"OAO VimpelCom"** or the **"Company"**) (Exhibit 5). According to the explanations of the Federal Financial Markets Service of the Russian Federation, the conditions of issuance and circulation of ADRs, having an ISIN (International Security Identification Number) assigned to them as provided for by a foreign law and evidencing the right to shares in Russian issuers, are fully compliant to all criteria for securities issued in series, as provided in Article 2 of Federal Law No. 39-FZ "On the Securities Market," dated April 22, 1996. Therefore, under Russian law, those ADRs are considered to be securities issued in series by a foreign issuer (letter No. 05-VG-03/13719 of the Federal Financial Markets Service, dated August 29, 2005) and evidencing property rights and non-property rights of the Plaintiff to shares in OAO VimpelCom.

This lawsuit is filed in connection with the bad faith exercise of rights by the Defendants and an improper performance of the Defendants' obligations which

shareholders of Russian joint stock companies bear, and is intended to claim damages from the Defendants which were caused by their illegal acts or omissions.

## 1. Facts in the Case

The first defendant, Eco Telecom Limited (hereinafter, **"Eco Telecom"** or **"Defendant 1"**), is a company registered in Gibraltar with its registered office at 10/5 International Commercial Center, Casemates Square, Gibraltar. Defendant 1 is the owner of 44% of all voting shares in OAO VimpelCom. According to an extract from the Gibraltar Companies Register (Exhibit 8), the director of Defendant 1 is Marina Kushnareva.

The second defendant, Altimo Holdings & Investments Ltd. (hereinafter, **"Altimo"** or **"Defendant 2"**), is a company registered in the British Virgin Islands with its registered office at Suite 2, 4 Irish Place, Gibraltar. The phone number of the company is 011-350-41977. According to a filing by Altimo with the US Securities and Exchange Commission (Exhibit 9), as well as an extract from the Gibraltar Companies Register regarding Defendant 1, it is a 100% shareholder of Eco Telecom Limited, which, in its turn, owns 44% of all voting shares in OAO VimpelCom. The directors of Defendant 2 are Geoffrey Piers, a UK citizen, Georgia Karydes, a citizen of Cyprus, Olga Kichatova, a citizen of Russia, Marina Kushnareva, a citizen of Russia, and Franz Wolf, a citizen of Germany.

According to the information shown on the websites of Altimo and Alfa Group Consortium, to which Altimo belongs (hereinafter, Alfa Consortium), Defendant 2 is a shareholder of OAO VimpelCom and OAO MegaFon (Exhibits 11 and 12 – protocols of notarized inspection of websites). Both companies are registered in the territory of the Russian Federation. As demonstrated above, Altimo effectively is an indirect shareholder of OAO VimpelCom. Altimo is also not a direct shareholder of OAO MegaFon. According to a list of affiliated persons of OAO MegaFon available on the website of OAO MegaFon, the direct shareholder of OAO MegaFon related to Altimo is Open Joint Stock Company CT-Mobile (OAO CT-Mobile) which owns 25.1% of all voting shares in OAO MegaFon (Exhibit 13 – a protocol of notarized inspection of a website). In its turn, according to an extract from the unified state register of legal entities regarding OAO CT-Mobile (Exhibit 17), the founders (shareholders) of OAO CT-Mobile are three international business companies registered in the British Virgin Islands: Avenue Limited, Janow Properties Limited and Santel Limited. OAO CT-Mobile is registered at 14 Kuzovatkin Street, Nizhnevartovsk, Khanty-Mansi Autonomous Okrug, 628611. The legislation of the British Virgin Islands does not permit access to information on shareholders of an international business company without the consent of shareholders of such company (Exhibit 21). For that reason, the Plaintiff cannot provide direct evidence that Altimo is a 100% shareholder of each of the above-mentioned three international business companies. Nevertheless, information available on the websites of Alfa Consortium and Altimo is indirect evidence confirming that Altimo owns 100% of the shares in each of the above-mentioned international business companies. In particular, both websites indicate that Altimo owns 25.1% of the

shares in OAO MegaFon, which is the same numbers of shares as the number of shares indicated in the list of affiliated persons of OAO MegaFon as belonging to OAO CT-Mobile.

The third defendant, Avenue Limited, an international business company, company number 437584 (hereinafter, **"Defendant 3"**), is registered in the British Virgin Islands with its registered office at Geneva Place, 2nd floor, #333 Waterfront Drive, Road Town, British Virgin Islands. According to an extract from the unified state register of legal entities regarding OAO CT-Mobile, Defendant 3 is a founder (shareholder) of OAO CT-Mobile (Exhibit 17).

The fourth defendant, Janow Properties Limited, an international business company, company number 233325 (hereinafter, **"Defendant 4"**), is registered in the British Virgin Islands with its registered office at Geneva Place, 2nd floor, #333 Waterfront Drive, Road Town, British Virgin Islands. According to an extract from the unified state register of legal entities regarding OAO CT-Mobile, Defendant 4 is a founder (shareholder) of OAO CT-Mobile (Exhibit 17).

The fifth defendant, Santel Limited, an international business company, company number 437587 (hereinafter, **"Defendant 5"**), is registered in the British Virgin Islands with its registered office at Geneva Place, 2nd floor, #333 Waterfront Drive, Road Town, British Virgin Islands. According to an extract from the unified state register of legal entities regarding OAO CT-Mobile, Defendant 5 is a founder (shareholder) of OAO CT-Mobile (Exhibit 17).

The sixth defendant, Telenor East Invest AS (hereinafter, **"Telenor"** or **"Defendant 6"**), is a company organized under the laws of Norway (Exhibit 10). The defendant is the owner of 17,254,579 uncertificated registered shares of common stock of OAO VimpelCom, or 33.6% of all outstanding shares of common stock of OAO VimpelCom.

In view of the claims contained in this lawsuit, an important fact is that Defendant 2 and Defendant 6 are principal shareholders of Closed Joint Stock Company (**"CJSC"**) Kyivstar GSM, the leading operator of mobile radiotelephone communications in Ukraine. According to information available on the website of Alfa Consortium, Altimo owns 43.48% of CJSC Kyivstar GSM (Exhibits 12 and 16 – pages 2 and 7). Also, the group of companies which includes Defendant 6 was and continues to be the owner of 56.5% of the shares of common stock of CJSC Kyivstar GSM. According to the Telenor's own data available on its website, CJSC Kyivstar GSM holds a 43% share of the Ukrainian mobile market (Exhibits 14 and 16 – pages 1 and 6).

The seventh defendant, OAO CT-Mobile (hereinafter, **"Defendant 7"**), is a company organized under the laws of the Russian Federation. According to an extract from the unified state register of legal entities regarding OAO CT-Mobile, Defendant 7 is fully controlled by Defendants 3-5, because they own, in the aggregate, 100% of the voting shares in OAO CT-Mobile (Exhibit 17).

According to the Charter of OAO VimpelCom (Article 10.2), the Board of Directors has 9 members (Exhibit 6). According to Article 10.6 of the Charter, voting on the most important issues on the agenda of the Company's Board of Directors must be by at least 2/3 of all members of the Board of Directors and in a number of cases (such as the acquisition or sale of shareholdings in other companies (see Article 10.5.11 of the Charter)) such matters must be approved by no less than 80% of the total number of votes to which the members of the Company's Board of Directors are entitled. Therefore, two members of the Company's Board of Directors can block the adoption of any resolution falling under the provisions of Article 10.6 of the Charter.

In the period from 2004 to date the representatives of Altimo on the Board of Directors of OAO VimpelCom (hereinafter, the "BoD" or the "Board of Directors") have been Mikhail Fridman and Alexei Reznikovich. The website of Altimo shows that Alexei Reznikovich is the Chief Executive Director of Altimo (Exhibit 11). In fact, Alexei Reznikovich has, in regard to Altimo, the same functions as the single-person executive body of a Russian joint stock company. As it will be demonstrated later, in reality, Alexei Reznikovich is the principal person who makes decisions in relation to Altimo and who makes Altimo's policies, including those in relation to the companies in which Defendant 2 directly or indirectly owns shares.

From June 2004 to June 2005, Mr. Arve Johansen, Mr. Jo Lunder, and Mr. Henrik Torgersen were Telenor's representatives on the Board of Directors of OAO VimpelCom. Mr. Thon was an independent director nominated by Telenor (Exhibit 7).

From the summer of 2005 to the summer of 2006, Mr. Arve Johansen, Mr. Henrik Torgersen, and Mr. Fridtjof Rusten were elected to serve on the of the Board of Directors of OAO VimpelCom as Telenor's representatives. Mr. Jo Lunder was an independent director nominated by Telenor (Exhibit 7).

In June 2004, the Board of Directors of OAO VimpelCom adopted a development strategy for the company which involved the active entry of OAO VimpelCom into the markets of CIS countries, including Ukraine. At the end of 2004, the management of OAO VimpelCom submitted to the Board of Directors for consideration the acquisition of CJSC Ukrainian RadioSystems (hereinafter, "CJSC URS" or "URS") as one of the options for entry into the Ukrainian market. Later, the management of OAO VimpelCom proposed different options for the implementation of the above-mentioned strategy in Ukraine, including a promising acquisition of CJSC Kyivstar GSM by OAO VimpelCom. According to the minutes of OAO VimpelCom's BoD meeting held on May 24, 2006, OAO VimpelCom had to withdraw its offer to buy CJSC Kyivstar GSM because Defendant 2 and Defendant 6 could not come to an agreement on the terms of the acquisition of said company.

The position of the Plaintiff on this issue is that Altimo and Telenor did not sell shares in CJSC Kyivstar GSM to OAO VimpelCom because it was in their best interests to keep ownership of shares in that company.

Defendants were active in trying to block the attempts of OAO VimpelCom to enter the Ukrainian market by other means, for example, by the acquisition of 100 percent of the shares in CJSC URS by OAO VimpelCom (hereinafter, the **"Transaction"**).

For instance, Telenor's representatives on the Board of Directors of OAO VimpelCom consistently voted against the approval of the Transaction, acting not in the best interests of OAO VimpelCom, but in the best interests of the shareholder that nominated them, i.e., Telenor, and Telenor's Ukrainian subsidiary CJSC Kyivstar GSM.

In particular, the possible entry of OAO VimpelCom into the telecommunications market of Ukraine had been discussed since the fall of 2004, when the members of the Board of Directors of OAO VimpelCom expressed their general agreement to consider this possibility (BoD Minutes No. 9 dated October 6, 2004, Exhibit 7).

During the BoD meeting held on November 4, 2004 (BoD Minutes No. 11 dated November 4, 2004, Exhibit 7), members of the Board of Directors were presented with a detailed plan for the potential acquisition of the Ukrainian company, which included, among other things, an analysis of costs, risks and profitability of the project. During the discussion of the project, it became evident that the BoD members representing Telenor were quite skeptical about this offer. In particular, Mr. Torgersen noted that "the expansion of the Company to Ukraine is, possibly, premature because it is necessary to consider and use the possibility of collaboration with existing operators in Ukraine"; by saying this, he openly implied Telenor's ownership of an interest in Kyivstar – one of the leading operators in Ukraine. The BoD members representing Telenor did not take into account that CJSC URS was already an existing operator in Ukraine. Also, Mr. Torgersen claimed that the management of the Company (OAO VimpelCom) exceeded its authority by asking the Board of Directors to consider the acquisition at the current stage; he forgot that, during previous BoD meetings, the Board of Directors itself granted the Company's management the authority to develop a Company expansion strategy for Ukraine.

Representatives of Baker Botts LLP were present during the project discussion at the meeting held on December 15, 2004 (BoD Minutes No. 12 of December 15, 2004, Exhibit 7). They commented on the procedural issues of the approval of the transaction on URS; in particular, they pointed out that "every BoD member should consider the acquisition in its essence, leaving behind his own interests, as well as the interests of every particular shareholder, and when making a decision about whether or not to approve this acquisition, he should act reasonably and prudently and be guided only by the interests of the Company." Also, the representatives of Baker Botts LLP noted that, according to the Company's Charter, the number of votes required for approval of such a transaction is quite large, and because of that "many important transactions or projects suggested for implementation by the Company can be blocked by any two directors." Then, Mr. Lunder and Mr. Thon expressed their consent to signing an option agreement so as to obtain exclusive and some other rights.

Later, on February 4, 2005, the BoD members were presented with another report on the acquisition of URS (BoD Minutes No. 1 of February 4, 2005, Exhibit 7).

The main discussion of the issue regarding the acquisition of CJSC URS took place at the BoD meeting held on April 22, 2005 (BoD Minutes No. 2, of April 22, 2005, Exhibit 7). The General Director of OAO VimpelCom, Alexander Izosimov, told BoD members that option agreements had been signed with the shareholders of CJSC URS, and the exclusivity period would soon expire thereunder, and that the price had significantly increased since the beginning of negotiations. BoD members were also presented with alternative scenarios of this transaction and were told that time was working against OAO VimpelCom.

It is necessary to note that, at all BoD meetings during which the acquisition of URS was discussed, almost all directors, except for the BoD members representing Telenor, pointed out that a delay in making a decision regarding the acquisition of CJSC URS could materially affect the price of that asset and called for making the decision more promptly.

Mr. Torgersen decided not to support the project, mainly based on the existence of a strong competitive environment in Ukraine. He assessed the proposed project as excessively optimistic, and, unlike other directors, he believed that the project was not sufficiently prepared. At the same time, Mr. Torgersen noted that "they [Telenor] are ready to support other acquisitions as well, including those in Ukraine, but such acquisitions should increase the Company's profitability for its shareholders."

To justify his refusal to approve the transaction, Mr. Johansen stated that CJSC URS was the fourth, not the third, entrant in Ukraine and that such acquisition would not be advantageous to OAO VimpelCom.

Mr. Thon remarked that at the moment the acquisition would be risky, and the entry into the Ukrainian market should be better carried out through private equity or using some other strategy.

Mr. Lunder said that the merger between OAO VimpelCom and CJSC Kyivstar GSM would be the best way for OAO VimpelCom to expand to Ukraine.

Torgersen, Thon and Johansen voted against the acquisition of control of URS by OAO VimpelCom.

In an interview given on May 24, 2005 to the Ukrainian newspaper InvestGazeta, Telenor's representative in Ukraine Sigmund Ekhougen made the following comment on the Transaction: "We think it is an unfortunate business decision. First of all, Alfa and Telenor have interests in Kyivstar, and this is a reason why we think that becoming the owner of yet another Ukrainian operator is wrong. Second, we think that URS is not worth the amount of money that was being discussed..." (Exhibit 19, page 17).

At the BoD meeting held on June 14, 2005, BoD members were presented with an alternative project for entry into the Ukrainian market, namely, through the acquisition of a minority stake in URS on the condition that the majority stake would be acquired by private equity funds. This project would significantly reduce the Company's risks, and the project, thus, reflected the wishes of the BoD members regarding alternative options for the acquisition of URS as expressed at previous meetings.

The Company's General Director, Mr. Izosimov, also said that OAO VimpelCom had filed an application with the Ukrainian anti-monopoly authority and that the Company had been requested to submit additional information. The anti-monopoly authority informed that it received a request from Telenor to be mentioned as an interested party (but OAO VimpelCom was not notified about this by Telenor). In the same application it was noted that if OAO VimpelCom would buy URS then URS, Kyivstar and Golden Telecom would be under common control, which could become a reason for denying approval of the possible transaction. In this manner, Telenor intentionally acted to impede the process of receiving approval from the antimonopoly authority as soon as possible.

During the next discussion, Mr. Thon expressed his concerns regarding profits from this investment. Mr. Torgersen said that he had concerns about the projected average revenue per user, CAPEX requirements and competitive environment on the Ukrainian market. Unlike the BoD members representing Telenor, the BoD members representing Alfa – Mr. Fridman and Mr. Reznikovich – supported the proposed structure of the transaction, although they pointed out to losses in value as compared to the acquisition of a 100% stake. They said that because they were BoD members "they think that this acquisition would benefit the Company" (BoD Minutes No. 5 of June 14, 2005, page 3, Exhibit 7).

During that BoD meeting, the decision to buy up to 40% of the URS shares was not made because it was blocked by Mr. Torgersen and Mr. Johansen who voted against it.

The issue about the acquisition of URS was raised again during the BoD meeting that took place on August 15, 2005 after the first extraordinary general meeting of shareholders that could not be held because of lack of quorum. The BoD members were asked to vote on the two following issues: the support of the expansion of OAO VimpelCom to Ukraine, and instructing the management to take all necessary measures to seek opinions about the fairness of the assessment from one or two international banks. The decision was not made because it was blocked by Mr. Johansen (BoD Minutes No. 7 of August 15, 2005, pages 4-5, Exhibit 7).

An Extraordinary General Meeting of Shareholders (the "**EGM**") was held on September 14, 2005 and approved the Transaction as an interested party transaction. Shareholders owning approximately 51.2% of all outstanding voting shares in the

Company voted for the approval of the acquisition of all outstanding shares in URS by the Company (Exhibit 22).

On September 16, 2005, the BoD members at their meeting discussed matters related to the Extraordinary General Meeting of Shareholders and the acquisition of URS, including statements on the fairness of the valuation.  The BoD chairman and independent director, Mr. Haines, particularly emphasized at the meeting that the EGM decision of September 14, 2005 remains valid until such time as a Russian court declares it invalid, and until then "all directors are obliged to perform their fiduciary obligations as directors of OAO VimpelCom and not to act as representatives of any individual shareholders, and he requested that the discussion take place on the basis of this principle" (BoD Minutes No. 8 of September 16, 2005, page 3, Exhibit 7).  After that, Mr. Haines explained that he and the General Director had received letters from Telenor "which contained a large number of statements and threats of initiating lawsuits" (BoD Minutes No. 8 of September 16, 2005, page 4, Exhibit 7).  He said that the BoD members were not expected to vote for the URS deal, and proposed that they express support for the General Director of the Company and confirm again that he was required to carry out the decisions of the EGM.   And again all the BoD members representing Telenor, Messrs. Johansen, Torgersen, and Rusten, voted against such decision and it was not approved (BoD Minutes No. 8 of September 16, 2005, page 10, Exhibit 7).

On November 11, 2005, the General Director of OAO VimpelCom completed a deal for the acquisition of 100% of the URS shares.

After the completion of this deal, beginning at the end of January of 2006, Defendant 6 began an active judicial campaign, simultaneously filing three lawsuits with the Moscow Business Court in connection with the acquisition of URS shares by OAO VimpelCom: 1) a claim for the invalidation of the resolution of an extraordinary general meeting of shareholders, dated September 14, 2005, approving an interested party transaction (namely, the acquisition of 100% of the shares in CJSC Ukrainian RadioSystems by OAO VimpelCom); 2) a claim for the invalidation of the decision of the chief executive officer on the acquisition of CJSC Ukrainian RadioSystems (which was a personal lawsuit against Mr. A.V. Izosimov), and 3) a claim for the invalidation of a transaction and the application of the consequences of such invalidation (namely, the acquisition of 100% of the shares in CJSC Ukrainian RadioSystems by OAO VimpelCom).

The above lawsuits passed through all levels of Russian courts (up to and including the Highest Business Court of the Russian Federation) and courts at all levels confirmed the legality of the resolution of the extraordinary general meeting of shareholders, the legality of the decision of the chief executive officer on the acquisition of URS and the legality of the acquisition of URS (Exhibit 22).

The litigations, which took almost two years (the last hearing took place in the fall of 2007), substantially limited the ability of OAO VimpelCom to manage URS, impeded the prompt adoption of strategic decisions on the development of URS, damaged the

image of the Company itself, emphasized differences between shareholders of the Company and, as a consequence, impeded the adoption of unanimous decisions on the strategic development of the Company itself.

In addition, it is necessary to state in regard to Telenor *that the development strategies of OAO VimpelCom and Telenor currently have a potential for multiple conflicts of interests between OAO VimpelCom and Telenor.* As is shown in the "Strategy" of Telenor (Exhibits 14 and 16, pages 3 and 8), one of the goals of Telenor is the strengthening of the position of Telenor as an international mobile operator: "*We intend to continue to strengthen our mobile industrialization in the sphere of mobile communications by gaining control over selected mobile operators. This control is important for us for obtaining benefits from international joint efforts, for example, in relation to the scale of deliveries, for developing new services and incorporating best practices, for improving the operational efficiency and increasing our general profitability. We intend to manage our non-strategic investments as financial investments and also to abandon activities in international mobile communications in the cases where we cannot gain control after a period of time.*"

In its turn, after maximizing profits in the Russian market, the second goal among the strategic objectives of OAO VimpelCom, is the goal of *growth of the business in the territory of the CIS*, to be achieved by, among other things, the acquisition of companies on existing markets (Exhibits 15 and 16, pages 5 and 10).

In this manner, in the absence of control over OAO VimpelCom, Telenor considers its investments in OAO VimpelCom as "financial investments," which are secondary in the strategy of Telenor in comparison with the "strategic investments" in the companies over which it exercises control.

As the Plaintiff believes, this means in practice that if a potential target for an acquisition appears on any CIS market or a situation arises where OAO VimpelCom intends to acquire an interest in a local operator, Telenor will always in the first instance think of its own goals, aimed at establishing Telenor's control over a company in the same CIS market. Any conflict of goals will be resolved in favor of Telenor, in light of the above-referenced provision of Article 10.6 of OAO VimpelCom's Charter. Such provision is an effective instrument by which in recent years Telenor has ensured the protection of its own interests in connection with the approval of the strategic decisions of OAO VimpelCom.

Therefore, the present lawsuit is a consequence of just one of the episodes of the existing conflict of strategic goals of OAO VimpelCom and Telenor.

The absence of any active discussion by the Board of Directors of OAO VimpelCom to explore any other options for the entry of OAO VimpelCom into the Ukrainian market for mobile communications also indicates that the directors representing Altimo were not interested in a more rapid initiation of work by OAO VimpelCom on the Ukrainian market that offers high potential.

Specifically, at the meeting of the Board of Directors on May 24, 2006, OAO VimpelCom's General Director, Mr. Izosimov, informed the directors of the withdrawal of the offer by OAO VimpelCom to purchase CJSC Kyivstar GSM because of the lack of progress in the negotiations between Telenor and Alfa Consortium (Altimo) in relation to "an agreement on dividing the market."

As a result of such actions by the representatives of Defendants' interests, the entry of OAO VimpelCom into the Ukrainian market was delayed by one year.

However, as later events demonstrated, had OAO VimpelCom begun work in Ukraine earlier this would have led to a greater market value of OAO VimpelCom and would have strengthened the position of OAO VimpelCom on the Russian market to the detriment of the position of another company of which Altimo is also a major indirect shareholder, OAO MegaFon. It is also necessary to note that Altimo was and continues to be the second largest shareholder of CJSC Kyivstar GSM, with Telenor being the largest shareholder. Thus, a "dual" conflict of interests existed on the part of Altimo which was resolved otherwise than in favor of OAO VimpelCom.

Therefore, any further successful development of business by OAO VimpelCom in the CIS is jeopardized since the situations described above may occur again in the future. The Plaintiff believes that, taking into account the existing and effective provisions of Russian law and the Charter of OAO VimpelCom, the only realistic means of protecting the interests of OAO VimpelCom and the Plaintiff as a shareholder of OAO VimpelCom is to claim damages from the Defendants on a joint and several basis to recover losses incurred by OAO VimpelCom and its minority shareholders as a results of the unfair and illegal actions of the Defendants.

## 2. Territorial Jurisdiction over This Lawsuit

Articles 36(3) and 247(1)(1) of the Code of Arbitration Procedure of the Russian Federation (the **"Procedural Code"**) provide that a lawsuit against a foreign legal entity can be filed at the location where that entity has property.

As noted above, Defendants 3-5 own, in the aggregate, 100% of the shares in OAO CT-Mobile, a company registered in the Khanty-Mansiysk Autonomous Okrug. There exist precedents in the business court practice where it was determined that the place where property is located in such a case is the place of registration of the relevant legal entity in which an interest or shares are held (the decision, dated April 18, 2005, taken by the Tenth Appellate Business Court in case no. 10AP-1697/04-GK; and the decision, dated February 17, 2004, taken by the Federal Business Court for the West Siberian District in case no. F04/820-64/A75-2004 (Exhibit 20)). Accordingly, the place where property of Defendants 3-5 is located is the place of registration of OAO CT-Mobile, namely, 14 Kuzovatkin Street, Nizhnevartovsk, Khanty-Mansi Autonomous Okrug.

With the presence of several foreign defendants, the Plaintiff can exercise its right to sue and bring an action at the location of any of the defendants in accordance with Articles 36(2), 36(3) and 36(7) of the Procedural Code (the decision, dated April 25, 2006, taken by the Federal Business Court for the Far Eastern District in case no. F03-A80/06-1/3 (Exhibit 20)).

The Plaintiff has exercised the right referred to above and have chosen the territorial jurisdiction for this lawsuit to be at the location of property of Defendants 3-5.

### 3. Address for Notification to Defendant 6

According to Article 121(1) of the Procedural Code, parties involved in a case and other participants in legal proceedings in a business court must be informed by the business court as to the time and place of the hearings by sending a copy of an appropriate court order no later than fifteen days before the beginning of the hearing or another proceeding, unless otherwise specified by the Procedural Code.

Pursuant to Article 121(5) of the Procedural Code, foreign parties must be informed by the business court in accordance with the rules established by Chapter 12 of the Procedural Code, unless otherwise specified by the Procedural Code or an international agreement of the Russian Federation.

As required by Article 152 of the Procedural Code, a case must be considered by a business court of first instance and the decision must be made within one month of the day of the court order scheduling the case for trial, unless otherwise specified by the Procedural Code.

Based on the rules of Article 253(2) of the Procedural Code, a case involving a foreign party must be reviewed within the time limits determined by the Procedural Code if such party or any of its governing bodies, branches, representative offices or representatives authorized to conduct affairs are located or reside in the territory of the Russian Federation.

In this connection, the Plaintiff calls the court's attention to the following circumstances. According to Exhibit 14 to the statement of claim, Telenor Russia AS is a representative of Telenor in Russia. Information confirming the registration of such representative in the territory of the Russian Federation at 32 Sadovo-Kudrinskaya Street, Building 1, Moscow 123001, is also contained in Exhibit 14 to the statement of claim. As shown on the website of the representative (Exhibit 14), the representative is responsible for support of investments of Telenor in the Russian telecommunications industry and also for looking for new business opportunities. A key objective of the representative office in Moscow is the maintenance of contacts with local government agencies, business partners, the press and analysts. It is also noted on the website of Telenor's representative that Telenor acts in Russia through two companies in which it owns shares. These are VimpelCom and Golden Telecom. Telenor has three representatives on the Board of Directors of OAO VimpelCom. As stated on page 14 of

the statement of claim [in Russian], Defendant 6, Telenor East Invest AS, is in fact a shareholder of OAO VimpelCom and the entity nominating directors to the BoD of OAO VimpelCom. The website, thus, provides confirmation of the fact that it is Telenor East Invest AS that has a presence and a representative in the territory of Russia or that such representative acts in a representative capacity for Telenor East Invest AS as well.

The head of Telenor's representative, Kjell Morten Johnsen, is named as a "Senior Vice-President of Telenor" or the "Senior Vice-President of Telenor, Central and Eastern Europe" on that website. He is also a member of the Board of Directors of OAO VimpelCom. Based on the list of Telenor companies contained in Exhibit 14 to the statement of claim, "Telenor, Central and Eastern Europe" is exactly Telenor East Invest AS.

Based on an interview given by Kjell Morten Johnsen to the newspaper "Vedomosti" (issue No. 229 (2003) of December 4, 2007 – Exhibit 28), it is possible to draw the conclusion that the activities of Mr. Johnsen and of the Moscow representative office of Telenor specifically relate to the activities of Telenor East Invest AS: in the interview Mr. Johnsen represented the position of Telenor East Invest AS in connection with the conflict regarding the acquisition of CJSC Ukrainian RadioSystems.

On March 25, 2008, the above-mentioned website presented information on an arbitration proceeding between Eco Telecom and Telenor East Invest in Geneva. Even though that proceeding is not related to Telenor Russia, Evgenia Cheredkova, PR and communications manager, Moscow representative office, Telenor Russia, was named as a contact person for receiving further information. This fact also points out that the Moscow representative office of Telenor Russia also acts in a representative capacity for Telenor East Invest as well.

Thus, the Plaintiff believes that the court has every reason to believe that a governing body, branch, representative office or representative of Telenor East Invest AS who is authorized to conduct affairs is located or resides in the territory of the Russian Federation and, consequently, the court has a basis for the review of the case within the time limits established by Article 152 of the Procedural Code and for giving notification of the place and time of the hearing to an address in Russia.

A similar legal position regarding the interpretation of Article 253(2) of the Procedural Code also prevails in the judicial practice. Business courts proceed from the fact that, based on the intent of that Article, if a foreign party or its governing bodies, branches or representatives are located (or reside) in the territory of the Russian Federation, then questions connected with giving them a due notice of scheduling the case for hearing are resolved as generally provided for by the Procedural Code (Exhibit 27).

**4. Actions of Members of the Board of Directors of the Company in the Interests of Defendant 6.**

The results of voting at meetings of the Board of Directors of the Company on the approval of the Transaction confirm that the members of the Board of Directors of OAO VimpelCom nominated by Telenor coordinated their positions for voting at a meeting of the Board of Directors of OAO VimpelCom with the position of Telenor as a legal entity (namely, acted on the direct instructions of Telenor's officers or themselves held top positions in the governing bodies of Telenor: Mr. Arve Johansen has been a Senior Executive Vice-President of Telenor East Invest AS since 1999; and Fridtjof Rusten has been a Senior Vice-President of Telenor East Invest AS since January 2003).

The Plaintiff also thinks that the inaction of the directors representing Altimo and Telenor on the question of the possible acquisition of CJSC Kyivstar GSM by OAO VimpelCom can also be explained by the fact that such acquisition was not to the advantage of Altimo or Telenor.

When the above-mentioned members of the Board of Directors voted on resolutions of the Board of Directors they acted in the interests and on the instructions of the respective shareholders that nominated them to the Board of Directors of OAO VimpelCom, and, consequently, were representatives of such shareholders by virtue of the second paragraph of Article 182(1) of the Civil Code of the Russian Federation (hereinafter, the **"Civil Code"**), and their authority was derived from the circumstances in which the voting took place.

For example, in a similar situation of voting on a shareholder's instructions, which is covered by Resolution No. 738 of the Russian Government, dated December 3, 2004 (On the Management of Federally Owned Shares in Open Joint Stock Companies and the Exercise of the Special Right of the Russian Federation to Participate in the Management of Open Joint Stock Companies (the "Golden Share")), paragraphs 17 and 22 thereof provide that the relevant members of the board of directors are expressly called "representatives of the interests of the Russian Federation on the board of directors" and that they vote on matters, put on the agenda of a meeting of the board of directors, on the basis of written directives of the Federal Agency for the Management of Federal Property.

The Federal Law "On Joint Stock Companies" (hereinafter, the **"JSC Law"**) provides that a member of the board of directors exercising his rights and performing his duties must act only in the interests of the company and exercise his rights and perform his duties with respect to the company in good faith and reasonably. Therefore, a member of the board of directors must act independently and not on the instructions of a shareholder.

Nevertheless, when the members of the Board of Directors of OAO VimpelCom nominated by Telenor voted at the meetings of the Board of Directors on the approval of the Transaction they acted not in the interests of OAO VimpelCom but rather in the

interests of Telenor and as its representatives, and, as a result, their actions must directly create, change or terminate the civil rights and obligations of Telenor, which they represent, under Article 182(1) of the Civil Code.

The foregoing indicates that Defendant 6, acting through the members of the Board of Directors of OAO VimpelCom who were its representatives loyal to it, took various actions (or failed to act) with the main goal of not permitting the Transaction to occur. After the Transaction was completed, Defendant 6 took a set of actions directed at challenging the completed Transaction and related decisions taken by the Company's governing bodies. All above-mentioned actions of the Defendant were contrary to the best interests of the Company and were taken other than in good faith and reasonably, which resulted in losses incurred by the Company.

Because the lawsuit against the individuals listed above is filed in connection with their functions as members of the Board of Directors of OAO VimpelCom, they should be notified at the location of this governing body of the Company. Thus, notices to the persons who served or are serving on the Board of Directors of OAO VimpelCom and are defendants in this case must be given to the following address: 10, 8th March Street, Building 14, Moscow 127083.

### 5. Defendant 2 Effectively Controls Defendants 3-5 and 7 and Acted in Their Interests.

As is evident from the facts in the case, Mr. Reznikovich, being the CEO of Altimo and acting as a member of the Board of Directors of OAO VimpelCom, implemented decisions approved by Altimo. This actions were taken on behalf of the Alfa Consortium group in such manner as if only one legal entity actually acted. Altimo participated in delaying the approval of the Transaction for over a year and did not let OAO VimpelCom implement other opportunities for entering the Ukrainian market, including entry through the purchase of CJSC Kyivstar GSM by OAO VimpelCom.

Through its representative on the Board of Directors of OAO VimpelCom, Altimo acted in the interests of Defendants 3-5 and 7, which indirectly, through OAO CT-Mobile, own shares in OAO Megafon. In addition, Altimo blocked the acquisition of CJSC Kyivstar GSM by OAO VimpelCom. Actions taken in order to prevent OAO VimpelCom from entering the Ukrainian market did not permit OAO VimpelCom to increase its market value by at least US$3,797,818,500. A company with a greater market value is able to attract more funds to carry out its activities, including activities in Russia. Greater financial capabilities of OAO VimpelCom on the Russian market could have damaged the position of OAO MegaFon, which, in its turn, would have adversely affected the value of the shares in OAO MegaFon that are indirectly owned by the above-mentioned three BVI companies.

The Plaintiff believes that full control of Defendants 2 and 3-5 over OAO CT-Mobile, on the one hand, and full control of Altimo over these Defendants, on the other

hand, deprive Defendants 3-5 and 7 of the ability to state any objections regarding the lack of responsibility for acts or omissions by Altimo.

Under Article 403 of the Civil Code, debtors are liable for non-fulfillment or an improper fulfillment of obligations by third parties which were asked to fulfill such obligations, unless the law provides that liability must be borne by the third party that was expected to directly fulfill the obligations.

### 6. Defendant 6 Breached its Obligation to Act in the Interests of the Company in Good Faith and Reasonably.

Defendant 6 is the holder of a large block of Company shares, which constitute 33.6% of all outstanding shares of common stock of OAO VimpelCom. Thus, the Defendant has broad actual powers to significantly influence the Company's activity as well as on the decisions taken by the Company which powers are supported by the rights of a shareholder provided by law.

A shareholder has rights in terms of the management of the Company and has the corresponding obligation to act in the best interests of the Company and not to abuse a shareholder's rights belonging to it.

By virtue of Article 53(1) of the Civil Code, a legal entity acquires civil rights and incurs civil obligations through its bodies acting in accordance with the applicable laws and regulations and its constitutive documents. A shareholder exercising the rights of management and control through the company's bodies is subject to the requirements set for individuals who are members of the Company's bodies, i.e., the requirements to act in the best interests of the company and to exercise his rights and perform its obligations in good faith and reasonably (Article 71(1) of the JSC Law).

Article 71(1) of the JSC Law points out not only to certain bodies of a joint stock company (viz., the single-person executive body), but also to individuals who directly participate in the decision-making of a body of the company (viz., members of the board of directors and members of the collective executive body), i.e., participate in the development and adoption of management decisions to be adopted by specific bodies of the company subject to their authority.

Article 47(1) of the JSC Law provides that the highest governing body of a company is the general meeting of shareholders. The individuals who participate in the decision-making at the general meeting of shareholders are shareholders themselves and each specific shareholder has an indirect influence on any decision made by the company, because all other bodies, including the company's board of directors, are elected by the shareholders.

Therefore, a shareholder, whose relationships with the company are relations in personam (the second paragraph of Article 48(2) of the Civil Code and the first paragraph of Article 2(1) the JSC Law), is not only endowed with rights in relation to the company,

but is also legally obligated to act in the best interests of the company and to exercise his rights and to perform his obligations with respect to the company in good faith and reasonably.

When Defendant 6 exercised its rights as a shareholder of OAO VimpelCom, it breached the general obligation under Article 10 of the Civil Code not to abuse the rights conferred on it, which in the case under review was the obligation not to abuse the rights conferred on it as a major shareholder to the prejudice of OAO VimpelCom and its other shareholders.

Defendant 6 exercised its right to participate in the management of OAO VimpelCom in order to create the situation where for over a year the Company was deprived of the opportunity to enter the promising Ukrainian mobile communications market where its presence was an absolutely justified decision advantageous for the Company.

In this situation, the Defendant's actions, that were the vote against a proposed resolution and a failure to act (by not supporting opportunities for the Company's development), carried out the intention to restrict competition on the Ukrainian market and were obviously not in the best interests of OAO VimpelCom or its shareholders but rather in the interests of the mobile operator controlled by the Defendant in Ukraine, CJSC Kyivstar GSM, which caused the Company and its shareholders to incur serious losses.

### 7. Defendant 6, Which Is a Major Shareholder of the Company, Breached Its Obligations, Which Caused Losses Incurred by the Company and Its Shareholders.

As established by Article 48(2) of the Civil Code, the founders (members) of a legal entity may have rights in personam with respect to such legal entity in connection with participation in the formation of its property. Legal entities in relation to which their members have rights in personam include, inter alia, business companies. Joint stock companies are business companies (Article 66(3) of the Civil Code). Thus, legal relationships arise between a shareholder, on the one hand, and the joint stock company, on the other hand, upon the acquisition of shares therein by the shareholder. In cases where a shareholder abuses the rights belonging to it, the joint stock company becomes entitled to a right of claim against the shareholder, who becomes an obligor of the joint stock company.

The current Russian civil law does not contain any special provisions regarding the liability of shareholders to the company. However, a major shareholder who has procured the election of its representatives to the company's governing bodies becomes a person who is obligated by law to act in the best interests of the company of which he is a member, by analogy with a similar obligation imposed on all individuals who are members the company's governing bodies (Article 71(1) of the JSC Law), and the shareholder is liable to the company in the case of the breach of this obligation.

Specifically, Defendant 6, exercising the rights of a shareholder granted to it, violated the requirements for good faith and reasonableness on several occasions when it directly took actions other than in the Company's best interests (by voting or refusing to vote at the general meetings of shareholders) or took indirect actions by giving the relevant instructions on voting to its representatives on the board of directors.

According to Article 15(1) of the Civil Code, a person whose right has been violated may demand full compensation for his losses.

As established by Article 6(4) of the JSC Law, a company is deemed to be a related company if another (holding) company holds more than 20 percent of the voting stock of the first company. OAO VimpelCom is, thus, a related company of Defendant 6, which owns 33.6% of all outstanding shares of common stock of OAO VimpelCom. According to Article 6(3) of the JSC Law, the shareholders of a subsidiary have the right to demand compensation from the parent company/partnership for any losses incurred by the subsidiary through the parent company's fault. The provision of Article 6(1) of the Civil Code permits the application of civil law by analogy. Because the relationships regarding a subsidiary and a related company are similar, the provisions of Article 6(3) of the JSC Law may also be applied to the relationships under review by analogy, i.e., the shareholders of a related company may demand compensation for losses under the rules of Article 6(3) of the JSC Law.

The losses of a subsidiary are considered to be incurred through the fault of its parent company/partnership only if the parent company/partnership used its right and/or ability for the purposes of causing the subsidiary to take actions and certainly knew that the subsidiary would incur losses because of such actions. As follows from the documents attached to this statement of claim, the acquisition of shares in CJSC URS was fully prepared in November 2004. The owners of shares in CJSC URS were prepared to sell the stock and there were no other obstacles to completing the Transaction except for the lack of approval by the Board of Directors of OAO VimpelCom. The management of OAO VimpelCom informed the company's directors on several occasions that a delay in making the Transaction would result in a rise in its price.

However, during September-November 2005, the members of the Board of Directors of OAO VimpelCom representing Telenor did not give their consent to the Transaction even when there was the decision of an extraordinary general meeting of shareholders of OAO VimpelCom to approve the transaction, which was not diligent or reasonable behavior on the part of such members of the Board of Directors in light of given circumstances, which circumstances required considerably faster actions for OAO VimpelCom to enter the Ukrainian mobile communications market.

Therefore, the Plaintiff as a shareholder of a related company of Defendant 6, viz., OAO VimpelCom, has the right to demand compensation from the holding company (Defendant 6) for losses incurred by the related company through the holding company's fault.

**8. The Defendants, As Major Shareholders of the Company, Abused Their Rights to Participate in the Management of OAO VimpelCom and, Thus, Caused Damage Incurred by the Company and Its Shareholders.**

According to Article 31 of the JSC Law, shareholders owning the company's common stock can participate in the general meeting of shareholders and vote on all matters falling within its authority, and also have the right to receive dividends, and if the company is liquidated, they have the right to receive part of its property. Article 53(1) of the JSC Law stipulates that a shareholder or shareholders who together own no less than 2 percent of the voting stock of the company have the right to propose items for the agenda of an annual general meeting of shareholders and propose candidates for election to the board of directors/supervisory board of the company and the collective executive body, internal audit commission (internal auditors) and inspectors of the vote of the company. In addition to the right to vote at the general meeting of shareholders, this provision creates the so-called *right of a shareholder to participate in the management of the joint stock company.*

In addition to these provisions, Article 10.6 of OAO VimpelCom's Charter applies to OAO VimpelCom, according to which voting on the most important items on the agenda of the Board of Directors must be by no less than two-thirds of all the members of the Board of Directors, and in a number of cases (such as the acquisition or sale of a shareholding in another company (Article 10.5.11 of the Charter)) such matters are subject to approval by no less than 80 percent of the total number of votes to which the members of the company's Board of Directors are entitled. Therefore, in the situation where the members of the Board of Directors nominated by Altimo and Telenor actually acted as their representatives, these representatives of the shareholders could block any decision of the Board of Directors.

The provision of Article 10 of the Civil Code establishes limits for exercising civil rights and forbids any abuse of right and, specifically, actions intended to restrict competition or to abuse a dominant position on the market. The Defendants should not have abused the rights conferred on them as shareholders to the detriment of OAO VimpelCom or used their rights to participate in the management of OAO VimpelCom in order to create a situation in which the Company was deprived of the opportunity to enter the Ukrainian mobile communications market for more than a year. As the Plaintiff believes, Defendant 6 also should not have created an artificial delay in initiating lawsuits regarding the acquisition of CJSC URS: as a consequence of such delay OAO VimpelCom's ability to operate and develop CJSC URS was significantly restricted. In this case, Defendant 6 attempted to restrict competition on the Ukrainian market and obviously acted otherwise than in the best interests of OAO VimpelCom, but rather in the interests of its own operator in Ukraine, CJSC Kyivstar GSM.

As follows from the documents attached to this statement of claim, the acquisition of shares in CJSC URS was fully prepared back in November 2004. However, during September-November 2005, the members of the Board of Directors of OAO VimpelCom representing Telenor did not give their consent to the Transaction even though there was

a decision of an extraordinary general meeting of shareholders of OAO VimpelCom approving the Transaction, which is not diligent or reasonable behavior on the part of such members of the Board of Directors in light of given circumstances.

According to the legal position of the Constitutional Court of the Russian Federation stated in Resolution No. 6-P of the Constitutional Court of the Russian Federation, dated April 21, 2003, the Civil Code (in line with the basic principles of civil law following from the Russian Constitution (Article 1(1) of the Civil Code)) does not restrict a citizen's right to select the method of protecting a violated right. Under Article 9 of the Civil Code, a citizen or legal entity has the right to make this choice in his/its own discretion *(the decision, dated March 22, 2006, taken by the Moscow Business Court in case no. A40-69739/05-1-362. The decision was made in connection with a claim of OAO NK Rosneft and OOO Baykalfinansgrupp against OAO Yuganskneftegaz et al. The decision was appealed at the first and the second appellate level and both higher courts supported the decision of the Moscow Business Court. The text of the decision of the court at the second appellate level is attached as Exhibit 20 hereto).*

The aforementioned legal position on the judicial interpretation of Article 10 of the Civil Code forms an independent legal basis for holding the Defendants liable for the losses caused (Article 15 of the Civil Code).

The abuse of right by Defendant 6 and the use of its rights to manage the Company otherwise than in the best interests of the Company itself are an illegal act that damaged the property of such legal entity. According to Article 1064(1) of the Civil Code, damage to property of a legal entity is to be compensated in the full amount by the party that caused the damage. The burden of proof that the actions of the Defendant were taken other than through its fault lies with the Defendant itself (Article 1064(2) of the Civil Code).

All of the Defendants, acting exclusively in their own interests, took actions aimed at preventing the timely entry by OAO VimpelCom into the Ukrainian mobile communications market which actions included the direct blocking of the relevant decisions of the Board of Directors of OAO VimpelCom and failures to act that were the refusal to discuss alternative options for OAO VimpelCom to enter the Ukrainian market through the acquisition of CJSC Kyivstar GSM or otherwise.

Defendant 6 as a major shareholder of OAO VimpelCom acted to the detriment of this Company by creating obstacles to the completion of the Transaction. By its actions aimed at safeguarding its interests (that were promoted in Ukraine via CJSC Kyivstar GSM) that were contrary to the interests of the Company, the Defendant caused damage to the Company, which is recoverable in full according to Article 1064(1) of the Civil Code.

Both in the case of the direct application of Article 10 of the Civil Code and in the case of the application of Article 1064 of the Civil Code and based on the aforementioned legal position of the Constitutional Court of the Russian Federation, the Plaintiff as a

shareholder of OAO VimpelCom has the right to choose a remedy and to demand compensation for losses in favor of OAO VimpelCom by filing this lawsuit.

The refusal of Defendant 1, Defendant 2 and Defendant 6 to complete the acquisition of CJSC Kyivstar GSM by OAO VimpelCom or to enter the Ukrainian mobile communications market in another way did not allow OAO VimpelCom to significantly increase its market value. Defendant 6, acting through its representatives on the Board of Directors of OAO VimpelCom, breached the duty to act in the best interests of OAO VimpelCom and exercised its rights to the detriment of the Company and its shareholders and in bad faith and unreasonably in terms of creating obstacles to the approval of the Transaction. These actions of the defendants caused OAO VimpelCom to incur a loss of three billion seven hundred ninety seven million eight hundred eighteen thousand five hundred dollars ($3,797,818,500).

As a result of a delay in the acquisition of the Ukrainian company CJSC URS by OAO VimpelCom by one year and the creation of legal uncertainty by Defendant 6 regarding the legality of this Transaction (as a result of numerous legal proceedings in Russia and abroad in 2005 and 2006), the operations of OAO VimpelCom in Ukraine only began in April 2006. If the Transaction had been made on a timely basis, active operations of OAO VimpelCom in Ukraine could have started in November 2004.

The average value of OAO VimpelCom per subscriber as of December 2007 was US$400 and the value (i.e., the price paid by OAO VimpelCom) per subscriber of CJSC URS as of November 2005 was US$1,100; thus, the average value of a subscriber of CJSC URS was US$750 ((400+1,100)/2).

If OAO VimpelCom had entered the Ukrainian mobile communications market via CJSC URS in 2004, then the number of subscribers would have increased by 5,063,758. Taking into account the value of one subscriber, the value of OAO VimpelCom would have been by US$3,797,818,500 more than now: 750 (average value per subscriber) x 5,063,758 (number of lost subscribers).

This amount is the losses incurred by OAO VimpelCom as a result of the bad faith actions of the Defendants.

Therefore, in the case of a timely completion of the Transaction and timely start of operations of OAO VimpelCom on the Ukrainian market the value of 100% of the stock of OAO VimpelCom would have been higher by $3,797,818,500 at this time.

Based on the foregoing and with reference to Articles 4, 36, 125, 126 and 130 of the Code of Arbitration Procedure of the Russian Federation:

## WE KINDLY REQUEST THAT

Eco Telecom Limited, Altimo Holdings and Investments Ltd., Avenue Limited, Janow Properties Limited, Santel Limited, OAO CT-Mobile and Telenor East Invest AS pay, on

a joint and several basis, three billion seven hundred ninety seven million eight hundred eighteen thousand five hundred dollars ($3,797,818,500) as damages and 100,000 (one hundred thousand) Russian rubles as official fees in favor of OAO Vimpel-Communications.

With reference to the provisions of Articles 125 and 126 of the Procedural Code, attached to this statement of claim are the following documents:

1. Documents that confirm that copies of the statement of claim were sent to the parties participating in the lawsuit (Article 126(1) of the Procedural Code);

2. Document that confirms payment of the applicable official fee (Article 126(2) of the Procedural Code) *(according to Informational Letter No. 118 of the Highest Business Court of the Russian Federation, dated May 29, 2007)*;

3. Notarized copy of the Memorandum and Articles of Association of the Plaintiff and the Certificate of Re-registration with a translation of the document;

4. Notarized copy of a document confirming the authority of the Plaintiff's Director (the Certificate of Incumbency) with a translation of the document;

5. Statement of custody account at the depository;

6. Copy of the Charter of OAO Vimpel-Communications;

7. Copies of the minutes of meetings of the Board of Directors of OAO VimpelCom for the period from October 2004 to September 2005 (minutes No. 9 dated October 6, 2004, minutes No. 11 dated November 4, 2004, minutes No. 12 dated December 15, 2004, minutes No. 1 dated February 4, 2005, minutes No. 2 dated April 22, 2005, minutes No. 5 dated June 14, 2005, minutes No. 7 dated August 15, 2005, minutes No. 8 dated September 16, 2005 and minutes No. 3 dated May 24, 2006) (Article 126(3) of the Procedural Code);

8. Extract from the Gibraltar Companies Register (with notarized translation);

9. Protocol No. 1580429 of inspection of written evidence, dated March 26, 2008 (Altimo's statement of January 18, 2008 to the US Securities and Exchange Commission (Article 126(3) of the Procedural Code) with a notarized translation of some of the information);

10. Documents confirming the legal status of Telenor (Article 126(3) of the Procedural Code);

11. Protocol No. 1580430 of inspection of written evidence, dated March 26, 2008 (notarized inspection of the website of Altimo (Article 126(3) of the Procedural Code));

12. Protocol No. 1580431 of inspection of written evidence, dated March 26, 2008 (notarized inspection of the website of Alfa Group Consortium (Article 126(3) of the Procedural Code));

13. Protocol No. 1580432 of inspection of written evidence, dated March 26, 2008 (notarized inspection of the website of OAO MegaFon (Article 126(3) of the Procedural Code));

14. Protocol No. 1580428 of inspection of written evidence, dated March 26, 2008 (notarized inspection of the website of Telenor (Article 126(3) of the Procedural Code));

15. Protocol No. 1580426 of inspection of written evidence, dated March 26, 2008 (notarized inspection of the website of OAO VimpelCom (Article 126(3) of the Procedural Code));

16. Notarized translation of information available on the websites of Telenor and OAO VimpelCom;

17. Extract from the unified state register of legal entities regarding OAO CT-Mobile, dated February 26, 2008 (Article 126(3) of the Procedural Code);

18. Informational Letter No. 118 of the Highest Business Court of the Russian Federation, dated May 29, 2007;

19. InvestGazeta, a Ukrainian newspaper, issue No. 21 of May 24, 2005 (Article 126(3) of the Procedural Code);

20. Precedents (Article 126(3) of the Procedural Code);

21. Extract from the International Business Companies Act of the British Virgin Islands (Article 126(3) of the Procedural Code) with translation;

22. Judicial decisions taken upon the consideration of Telenor's claims (Article 126(3) of the Procedural Code);

23. Certificate of Registered Agent for Altimo (with translation);

24. Certificate of Registered Agent for Janow Properties Limited (with translation);

25. Certificate of Registered Agent for Avenue Limited (with translation);

26. Certificate of Registered Agent for Santel Limited (with translation);

27. Precedents with respect to Article 253 of the Procedural Code;

28. Copy of a newspaper article from Vedomosti (issue No. 229 (2003) of December 4, 2007);

29. Request for interim relief (together with a document confirming payment of official fees in the amount of 1,000 rubles); and

30. Notarized copy of the power of attorney authorizing the Plaintiff's representative (Article 126(5) of the Procedural Code).

Pursuant to the requirements of Articles 125(2)(8) and 125(2)(9) of the Procedural Code, we inform that the requirement to comply with a pre-action protocol or another pretrial procedure in connection with the filing of this lawsuit is not stipulated by either Russian law or the constitutive documents of OAO VimpelCom; no interim relief has been granted to the Plaintiff by a business court prior to the filing of this lawsuit. For this reason, no document stipulated by Articles 126(6) or 126(7) of the Procedural Code should be submitted in the case under review.

[signed]
D.S. Chernyi
Representative of Farimex Products, Inc.
acting under a power of attorney

# EXHIBIT  F

01/04 '08 TUE 18:41 FAX                 @001

 **Alfa Capital**
Holdings (Cyprus) Ltd

| Registered address: | Themistokli Dervi 5, Elenion Building, 2nd Floor, P.C. ... Nicosia, Cyprus | Tel: +357 2 555800 Fax: +357 22555 803/4 |
| Administration office: | Demosthoni Severi 6, Kastellorizo Presidium, 3rd floor, CY-1080 Nicosia | Tel. +357 22 681568 Fax: +357 22 681505 |

1 апреля 2008 г.

Справка о состоянии счета депо депозитария по месту требования

Настоящим подтверждается, что компания FARIMEX PRODUCTS, INC (BVI Company number 1054174) начиная с 31.03.2004 по настоящее время является владельцем ценных бумаг - ADR (американские депозитарные расписки), выпущенных на акции российского ОАО "Вымпел-Коммуникации".

По состоянию на 31.03.2008 указанной компании принадлежит 25 000 американских депозитарных расписок на акции ОАО "Вымпел-Коммуникации".

С уважением,

Андрей Главацкий
Директор

OHS Translation

**ALFA CAPITAL**
**Holdings (Cyprus) Ltd**

| | | | |
|---|---|---|---|
| Registered Address: | Themistocles Dervi 5 Elenion | Tel: +357 32555800 | |
| | Building 2nd Floor, P.C. | Fax: +357 32555803/4 | |
| | [*illegible*], Nicosia, Cyprus | | |
| Administration Office: | Demostheni Severi 6 | Tel: +357 22 681_88 | |
| | Kastellorizo Presidium | Fax: +357 22 681505 | |
| | 1st Floor, CY-1080 Nicosiu | | |

April 1, 2008

Certificate on Status of Depositary Depo-Account
To Whom it May Concern

It is hereby certified that the company FARIMEX PRODUCTS, INC (BVI Company number 1054174) existing as of March 31, 2004 to present is the owner of ADR securities (American Depositary Receipts) issued for shares of OAO "Vimpel-Communications".

As of March 31, 2008, the company indicated above owns 25,000 American Depositary Receipts for shares of OAO "Vimpel-Communications".

Respectfully,

[signature]          [seal of Alfa Capital Holdings (Cyprus)]
Andrei Glavatskiy
Director

*Registered by the Cyprus Securities and Exchange Commission under number CIF025/04*
*[illegible]*

# EXHIBIT  G

*Suspited*

## ДОВЕРЕННОСТЬ

**Город Москва**                                                    «*31*» марта 2008 г.
Компания FARIMEX PRODUCTS, INC (BVI Company number 1054174), (именуемое далее
«Доверитель»), юридическое лицо, созданное и законным образом существующее в
соответствии с законами Британских Виргинских островов, дата регистрации 12 сентября
2003 года, представляемое директором Фридманом Дмитрием, действующего в
соответствии с Уставом, настоящим уполномочивает указанное ниже лицо

**Черного Дмитрия Сергеевича**, паспорт Российской Федерации 45 07 741268, выдан
Отделом внутренних дел района Строгино 24 сентября 2004 г. (код подразделения
772-090), удостоверение адвоката № 8142, выдано Главным управлением Федеральной
регистрационной службы по Москве 15 декабря 2005 г., регистрационный номер 77/7651 в
реестре адвокатов г. Москвы, далее именуемого «Представитель»,

представлять интересы Доверителя перед любыми государственными и местными
органами власти, исполнительными органами власти и должностными лицами,
нотариусами, юрисдикционными органами, юридическими или физическими лицами по
всем вопросам, касающимся Доверителя.

На основании настоящей Доверенности Представитель уполномочен действовать
от имени Доверителя в любом суде, включая любой арбитражный суд, со всеми правами
истца, ответчика, заявителя, ходатайствующего лица и третьего лица, включая
следующие:

— подписывать и подавать исковые заявления, встречные исковые заявления,
  заявления, отзывы на исковые заявления, ходатайства и другие документы,
  которые подаются в суды, включая арбитражные суды, а также подавать в
  суды или получать из судов, включая арбитражные суды, любые исковые
  заявления, встречные исковые заявления, заявления, отзывы на исковые
  заявления и иные документы;
— передавать дело на рассмотрение третейского суда;
— подписывать заявления о пересмотре дела на основании вновь открывшихся
  обстоятельств;
— подписывать заявления об обеспечении иска;
— заключать и подписывать соглашения по фактическим обстоятельствам;
— обжаловать вынесенные судебные акты, подписывать и подавать или
  отзывать апелляционные, кассационные и иные жалобы на действия и/или
  деяния судов или иных органов на любом уровне, а также подписывать или
  отзывать заявления о пересмотре судебных актов в надзорном порядке;
— изменять в целом или частично предмет или основания иска или
  обоснование иска;
— признавать иск;
— оплачивать от имени Доверителя государственные пошлины, судебные
  пошлины и иные судебные издержки;
— требовать принудительного исполнения судебных актов;
— получать исполнительные листы и их дубликаты в судах, включая
  арбитражные суды;
— подавать в органы принудительного исполнения и их должностным лицам и
  отзывать или получать у них исполнительные документы, включая
  исполнительные листы и любые иные документы;

ПРЕДСТАВИТЕЛЬ
« ФЭРИМЕКС
ПРОДАКТС ИНК »
ЧЕРНЫЙ Д. С.

- подавать жалобы на акты и действия органов принудительного исполнения и их должностные лица;
- получать любые платежи или имущество, присужденные Доверителю;
- подписывать и подавать или отзывать из судов, включая арбитражные суды и органы принудительного исполнения и их должностных лиц, заявления об изменении способов и порядка исполнения исполнительных документов.

На основании настоящей Доверенности, Представитель также уполномочен запрашивать и/или подписывать, подавать от имени Доверителя и получать от реестродержателя и депозитариев (юридических лиц, оказывающих услуги по ведению записей о праве собственности и передаче прав на акции и иные ценные бумаги) любые выписки, информацию и документы, которые могут быть запрошены и получены или предоставлены акционером в соответствии с законами Российской Федерации и любыми применимыми договорами и соглашениями.

Представитель также уполномочен совершать любые иные действия, вытекающие из полномочий, предоставленных настоящей Доверенностью.

Подпись Представителя на любом документе, составленном от имени Доверителя в целях, указанных в настоящей Доверенности, является достаточной для юридической действительности такого документа, и проставление на таком документе печати Доверителя не является необходимым или обязательным.

Настоящая доверенность регулируется и толкуется в соответствии законами Российской Федерации и остается в силе то тех пор, пока не будет отозвана в письменной форме Доверителем.

Полномочия, предоставленные настоящей Доверенностью, могут быть переданы Представителем полностью или частично (передоверие).

Настоящая доверенность выдана в городе Москва, Российской Федерации.

Доверенность выдана сроком на три года.

Подпись Черного Д.С. _____ удостоверяю.

Директор Компании
FARIMEX PRODUCTS, INC                                    Фридман Дмитрий

ПРЕДСТАВИТЕЛЬ
• ФЭРЬМЕКС
ПРОДАКТС ИНК •
ЧЕРНЫЙ Д. С.



Скреплено
на двух листах

# EXHIBIT H

Арбитражный суд Ханты-Мансийского
Автономного Округа
628012, Тюменская область, ХМАО,
г. Ханты-Мансийск, ул. Ленина, 54/1

**Истец:** Компания «ФЭРИМЕКС ПРОДАКТС,
ИНК.»
рег.номер компаний БВО: 1054174
**FARIMEX PRODUCTS, INC**
BVI Company number 1054174,
Sea Meadow House, Blackburne Highway (P.O.
Box 116), Road Town, Tortola,
British Virgin Islands
адрес для направления корреспонденции:
105005, г. Москва, Денисовский пер., д. 23,
стр. 6, для адвоката
Черного Дмитрия Сергеевича

**Ответчики:** 1. Компания «ЭКО ТЕЛЕКОМ ЛИМИТЕД»
Номер инкорпорации: 79038
10/5 Интернешнл Комешл Сентэ
Кэйсмэйтс Сквэ, Гибралтар
**ECO TELECOM LIMITED**
Incorporation Number: 79038
10/5 International Commercial Center
Casemates Square, Gibraltar

2. Компания «Алтимо Холдингс энд
Инвестментс Лтд.»
рег.номер компаний БВО: 178274
Сьют 2, 4 Айриш Плэйс, Гибралтар
**Altimo Holdings & Investments Ltd.**
BVI Company Number: 178274
Mailing Address: Suite 2, 4 Irish Place, Gibraltar

3. Компания «АВЕНЮ ЛИМИТЕД»
рег.номер компаний БВО: 437584
Женева Плейс, 2-й этаж, 333 Вотефронт
Драйв, Роуд Таун, Британские Виргинские
острова
**AVENUE LIMITED**
BVI Company Number: 437584
Geneva Place, 2nd Floor, #333 Waterfront Drive,
Road Town, Tortola, British Virgin Islands

4. Компания «ДЖЭНАУ ПРОПЕРТИЗ
ЛИМИТЕД»
рег.номер компаний БВО: 233325
Женева Плейс, 2-й этаж, 333 Вотефронт
Драйв, Роуд Таун, Британские Виргинские
острова
**JANOW PROPERTIES LIMITED**

BVI Company Number: 233325
Geneva Place, 2nd Floor, #333 Waterfront Drive,
Road Town, Tortola, British Virgin Islands

**5. Компания «СЭНТЭЛ ЛИМИТЕД»**
рег.номер компаний БВО: 437587
Женева Плейс, 2-й этаж, 333 Вотефронт
Драйв, Роуд Таун, Британские Виргинские
острова
**SANTEL LIMITED**
BVI Company Number: 437587
Geneva Place, 2nd Floor, #333 Waterfront Drive,
Road Town, Tortola, British Virgin Islands

**6. Компания «Теленор Ист Инвест АС»**
**TELENOR EAST INVEST AS**
Представительство на территории России:
125047, Москва, ул. Садово-Кудринская д. 32,
стр.1,
тел.: (495) 937 95 88, факс (495) 937 95 89,
e-mail: telenor.moskva@telenor.com

**7. ОАО «ЦТ-Мобайл»**
628611, ХМАО, г. Нижневартовск,
ул. Кузоваткина, д. 14

**Третьи лица:**  **1. ОАО «Вымпел – Коммуникации»**
127083, г. Москва, ул. Восьмого Марта, д.10,
стр.14,
тел.: +7(495) 725-0700, факс: +7(909) 991-7903

**2. Михаил Фридман,** гражданин Российской
Федерации
127083, г. Москва, ул. Восьмого Марта, д.10,
стр.14

**3. Алексей Резникович,** гражданин
Российской Федерации
127083, г. Москва, ул. Восьмого Марта, д.10,
стр.14

**4. Арве Йохансен (Arve Johansen),**
гражданин Королевства Норвегии
127083, г. Москва, ул. Восьмого Марта, д.10,
стр.14

**5. Фритьеф Рюстен (Fridtjof Rusten),**
гражданин Королевства Норвегии
127083, г. Москва, ул. Восьмого Марта, д.10,
стр.14

**6. Хенрик Торгерсен (Henrik Torgersen),**
гражданин Королевства Норвегии.
127083, г. Москва, ул. Восьмого Марта, д.10,
стр.14

---

**Цена иска: 3 797 818 500 долларов США**

*Госпошлина за рассмотрение заявления о
принятии обеспечительных мер:* 1 000 рублей

## ЗАЯВЛЕНИЕ
### об обеспечении иска

Компания «ФЭРИМЕКС ПРОДАКТС, ИНК.» (далее также - Истец) обратилась в Арбитражный суд Ханты-Мансийского автономного округа с иском к компаниям «Эко Телеком Лимитед», «Алтимо Холдингс энд Инветсментс Лтд.», «Авеню Лимитед», «Джэнау Пропертиз Лимитед», «Сэнтэл Лимитед», ОАО «ЦТ-Мобайл», «Теленор Ист Инвест АС» о взыскании убытков.

Одним из требований Истца по настоящему иску является взыскание с ответчиков солидарно убытков в размере 3 797 818 500 долларов США, которые были причинены ОАО «ВымпелКом» недобросовестными действиями (бездействием) Ответчиков.

В соответствии с диспозицией нормы статьи 2 АПК РФ задачами арбитражного судопроизводства выступают, среди прочего, защита нарушенных или оспариваемых прав и законных интересов предприятий, учреждений, организаций в сфере предпринимательской и иной экономической деятельности.

Одной из процессуальных гарантий справедливого и эффективного правосудия является закрепление в АПК РФ института обеспечительных мер.

Истец ходатайствует о применении обеспечительной меры в виде наложения ареста на все ценные бумаги (акции) ОАО «Вымпел-Коммуникации», принадлежащие Ответчику 1 и Ответчику 6, соответственно компаниям «Эко Телеком Лимитед» и «Теленор Ист Инвест АС», поскольку, как полагает Истец, применение указанной меры необходимо как в целях устранения невозможности исполнения в будущем судебного акта, так и в целях исключения (минимизации) причинения дальнейшего значительного ущерба Истцу.

В силу ст. 90 АПК РФ арбитражный суд может принять обеспечительные меры, направленные на обеспечение иска или имущественных интересов заявителя. Условиями принятия данных мер является следующее (согласно п. 9 Постановления Пленума ВАС РФ № 55 для удовлетворения ходатайства об обеспечительных мерах достаточно хотя бы одного основания):

1)     *если непринятие этих мер может затруднить или сделать невозможным исполнение судебного акта*

3

В случае удовлетворения требований Истца взыскание во исполнение будущего судебного акта будет обращено, прежде всего, на то имущество Ответчиков, место нахождение которого известно, то есть на ценные бумаги, принадлежащие «Эко Телеком Лимитед» и «Теленор Ист Инвест.АС». По имеющимся у Истца данным (соответствующие доказательства приложены к иску) компания «Эко Телеком Лимитед» владеет 44 % акций ОАО «Вымпел - Коммуникации», что составляет 18 964 799 штук обыкновенных именных акций и 6 426 600 штук привилегированных акций типа А ОАО «Вымпел - Коммуникации», а компания «Теленор Ист Инвест АС» - 29,9 % акций ОАО «Вымпел- Коммуникации», что составляет 17 254 579 штук обыкновенных именных акций ОАО «Вымпел - Коммуникации». Истцу не известно о нахождении на территории РФ иного имущества, принадлежащего Ответчику 1 и Ответчику 6, при этом Истец полагает, что в связи со значительностью суммы причиненных убытков, указанные лица примут все меры для того, чтобы избежать взыскания, и в течение срока рассмотрения дела указанные акции ОАО «Вымпел - Коммуникации» могут быть отчуждены в пользу третьих лиц. Данное обстоятельство может существенно затруднить исполнение в будущем судебного акта, поскольку в этом случае имеется большая вероятность того, что при удовлетворении требований Истца исполнение решения суда будет проходить за пределами РФ.

В связи с тем, что «Эко Телеком Лимитед» и «Теленор Ист Инвест АС» находятся за пределами РФ, Истец лишен возможности предоставить суду доказательства принадлежности названным Ответчикам какого-либо иного имущества, за исключением прав на ценные бумаги - акции ОАО «Вымпел - Коммуникации». Данное обстоятельство (отсутствие сведений у Истца о размере и местонахождения имущества Ответчиков за рубежом) может быть использовано указанными Ответчиками для создания препятствий в виде передачи своего ликвидного имущества третьим лицам в целях избежания выплаты сумм взысканных убытков. Это, в свою очередь, также повлечет затруднения в исполнении судебного акта, или сделает его исполнение невозможным.

2)    *в целях предотвращения причинения значительного ущерба заявителю*

В случае возникновения ситуации, при которой ответчиками будут предприняты меры по сокрытию имущества и (или) выводу активов в целях избежания обращения на него взыскания по решению суда, ОАО «Вымпел - Коммуникации» - лицо, в пользу которого заявлены требования о взыскании убытков, будет вынуждено будет нести дополнительные убытки в виде неполученного дохода от использования в гражданском обороте суммы в размере 3 797 818 500 доларов США, а также затрат на поиск имущества Ответчиком за пределами Российской Федерации с целью обращения на него взыскания по решению суда, на возможные дополнительные судебные процессы связанные с выводом Ответчиками активом, оспариванием передачи ими своего ликвидного имущества третьим лицам

Согласно п. 10  Постановления Пленума ВАС РФ № 55 *заявитель должен обосновать причину обращения с требованием о применении обеспечительных мер*, в частности обязательным является представление заявителем доказательств:

1)    *оспоренного или нарушенного права*

4

Истец являлся и является акционером ОАО «Вымпел - Коммуникации», которому в результате неправомерных действий Ответчиков были причинены значительные убытки. В качестве доказательства статуса Истца как акционера к исковому заявлению приложена выписка со счета ДЕПО (приложение № 5 к иску), удостоверяющая, в соответствии со ст. 28 Федерального закона «О рынке ценных бумаг», права собственности Истца на 25 000 американский депозитарных расписок, выпущенных на акции ОАО «ВымпелКом». Согласно разъяснениям Федеральной службы по финансовым рынкам Российской Федерации условия возникновения и обращения американских депозитарных расписок - ADR, имеющих присвоенный в установленном иностранным правом порядке идентификационный номер ценных бумаг ISIN (International Security Identification Number) и удостоверяющих права на акции российских эмитентов, соответствуют совокупности признаков эмиссионной ценной бумаги, указанной в ст. 2 Федерального закона от 22.04.1996 N 39-ФЗ «О рынке ценных бумаг». Следовательно, указанные депозитарные расписки в соответствии с законодательством Российской Федерации являются эмиссионными ценными бумагами иностранных эмитентов (Письмо ФСФР от 29.08.2005 N 05-ВГ-03/13719), удостоверяющими имущественные и неимущественные права Истца на акции ОАО «ВымпелКом».

Злоупотребление Ответчиками своими правами акционеров на управление Обществом, использование их не в интересах самого Общества является неправомерным действием, причиняющим вред имуществу юридического лица, а, следовательно, и иным акционерам, как лицам, которые могут участвовать в общем собрании акционеров с правом голоса по всем вопросам его компетенции, а также имеют право на получение дивидендов, а в случае ликвидации общества - право на получение части его имущества.

2)  *нарушения права*

В результате злоупотребления предоставленными правами акционеров в ущерб интересам самого ОАО «Вымпел - Коммуникации» и его других акционеров, не обладающих контрольными правомочиями, а также использования своих прав на участие в управлении ОАО «Вымпел - Коммуникации» Ответчиками 1 и 6 была создана ситуация, при которой Общество более чем в течение года было лишено возможности выхода на украинский рынок мобильной связи, что повлекло причинение ему ущерба на сумму свыше 3 миллиардов долларов США.


Таким образом, налицо нарушение прав Истца и необходимость принятия обеспечительных мер в целях предотвращения затруднения или невозможности исполнения судебного акта, а также предотвращения причинения значительного ущерба заявителю.

Кроме того, в соответствии с п. 10 Постановления Пленума ВАС РФ № 55 при рассмотрении ходатайства о принятии обеспечительных мер суд должен иметь в виду:

1) *разумность и обоснованность требования заявителя о применении обеспечительных мер*

Истец полагает, что наложение ареста на имущество Ответчиков является разумной мерой, поскольку только такая мера может гарантировать предотвращение причинения Истцу ущерба;

2) *вероятность причинения заявителю значительного ущерба в случае непринятия обеспечительной меры*

Недобросовестное поведение Ответчиков на протяжении ряда последних лет, игнорирование ими фактов причинения значительных убытков ОАО «Вымпел - Коммуникации» дает основание предположить, что ими будут приняты все возможные меры для вывода активов с целью не допустить обращение взыскания на принадлежащее им ликвидное имущество. Значительный ущерб заявителю в случае непринятия мер будет не только вероятен, но и реален, поскольку Истец не получит возмещения убытков на суммы свыше 3 миллиардов долларов.

Вероятность вывода активов с целью избежать взыскания судебной практикой рассматривается как достаточное основание для принятия обеспечительных мер (постановление ФАС СКО от 05.07.2004 № Ф08-2824/2004).

3) *обеспечение баланса интересов заинтересованных сторон*

Как разъяснил Высший Арбитражный Суд РФ в п.1 Информационного письма от 24.07.2003 № 72 арест акций, налагаемый арбитражным судом в целях обеспечения иска, означает лишь запрет владельцу акций распоряжаться ими как объектом гражданского оборота, но не препятствует пользованию ими и осуществлению удостоверенных ими прав по участию в управлении акционерным обществом. Таким образом, негативные последствия указанной обеспечительной меры (в соотношении с суммой заявленных требований) для Ответчиков минимальны, поскольку позволяют осуществлять права акционеров по данным акциям. Более того, принятие мер по обеспечению требований Истца до выяснения всех обстоятельств дела не может причинить ущерб Ответчикам, поскольку не влияет на рыночную стоимость акций. Неблагоприятные последствия могут быть только для Истца в случае, если обеспечительные меры не будут приняты.

4) *предотвращение нарушения при принятии обеспечительных мер публичных интересов, интересов третьих лиц.*

Истец полагает, что при принятии обеспечительных мер, публичные интересы и интересы третьих лиц затронуты не будут, поскольку испрашиваемая мера касается лишь имущественных прав Ответчиков (возможность отчуждения) и не влияет на права по

управлению ОАО «Вымпел - Коммуникации»; права прочих акционеров, публично-правовых образований в таком случае не затрагиваются.

*5) соразмерность обеспечительной меры заявленному требованию и ее возможность обеспечит фактическую реализацию целей обеспечительных мер*

Оценка соразмерности производится судом, в том числе, с учетом соотносимости права и интереса, о защите которых просит истец и имущественных последствий запрещения должнику совершения определенных действий (п. 10 Информационного Письма Президиума ВАС РФ от 24.07.2003 № 72).

Учитывая значительность уже причиненных убытков на сумму 3 797 818 500 долларов США полагаем, что обеспечительная мера в виде наложения ареста на ценные бумаги (акции) ОАО «Вымпел - Коммуникации», принадлежащие «Эко Телеком Лимитед» и «Теленор Ист Инвест АС» соразмерна заявленным требованиям. Общее количество акций ОАО «Вымпел - Коммуникации», принадлежащих названным Ответчикам составляет 42 645 978 штук. Акции ОАО «Вымпел - Коммуникации» не котируются на российских биржах, хотя некоторое количество американских депозитарных расписок, выпущенных на акции ОАО «Вымпел - Коммуникации» торгуется на Нью-Йоркской фондовой бирже. Таким образом, отсутствует объективная возможность установить стоимость акций ОАО «Вымпел - Коммуникации» на территории Российской Федерации. По оценке Истца, стоимость всего вышеуказанного пакета акций, принадлежащего обоим ответчикам может быть сопоставимой с ценой иска. Указанное обстоятельство также подтверждает соразмерность заявленных требований стоимости имущества ответчика, на которое налагается арест.

Наложение ареста на указанное имущество обеспечит в случае удовлетворения требований Истца реальное исполнение судебного акта, поскольку позволит получить возмещение ущерба в пределах всей взыскиваемой суммы. Таким образом, будет обеспечена реализация целей испрашиваемой обеспечительной меры:

- устраняется невозможность и затруднительность исполнения судебного акта;

- заявитель получает возможность минимизировать негативные последствия в случае недобросовестного поведения Ответчиков и сокрытия ими информации об ином, припадлежащем им имуществе.

Таким образом, испрашиваемая Истцом обеспечительная мера в виде наложения ареста на ценные бумаги (акции) ОАО «Вымпел - Коммуникации», принадлежащие компаниям «Эко Телеком Лимитед» и «Теленор Ист Инвест АС» полностью отвечает требованиям, установленным ч. 2 ст. 90 АПК РФ и ч. 2 ст. 91 АПК РФ, разъяснения о применении которых были даны Высшим Арбитражным Судом РФ в Постановлении Пленума № 55 от 12.10.2006.

Непринятие же указанных обеспечительных мер может привести к тому, что права ОАО «Вымпел - Коммуникации», а также опосредованно — его миноритарных акционеров не получат реальной и эффективной судебной защиты.

На основании изложенного и в соответствии со ст. ст. 90-92 АПК РФ

прошу:

принять обеспечительные меры по иску Компании «Фэримекс Продактс, Инк.» о взыскании убытков в виде наложения ареста на 18 964 799 штук обыкновенных именных акций и 6 426 600 штук привилегированных акций типа А ОАО «Вымпел - Коммуникации», принадлежащих компании «Эко Телеком Лимитед» и 17 254 579 штук обыкновенных именных акций ОАО «Вымпел - Коммуникации», принадлежащих компании «Теленор Ист Инвест АС».


Приложение:

1. Документ, подтверждающий уплату госпошлины за подачу заявления об обеспечении иска.


Представитель Компании «Фэримекс Продактс, Инк.»
по доверенности, адвокат                                                    Д.С. Черный

8

**Business Court for the Khanty-Mansiysk Autonomous Okrug**
54/1 Lenin Street, Khanty-Mansiysk, Khanty-Mansi
Autonomous Okrug, Tyumen Region 628012

**Plaintiff:** **FARIMEX PRODUCTS, INC.**
BVI company number: 1054174,
Sea Meadow House, Blackburne Highway (P.O. Box 116),
Road Town, Tortola, British Virgin Islands
Mailing address:
23 Denisovsky Pereulok, Building 6, Moscow 105005
Attn: Dmitri Sergheevich Chernyi, an attorney-at-law

**Defendants:** **1. ECO TELECOM LIMITED**
Incorporation number: 79038
10/5 International Commercial Center
Casemates Square, Gibraltar

**2. Altimo Holdings & Investments Ltd.**
BVI company number: 178274
Suite 2, 4 Irish Place, Gibraltar

**3. AVENUE LIMITED**
BVI company number: 437584
Geneva Place, 2nd Floor, #333 Waterfront Drive,
Road Town, [Tortola,] British Virgin Islands

**4. JANOW PROPERTIES LIMITED**
BVI company number: 233325
Geneva Place, 2nd Floor, #333 Waterfront Drive,
Road Town, [Tortola,] British Virgin Islands

**5. SANTEL LIMITED**
BVI company number: 437587
Geneva Place, 2nd Floor, #333 Waterfront Drive,
Road Town, [Tortola,] British Virgin Islands

**6. TELENOR EAST INVEST AS**
Representative in Russia:
32 Sadovo-Kudrinskaya Street, Building 1, Moscow
125047
Tel: (495) 937 9588, fax: (495) 937 9589
E-mail: **telenor.moskva@telenor.com**

**7. OAO CT-Mobile**
14 Kuzovatkin Street, Nizhnevartovsk, Khanty-Mansi
Autonomous Okrug, 628611

**Third Parties:**     **1. Open Joint Stock Company ("OAO") Vimpel-Communications**
10, 8th March Street, Building 14, Moscow 127083
Tel: +7(495) 725 0700, Fax: +7(909) 991 7903

**2. Mikhail Fridman**, a citizen of the Russian Federation
10, 8th March Street, Building 14, Moscow 127083

**3. Aleksey Reznikovich**, a citizen of the Russian Federation
10, 8th March Street, Building 14, Moscow 127083

**4. Arve Johansen**, a citizen of the Kingdom of Norway
10, 8th March Street, Building 14, Moscow 127083

**5. Fridtjof Rusten**, a citizen of the Kingdom of Norway
10, 8th March Street, Building 14, Moscow 127083

**6. Henrik Torgersen**, a citizen of the Kingdom of Norway
10, 8th March Street, Building 14, Moscow 127083

**Amount of claim: US$3,797,818,500**

*Official fee for the consideration of this request for interim relief: 1,000 Russian rubles*

## REQUEST
### for interim relief

FARIMEX PRODUCTS, INC. (hereinafter sometimes referred to as the "Plaintiff") has filed with the Business Court for the Khanty-Mansi Autonomous Okrug a claim against Eco Telecom Limited, Altimo Holdings & Investments Ltd., Avenue Limited, Janow Properties Limited, Santel Limited, OAO CT-Mobile and Telenor East Invest AS for damages.

In this lawsuit, the Plaintiff seeks, among other things, payment of damages by the defendants, on a joint and several basis, in the amount of US$3,797,818,500 as losses incurred by OAO VimpelCom as a result of acts or omissions by the Defendants in bad faith.

According to the provision of Article 2 of the Code of Arbitration Procedure of the Russian Federation (the "Procedural Code"), the objectives of proceedings in a business court include, *inter alia*, protection of violated or challenged rights and legitimate interests of enterprises, institutions and organizations in connection with business or other economic activities.

One of the procedural guarantees of fair and efficient justice is interim relief as set forth in the Procedural Code.

The Plaintiff seeks interim relief in the form of the attachment of all securities (shares) of OAO Vimpel-Communications that are owned by Defendant 1 and Defendant 6, i.e., by Eco

Telecom Limited and Telenor East Invest AS, respectively, because, in the Plaintiff's opinion, such relief is necessary for both the elimination of the unenforceability of a relevant judicial decision in the future and the elimination (or minimization) of further damage to the Plaintiff.

Based on Article 90 of the Procedural Code, a business court may grant interim relief intended as preliminary protection in connection with a petitioner's claim or its property-related interests. The conditions for granting interim relief (according to paragraph 9 of Resolution No. 55 of the Plenum of the Highest Business Court of the Russian Federation, even the existence of a single ground is sufficient for granting a request for interim relief) are:

*1) If failure to grant such relief may hinder or prevent enforcement of a judicial decision*

If the Plaintiff's claim is satisfied, a relevant future judicial decision will be executed, first and foremost, against the Defendants' property the location of which is known, i.e., the securities owned by Eco Telecom Limited and Telenor East Invest AS. According to information in the Plaintiff's possession (the relevant evidence is attached to the statement of claim), Eco Telecom Limited owns 44% of the shares in OAO Vimpel-Communications, which constitutes 18,964,799 registered common shares and 6,426,600 Class A preferred shares in OAO Vimpel-Communications, and Telenor East Invest AS owns 29.9% of the shares in OAO Vimpel-Communications, which constitutes 17,254,579 registered shares of common stock of OAO Vimpel-Communications. The Plaintiff is not aware of any other property of Defendant 1 or Defendant 6 in the territory of the Russian Federation, and the Plaintiff further believes that in view of the significance of the amount of the losses caused, said parties will take any steps required to avoid execution, and during the proceedings, said shares in OAO Vimpel-Communications may be disposed of in favor of third parties. This circumstance may significantly hinder the enforcement of a future judicial decision, as there is a high probability in such case that if the Plaintiff's claim is satisfied, enforcement of the judicial decision will take place outside the Russian Federation.

Because Eco Telecom Limited and Telenor East Invest AS are domiciled outside the Russian Federation, the Plaintiff is deprived of the possibility to present to the court any evidence that the Defendants own any other property except the rights to the securities that are shares in OAO Vimpel-Communications. This circumstance (that is, no information available to the Plaintiff about the amount or location of any of the Defendants' property abroad) may be used by the Defendants for creating obstacles by transferring liquid property to third parties for the purpose of avoiding payment of any damages awarded. This, in its turn, would lead to complications in the enforcement of the judicial decision or would render it unenforceable.

*2) For the purpose of preventing significant damage to the petitioner*

In the event that a situation arises where the Defendants take steps to conceal their property and/or siphon assets for the purpose of preventing the levy of execution thereon by order of the court, OAO Vimpel-Communications, which is the party in which favor the claim for damages has been filed, would have to incur additional losses in the form of lost income that may have been earned from the use of funds in the amount US$3,797,818,500 in transactions under civil law as well as in the form of costs incurred in searching for the Defendants' property outside the Russian Federation in order to levy execution thereon by order of the court or incurred in possible additional litigations associated with the siphoning of assets by the Defendants or the contesting of the transfer of their liquid property to third parties.

According to paragraph 10 of Resolution No. 55 of the Plenum of the Highest Business Court of the Russian Federation, *a petitioner must substantiate the reason for his request for interim relief*; specifically *the petitioner must provide proof of*:

### 1) Challenged or violated right

The Plaintiff was and is a shareholder of OAO Vimpel-Communications, which incurred significant losses as a result of unlawful acts by the Defendants. As proof of the Plaintiff's status as a shareholder, a custody account statement (Exhibit 5 to the statement of claim) is attached to the statement of claim, which account statement evidences the Plaintiff's title to 25,000 American Depositary Receipts for shares in OAO VimpelCom in accordance with Article 28 of the Federal Law "On the Securities Market." According to the explanation of the Federal Financial Markets Service of the Russian Federation, the conditions of issuance and circulation of ADRs, having an ISIN (International Security Identification Number) assigned to them as provided for by a foreign law and evidencing the right to shares in Russian issuers, are fully compliant to all criteria for securities issued in series, as provided in Article 2 of Federal Law No. 39-FZ "On the Securities Market," dated April 22, 1996. Therefore, under Russian law, those ADRs are considered to be securities issued in series by a foreign issuer (Letter No. 05-VG-03/13719 of the Federal Financial Markets Service, dated August 29, 2005) and evidencing property rights and non-property rights of the Plaintiff to shares in OAO VimpelCom.

Abuse by the Defendants of their shareholders' rights to manage the Company and the use of such rights otherwise than in the best interests of the Company are an unlawful act that damages property of such legal entity and, therefore, other shareholders as parties who are entitled to participate in the shareholders meeting with the right to vote on all matters falling within its authority and also have the right to receive dividends, and the right to receive a part of the company's property in the case of liquidation of the company.

### 2) Violation of right

As a result of the abuse of rights, granted to shareholders, to the detriment of the interests of OAO Vimpel-Communications itself and its other shareholders which do not have controlling powers and as a result of the use of the rights to participate in the management of OAO Vimpel-Communications, Defendants 1 and 6 created a situation where the Company was deprived of the ability to enter the Ukrainian mobile communications market for more than a year, which resulted in losses in excess of US$3 billion incurred by it.

Therefore, the violation of the Plaintiff's rights is obvious as well as the necessity of granting interim relief to prevent hindrance to, or the impossibility of, enforcement of a relevant judicial decision as well as to prevent considerable damage to the petitioner.

Furthermore, according to paragraph 10 of Resolution No. 55 of the Plenum of the Highest Business Court of the Russian Federation, when considering a request for interim relief, a court must take into account:

### 1) Reasonableness and substantiation of the petitioner's request for interim relief

The Plaintiff believes that the attachment of the Defendants' property is a reasonable measure, as only such measure can guarantee prevention of damage to the Plaintiff.

*2) Probability of significant damage to the petitioner in the case of failure to grant interim relief*

The unfair conduct of the Defendants in recent years and their ignoring of the facts of substantial losses incurred by OAO Vimpel-Communications gives reason to believe that they will take all possible steps to siphon assets to prevent the levy of execution on the liquid property they own. A significant damage to the petitioner in the case of failure to grant relief will be both probable and real, as the Plaintiff will not receive damages of more than US$3 billion.

A probability of siphoning assets for the purpose of avoiding execution is considered by the judicial practice as a sufficient ground for granting interim relief (the decision, dated July 5, 2004, taken by the Federal Business Court for the Northern Caucasian District in case no. F08-2824/2004).

*3) Ensuring the balance of interests of interested parties*

As is explained by the Highest Business Court of the Russian Federation in paragraph 1 of its Informational Letter No. 72 dated July 24, 2003, the attachment of shares ordered by a business court as interim relief only means the prohibition for the relevant shareholder to transfer them as items capable of being dealt with in civil relationships, but does not prevent their use or the exercise of the rights attached to them for participation in the management of the joint stock company. Therefore, the negative consequences of the interim relief (in relation to the amount of the claim) will be minimal for the Defendants, as they will still be able to exercise shareholders' rights attached to the shares. Moreover, the interim relief that may be granted with respect to the Plaintiff's claim until all facts in the case are established cannot harm the Defendants because it does not affect the market value of the shares. Adverse consequences may only be suffered by the Plaintiff in the event that the interim relief is not granted.

*4) Preventing the violation of public interests and interests of third parties by the interim measures*

The Plaintiff believes that the interim relief will not affect public interests or interests of third parties, as the relief sought only concerns the property rights of the Defendants (the possibility of disposal) and does not affect the rights to manage OAO Vimpel-Communications; the rights of other shareholders and political subdivisions or local political entities will not be affected.

*5) Commensurability of the interim relief and the claim and its ability to ensure the practical implementation of the purpose of the interim relief*

The commensurability is evaluated by the court that should consider, among other things, the comparison between (i) the right and interest for which protection is sought by the plaintiff and (ii) property-related consequences of prohibiting the debtor from taking certain actions (paragraph 10 of Informational Letter No. 72 of the Presidium of the Highest Business Court of the Russian Federation, dated July 24, 2003).

Taking into account the significance of the losses in the amount of US$3,797,818,500, we believe that interim relief in the form of the attachment of the securities (shares) owned by Eco Telecom Limited and Telenor East Invest AS in OAO Vimpel-Communications is commensurate with the claim. The total number of shares owned by the Defendants in OAO Vimpel-

Communications is 43,645,978. Shares in OAO Vimpel-Communications are not traded on any Russian stock exchange, although a certain number of American Depositary Receipts for shares in OAO Vimpel-Communications are traded on the New York Stock Exchange. Therefore, there is no objective possibility to establish the value of shares in OAO Vimpel-Communications in the territory of the Russian Federation. According to the Plaintiff's estimate, the value of the above block of stock owned by both defendants may be comparable to the amount of claim. This fact also confirms the commensurability of the claim and the value of the defendants' property which may be attached.

Attachment of the property will ensure actual enforcement of a relevant judicial decision if the Plaintiff's claim is satisfied, as it will permit recovery of damages for the full amount sought. Therefore, the implementation of the purposes of the relief will be ensured:

- unenforceability of, or difficulties in the enforcement of, a relevant judicial decision will be eliminated; and

- the plaintiff will be enabled to minimize negative consequences in the case of the unfair conduct of the Defendants and concealment by them of information about their other property.

Therefore, the relief sought by the Plaintiff in the form of attachment of the securities (shares) owned by Eco Telecom Limited and Telenor East Invest AS in OAO Vimpel-Communications fully meets the requirements specified by Articles 90(2) and 91(2) of the Procedural Code, the application of which is explained by the Highest Business Court of the Russian Federation in Resolution No. 55 of its Plenum, dated October 12, 2006.

Failure to grant the interim relief may lead to a situation where the rights of OAO Vimpel-Communications and, indirectly, its minority shareholders would not be provided with real and effective judicial protection.

Based on the foregoing and with reference to Articles 90-92 of the Procedural Code,

we kindly request that:

Interim relief be granted in connection with the claim of Farimex Products, Inc. for damages by attaching 18,964,799 registered common shares and 6,426,600 Class A preferred shares owned by Eco Telecom Limited in OAO Vimpel-Communications and 17,254,579 registered common shares owned by Telenor East Invest AS in OAO Vimpel-Communications.

Attachment:

1. Document evidencing payment of the applicable official fees for the filing of a request for interim relief.

[signed]
D.S. Chernyi, an attorney-at-law
Representative of Farimex Products, Inc.
acting under a power of attorney

# EXHIBIT  I



# АРБИТРАЖНЫЙ СУД ХАНТЫ-МАНСИЙСКОГО АВТОНОМНОГО ОКРУГА

628012, Тюменская область, г.Ханты-Мансийск,
ул.Ленина, 54/1, тел. 3-10-34

## ОПРЕДЕЛЕНИЕ

Город Ханты-Мансийск                                      Дело № А75-2374/2008

10 июня 2008 года

**Резолютивная** часть определения объявлена 10 июня 2008 года. Полный текст
определения изготовлен 10 июня 2008 года.

Арбитражный суд Ханты-Мансийского автономного округа в
составе судьи Каранкевича Е.А.
при ведении протокола судебного заседания помощником судьи Назметдиновой Р.Б.
рассмотрел в судебном заседании заявление Компании «Фэримекс Продактс,Инк.» к
Компании «ЭКО ТЕЛЕКОМ ЛИМИТЕД», Компании «Алтимо Холдинге энд Инвестменте
Лтд.», Компании АВЕНЮ ЛИМИТЕД», Компании «ДЖЭНАУ ПРОПЕРТИЗ ЛИМИТЕД»,
Компании «СЭНТЭЛ ЛИМИТЕД», Компании «Теленор Ист Инвест АС», ОАО ЦТ-
Мобайл»
третьи лица: ОАО «Вымпел-Коммуникации», Михаил Фридман, Алексей Резникович, Арве
Иохансен, Фрнтьеф Рюстен, Хенрик Торгерсен о взыскании 3 797 818 500 д^лл. США при
участии
от истца: Муранов А.И., уд. №3128, доверенность от 31.03.2008г., Черный Д.С., уд.№
8142, доверенность от 31.03.2008г. от ответчиков:
Компания «ЭКО ТЕЛЕКОМ ЛИМИТЕД»- Яременко М.А., доверенность от 29.04.2008г.,
паспорт 4607 №656140, Степанов Д.И., удост.№4575 от 27.03.2003г., доверенность от
29.04.2008г.
Компания «Алтимо Холдинге энд Инвестменте Лтд.»- Егоров В.В., паспорт 4506
№326008, доверенность от 25.03.2008г.;
Компания АВЕНЮ ЛИМИТЕД», Компания «ДЖЭНАУ ПРОПЕРТИЗ ЛИМИТЕД»,
Компания «СЭНТЭЛ ЛИМИТЕД»- Минакова С.В., паспорт 4602 №437991 , доверенность
от 06.05.2008г.;
Компания «Теленор Ист Инвест АС»- не явились;
**ОАО «ЦТ-Мобайл»**-не явились, от третьих лиц:
ОАО «Вымпел-Коммуникации»- не явились,
Михаил Фридман-Баталова Н.В., уд.№263, доверенность от 29.04.2008г.; Алексей
Резникович- Баталова Н.В., уд.№263, доверенность от 14.05.2008г.; Арве Иохансен-
Ляпин А.А. паспорт 0503 №327220, доверенность от 07.05.2008г.; Фритьеф Рюстен-
Касьян К.К., паспорт 4503 №846597, доверенность от 07.05.2008г. Хенрик Торгерсен-
не явились;

установил:

Истец обратился в арбитражный суд с иском о взыскании солидарно с ответчиков 3.797.818.500 долларов США.

Определением от 12.05.2008 назначено повторное предварительное судебное заседание. Указанным определением истцу было предписано известить всех лиц, участвующих в деле, о времени и месте судебного заседания, доказательства извещения представить в суд.

Представители истца, ответчиков, кроме Компании «Теленор Ист Инвест АС», ОАО «ЦТ-Мобайл», третьих лиц, кроме ОАО «Вымпел-Коммуникации», Хенрика Торгерсена явились в судебное заседание.

Истец представил в качестве доказательств извещения всех лиц, участвующих в деле, в том числе Компании «Теленор Ист Инвест АС», Хенрика Торгерсена, о времени и месте предварительного судебного заседания документы курьерской службы ОНЬ (ЗАО «ДХЛ Интернешнл») - сообщения о доставке отправлений, авиатранспортные накладные.

При этом, Компания «Теленор Ист Инвест АС» была извещена путем направления извещения в адрес ее представительства в России - Компании «Теленор Раша АС»: 123001, г. Москва, ул. Садовая-Кудринская, д.32, стр. 1.

В качестве доказательства извещения Компании «Теленор Ист Инвест АС» истец также представил протокол нотариального осмотра сайта компании «Теленор» в сети Интернет от 01-07.06.2008.

Третье лицо Хенрик Торгерсен, являющийся членом Совета директоров ОАО «Вымпел-Коммуникации», был извещен путем направления определения от 12.05.2008 в адрес ОАО «Вымпел-Коммуникации»: 127083, г. Москва, ул. Восьмого Марта, д.Ю, стр.14.

Представитель третьего лица Арве Йохансена представил ходатайство о прекращении производства по делу в связи с тем, что у истца отсутствует статус российского акционерного общества и соответственно отсутствует право на предъявление настоящего иска. При этом заявитель ходатайства ссылается на пункт 1 части 1 статьи 150 Арбитражного процессуального кодекса Российской Федерации.

Между тем, согласно указанной норме, арбитражный суд прекращает производство по делу, если установит, что дело не подлежит рассмотрению в арбитражном суде. Вопрос о праве истца на предъявление настоящего иска может быть разрешен судом только в ходе судебного разбирательства в порядке, установленном статьями 152-166 Арбитражного процессуального кодекса Российской Федерации. Кроме того, довод о том, что отсутствие у истца права на предъявление иска влечет прекращение производства по делу, нормативно не обоснован.

При таких обстоятельствах суд не находит оснований для удовлетворения заявленного ходатайства.

Представитель третьего лица Фритьефа Рюстена представил ходатайство о передаче дела для рассмотрения по подсудности в иной арбитражный суд в связи неподсудностью данного спора Арбитражному суду Ханты-Мансийского автономного округа- Югры.

Между тем, в соответствии с частью 2 статьи 36 Арбитражного процессуального кодекса Российской Федерации иск к ответчикам, находящимся или проживающим на территории разных субъектов Российской Федерации, предъявляется в арбитражный суд по месту нахождения или месту жительства одного из ответчиков. Одним из ответчиков является ОАО «ЦТ-Мобайл», находящееся на территории Ханты-Мансийского автономного округа - Югры.

Таким образом, ходатайство третьего лица необоснованно, удовлетворению не подлежит.

Истец заявил ходатайство о назначении судебно-экономической экспертизы для оценки увеличения стоимости ОАО «Вымпел-Коммуникации» в случае его выхода на украинский рынок сотовой связи в 2004 году, а также определения суммы убытков, причиненных компании ОАО «Вымпел-Коммуникации» недобросовестными действиями ответчиков.

Учитывая, что для разъяснения указанных вопросов требуются специальные познания, в соответствии со статьей 82 Арбитражного процессуального кодекса Российской Федерации, арбитражный суд считает необходимым удовлетворить указанное ходатайство о назначении экспертизы.

Кроме того, в целях получения документов для проведения указанной экспертизы, истец заявил ходатайства об истребовании у ОАО «Вымпел-Коммуникации» следующих доказательств:

В отношении ОАО «Вымпел - Коммуникации»:

Бухгалтерский баланс (форма № 1) за 2004 г., 4 квартал 2004 г., 2005 г., 4 квартал 2005 г., 1 квартал 2006 г., 2006 г., 2007 г. и 1 квартал 2008 г.
• Отчет о прибылях и убытках (форма № 2) за 2004 г., 4 квартал 2004 г., 2005 г., 4 квартал 2005 г., 1 квартал 2006 г., 2006 г., 2007 г. и 1 квартал 2008 г.
• Отчет об изменениях капитала (форма № 3) за 2004 г., 4 квартал 2004 г., 2005 г., 4 квартал 2005 г., 1 квартал 2006 г., 2006 г., 2007 г. и 1 квартал 2008 г.
Отчет о движении денежных средств (форма № 4) за 2004 г., 4 квартал 2004 г., 2005 г., 4 квартал 2005 г., 1 квартал 2006 г., 2006 г., 2007 г. и 1 квартал 2008 г.
• Приложение к бухгалтерскому балансу (форма № 5) за 2004 г., 4 квартал 2004 г., 2005 г., 4 квартал 2005 г., 1 квартал 2006 г., 2006 г., 2007 г. и 1 квартал 2008 г.
• Балансовые отчеты и отчеты о финансовых результатах (доходах) по стандартам ГААП (СААР) за 2004 г., 4 квартал 2004 г., 2005 г., 4 квартал 2005 г., 1 квартал 2006 г., 2006 г., 2007 г. и 1 квартал 2008 г.
Расшифровка НМА (нематериальных активов).
• Сведения о незавершенном строительстве (если имеются объекты, замороженные или отложенные строительством).
• Бизнес-план (если есть).
• Сведения о численности работников по годам за 2004 г., 4 квартал 2004 г., 2005 г., 4 квартал 2005 г., 1 квартал 2006 г., 2006 г., 2007 г. и 1 квартал 2008 г.
• Сведения о средней стоимости одного абонента по состоянию на 1 ноября 2004 г., на 1 ноября 2005 г., на 1 января 2006 г., на 1 апреля 2006 г., на 1 января 2007 г., на 1 января 2008 г. на 1 апреля 2'08 г.
• Сведения о структуре стоимости абонента - - для оценки чистого дохода с одного абонента в месяц.
• Сведения об общем количестве абонентов по состоянию на 1 ноября 2004 г., на 1 ноября 2005 г., на 1 апреля 2006 г., на 1 января 2007 г., на 1 января 2008 г., на 1 апреля 2008 г.
• Сведения о существенных фактах, которые могли повлиять на котировки акций в период (либо могут приобретения ЗАО «УРС» (4 квартал 2005 г. — 1 квартал 2006 г.).
• Копия устава, а также копии всех изменений в устав до даты оценки.
• Справка из реестра владельцев именных ценных бумаг - более 5 % от уставного капитала (номер лицевого счета акционера, количество принадлежащих акций, доля в уставном капитале в %).
• Итоговая часть аудиторского заключения, выданного по результатам обязательного по законодательству РФ аудита бухгалтерской отчетности за 2005-2007 годы.
Копии всех свидетельств о государственной регистрации.

В отношении ЗАО «Украинские радиосистемы»:

Бухгалтерский баланс (форма № 1) за 2004 г., 4 квартал 2004 г., 2005 г., 4 квартал 2005 г., 1 квартал 2006 г., 2006 г., 2007 г. и 1 квартал 2008 г.
- Отчет о прибылях и убытках (форма № 2) за 2004 г., 4 квартал 2004 г., 2005 г., 4 квартал 2005 г., 1 квартал 2006 г., 2006 г., 2007 г. и 1 квартал 2008 г.
Отчет об изменении капитала (форма № 3) за 2004 г., 4 квартал 2004 г., 2005 г., 4 квартал 2005 г., 1 квартал 2006 г., 2006 г., 2007 г. и 1 квартал 2008 г.
Отчет о движении денежных средств (форма № 4) за 2004 г., 4 квартал 2004 г., 2005 г., 4 квартал 2005 г., 1 квартал 2006 г., 2006 г., 2007 г. и 1 квартал 2008 г.
- Приложение к бухгалтерскому балансу (форма № 5) за 2004 г., 4 квартал 2004 г., 2005 г., 4 квартал 2005 г., 1 квартал 2006 г., 2006 г., 2007 г. и 1 квартал 2008 г.
- Балансовые отчеты и отчеты о финансовых результатах (доходах) по стандартам ГААП (ГААР) за 2004 г., 4 квартал 2004 г., 2005 г., 4 квартал 2005 г., 1 квартал 2006 г., 2006 г., 2007 г. и 1 квартал 2008 г.
Расшифровка НМА (нематериальных активов).
- Сведения о незавершенном строительстве (если имеются объекты, замороженные или отложенные строительством).
- Бизнес-план (если есть).
- Сведения о численности работников по годам за 2004 г., 4 квартал 2004 г., 2005 г., 4 квартал 2005 г., 1 квартал 2006 г., 2006 г., 2007 г. и 1 квартал 2008 г.
Сведения о средней стоимости одного абонента по состоянию на 1 ноября 2004 г., на 1 ноября 2005 г., на 1 января 2006 г., на 1 апреля 2006 г., на 1 января 2007 г., на 1 января 2008 г., на 1 апреля 2008 г.
- Сведения о структуре стоимости абонента - - для оценки чистого дохода с одного абонента в месяц.
- Сведения об общем количестве абонентов по состоянию на 1 ноября 2004 г., на 1 ноября 2005 г., на 1 апреля 2006 г., на 1 января 2007 г., на 1 января 2008 г., на 1 апреля 2008 г.
Сведения о существенных фактах, которые могли повлиять на котировки акций в период (либо дату) приобретения ЗАО «УРС» (4 квартал 2005 г. — 1 квартал 2006 г.).
- Копия устава, а также копии всех изменений в устав до даты оценки.
- Справка из реестра владельцев именных ценных бумаг • более 5 % от уставного капитала (номер лицевого счета акционера, количество принадлежащих акций, доля в уставном капитале в %).
- Итоговая часть аудиторского заключения, выданного по результатам обязательного аудита бухгалтерской отчетности за 2005-2007 годы.
Копии всех свидетельств о государственной регистрации.
Суд признает обоснованным довод истца о том, что указанные документы необходимы для проведения указанной выше экспертизы, в связи с чем, заявленное ходатайство подлежит удовлетворению.
Кроме того, истец заявил ходатайство об истребовании у ОАО «Вымпел-Коммуникации» следующих документов:
1. Надлежащим образом заверенную копию договора по приобретению 100% акций ЗАО «Украинские радиосистемы» от 11.11.2005;
2. Надлежащим образом заверенную копию заявления в антимонопольный орган Украины на одобрение сделки по приобретению акций ЗАО «Украинские радиосистемы»;
3. Надлежащим образом заверенные копии заявлений от продавцов ЗАО «Украинские радиосистемы»;
4. Надлежащим образом заверенную копию решения единоличного исполнительного органа ОАО «Вымпел - Коммуникации» по приобретению акций ЗАО «Украинские радиосистемы»;

5. Надлежащим образом заверенные копии писем от исполнительных органов ОАО «Вымпел - Коммуникации» в адрес Совета директоров ОАО «Вымпел Коммуникации» в отношении сделки купли-продажи акций ЗАО «Украинские радиосистемы» (сроков ее заключения, негативных последствий отложения момента включения договора и г.д.) (период 2004-2005 годы);

6. Надлежащим образом заверенные копии писем от 29.09.2005 и 04.10.2005 от ОАО «Вымпел - Коммуникации» в адрес Теленора;

7. Надлежащим образом заверенную копию экспертного заключения по рынку мобильной связи на Украине за период 2005 - 2006 годы;

8. Надлежащим образом заверенную копию экспертного заключения, подтверждающего увеличение стоимости ОАО «Вымпел - Коммуникации» в случае приобретения акций ЗАО «Украинские радиосистемы»;

9. Надлежащим образом заверенные копии писем Альфа-Телеком акционерам ОАО «**ВымпелКом**» от 13.07.2005 и Эко-Телеком акционерам ОАО «ВымпелКом» от 5.08.2005.

Указанное ходатайство обосновано и подлежит удовлетворению. При таких обстоятельствах суд считает необходимым назначить повторное судебное заседание для завершения подготовки дела к судебному разбирательству. Руководствуясь статьями 82, 135, 184, 185 АПК РФ арбитражный суд

определил:

1. В удовлетворении ходатайства третьего лица Арве Йохансена о прекращении производства по делу отказать.
2. В удовлетворении ходатайства третьего лица Фритьефа Рюстена о передаче дела для рассмотрения по подсудности в иной арбитражный суд отказать.
3. Ходатайство истца Компании «Фэримекс Продактс,Инк.» об истребовании доказателоств у третьего лица ОАО «Вымпел - Коммуникации» удовлетворить.
4. Ходатайство истца Компании «Фэримекс Продактс,Инк.» о назначении судебной экспертизы удовлетворить.
5. Назначить повторное предварительное судебное заседание на 23 июня 2008 года на 14 часов 30 минут по адресу: г. Ханты-Мансийск, ул.Ленина, д.54/1.
6. Обязать истца известить всех лиц, участвующих в деле, о времени и месте судебного разбирательства, доказательства извещения представить в суд до судебного заседания.
7. Разъяснить лицам, участвующим в деле, что они вправе представить в арбитражный суд вопросы, которые должны быть разъяснены при проведении экспертизы, ходатайствовать о привлечении в качестве экспертов указанных ими лиц или о поведении экспертизы в конкретном экспертном учреждении, заявлять отвод эксперту, ходатайствовать о внесении в определение о назначении экспертизы дополнительных вопросов, поставленных перед экспертом.
8. ОАО «Вымпел - Коммуникации» представить в суд в виде копий, заверенных печатью ОАО «Вымпел - Коммуникации» или ЗАО «Украинские радиосистемы» следующие документы:

В отношении ОАО «Вымпел - Коммуникации»:

Бухгалтерский баланс (форма № 1) за 2004 г.. 4 квартал 2004 г.. 2005 г.. 4 квартал 2005 г.. 1 квартал 2006 г., 2006 г., 2007 г. и 1 квартал 2008 г.

Отчет о прибылях и убытках (форма № 2) за 2004 г.. 4 квартал 2004 г., 2005 г.. 4 квартал 2005 г.. 1 квартал 2006 г.. 2006 г., 2007 г. и 1 квартал 2008 г.

• Отчет об изменениях капитала (форма № 3) за 2004 г., 4 квартал 2004 г., 2005 г., 4 квартал 200ᴦ г., 1 квартал 2006 г., 2006 г., 2007 г. и 1 квартал 2008 г.

- Отчет о движении денежных средств (форма № 4) за 2004 г., 4 квартал 2004 г., 2005 г., 4 квартал 2005 г., 1 квартал 2006 г., 2006 г., 2007 г. и 1 квартал 2008 г.
- Приложение к бухгалтерскому балансу (форма № 5) за 2004 г., 4 квартал 2004 г., 2005 г., 4 квартал 2005 г., 1 квартал 2006 г., 2006 г., 2007 г. и 1 квартал 2008 г.
- Балансовые отчеты и отчеты о финансовых результатах (доходах) по стандартам ГААП (СААР) *za* 2004 г., 4 квартал 2004 г., 2005 г., 4 квартал 2005 г., 1 квартал 2006 г., 2006 г., 2007 г. и 1 квартал 2008 г.
  Расшифровка НМА (нематериальных активов).
- Сведения о незавершенном строительстве (если имеются объекты, замороженные млн отложенные строительством).
  Бизнес-план (если есть).
  Сведения о численности работников по годам за 2004 г., 4 квартал 2004 г., 2005 г., 4 квартал 2005 г., 1 квартал 2006 г.. 2006 г., 2007 г. и 1 квартал 2008 г.
  Сведения о средней стоимости одного абонента по состоянию на 1 ноября 2004 г., на 1 ноября 2005 г., на > января 2006 г., на 1 апреля 2006 г., на 1 января 2007 г., на 1 января 2008 г., на I апреля 2008 г.
  Сведения о структуре стоимости абонента - - для оценки чистого дохода с одного абонента в месяц.
  Сведения об общем количестве абонентов по состоянию на 1 ноября 2004 г., на 1 ноября 2005 г., на 1 апреля 2006 г., на 1 января 2007 г., на 1 января 2008 г., на 1 апреля 2008 г.
- Сведения о существенных фактах, которые могли повлиять на котировки акций в период (либо дату) приобретения ЗАО «УРС» (4 квартал 2005 г. — 1 квартал 2006 г.).
- Копия устава, а также копии всех изменений в устав до даты оценки.
  Справка из реестра владельцев ценных бумаг - более 5 % от уставного капитала (номер лицевого счета акционера, количество принадлежащих акций, доля в уставном капитале в УО).
  Итоговая часть аудиторского заключения, выданного по результатам обязательного по законодательству РФ аудита бухгалтерской отчетности за 2005-2007 годы.
- Копии всех свидетельств о государственной регистрации.

В отношении ЗАО «Украинские радиосистемы»:
  Бухгалтерский баланс (форма № 1) за 2004 г., 4 квартал 2004 г., 2005 г., 4 квартал 2005 г.. 1 квартал 2006 г., 2006 г., 2007 г. и 1 квартал 2008 г.
  Отчет о прибылях и убытках (форма № 2) за 2004 г., 4 квартал 2004 г., 2005 г., 4 квартал 2005 г., 1 квартал 2006 г., 2006 г., 2007 г. и 1 квартал 2008 г.
- Отчет об измене'-^ях капитала (форма № 3) за 2004 г.. 4 квартал 2004 г., 2005 г., 4 квартал 2005 г., 1 квартал 2006 г., 2006 г., 2007 г. и 1 квартал 2008 г.
  Отчет о движении денежных средств (форма № 4) за 2004 г.. 4 квартал 2004 г., 2005 г., 4 квартал 2005 г., 1 квартал 2006 г., 2006 г., 2007 г. и 1 квартал 2008 г.
  Приложение к бухгалтерскому балансу (форма № 5) за 2004 г., 4 квартал 2004 г., 2005 г., 4 квартал 2005 г., 1 квартал 2006 г., 2006 г., 2007 г. и 1 квартал 2008 г.
  Балансовые отчеты и отчеты о финансовых результатах (доходах) по стандартам ГААП (СААР) за 2004 г., 4 квартал 2004 г., 2005 г., 4 квартал 2005 г., 1 квартал 2006 г., 2006 г., 2007 г. и 1 квартал 2008 г.
- Расшифровка НМА (нематериальных активов),
  Сведения о незавершенном строительстве (если имеются объекты, замороженные или отложенные строительством).
- Бизнес-план (есл:. есть).
  Сведения о численности работников по годам за 2004 г., 4 квартал 2004 г., 2005

г.. 4 квартал 2005 г., 1 квартал 2006 г., 2006 г., 2007 г. и 1 квартал 2008 г.

Сведения о средней стоимости одного абонента по состоянию на 1 ноября 2004 г., на 1 ноября 2005 г.. на 1 января 2006 г., на 1 апреля 2006 г., на 1 января 2007 г., на 1 января 2008 г.. на 1 апреля 2008 г.

• Сведения о структуре стоимости абонента - - для оценки чистого дохода с одного абонента в месяц.

• Сведения об общем количестве абонентов по состоянию на 1 ноября 2004 г., на 1 ноября 2005 г., на 1 апреля 2006 г., на 1 января 2007 г., на 1 января 2008 г., на 1 апреля 2008 г.

Сведения о существенных фактах, которые могли повлиять на котировки акций в период (либо дату) приобретения ЗАО «УРС» (4 квартал 2005 г. -- 1 квартал 2006 г.). Копия устава, а тжже копии всех изменений в устав до даты оценки.

• Справка из реестра владельцев именных ценных бумаг • более 5 % от уставного капитала (номер лицевого счета акционера, количество принадлежащих акций, доля в уставном капитале в %).

• Итоговая часть аудиторского заключения, выданного по результатам обязательного аудита бухгалтерской отчетности за 2005-2007 годы.

• Копии всех свидетельств о государственной регистрации.

1. Надлежащим образом заверенную копию договора по приобретению 100% акций ЗАО «Украинские радиосистемы» от 11.11.2005;

2. Надлежащим образом заверенную копию заявления в антимонопольный орган Украины на одобрение сделки по приобретению акций ЗАО «Украинские радиосистемы»;

3. Надлежащим образом заверенные копии заявлений от продавцов ЗАО «Украинские радиосистемы»;

4. Надлежащим образом заверенную копию решения единоличного исполнительного органа ОАО «Вымпел - Коммуникации» по приобретению акций ЗАО «Украинские радиосистемы»;

5. Надлежащим образом заверенные копии писем от исполнительных органов ОАО «Вымпел - Коммуникации» в адрес Совета директоров ОАО «Вымпел - Коммуникации» в отношении сделки купли-продажи акций ЗАО «Украинские радио^истемы» (сроков ее заключения, негативных последствий отложения момента заключения договора и т.д.) (период 2004-2005 годы);

6. Надлежащим образом заверенные копии писем от 29.09.2005 и 04.10.2005 от ОАО «Вымпел - Коммуникации» в адрес Теленора;

7. Надлежащим образом заверенную копию экспертного заключения по рынку мобильной связи на Украине за период 2005 - 2006 годы;

8. Надлежащим образом заверенную копию экспертного заключения, подтверждающего увеличение стоимости ОАО «Вымпел - Коммуникации» в случае приобретения акций ЗАО «Украинские радиосистемы»;

9. Надлежащим образом заверенные копии писем Альфа-Телеком акционерам ОАО «ВымпелКом» от 13.07.2005 и Эко-Телеком акционерам ОАО «ВымпелКом» от 5.08.2005.

Определение может быть обжаловано в установленном порядке.

*Подпись**

Судья                                    Ш.А.ЮйАнкевич

[State Emblem]

**THE BUSINESS COURT FOR THE KHANTY-MANSI AUTONOMOUS OKRUG**
54/1 Lenin Street, Khanty-Mansiysk, Tyumen Region 628012, tel. 3-1034

**ORDER**

In Khanty-Mansiysk                                            Case no. A75-2374/2008
This 10th day of June 2008

The operative part of the order was pronounced on June 10, 2008. The full text of the order was prepared on June 10, 2008.

The Business Court for the Khanty-Mansi Autonomous Okrug

sitting with judge Ye.A. Karankevich,

with the record of the hearing being taken by clerk R.B. Nazmetdinova,

considered the claim of Farimex Products, Inc.

against Eco Telecom Limited, Altimo Holdings and Investments Ltd., Avenue Limited, Janow Properties Limited, Santel Limited, Telenor East Invest AS and Open Joint Stock Company CT-Mobile ("CT-Mobile"),

with Open Joint Stock Company Vimpel-Communications ("VimpelCom"), Mikhail Fridman, Alexey Reznikovich, Arve Johansen, Fridtjof Rusten and Henrik Torgersen as third parties,

for the payment of US$3,797,818,500.

The hearing was attended by:

For the plaintiff: A.I. Muranov, holder of certificate No. 3128, acting under the power of attorney dated March 31, 2008; and D.S. Chernyi, holder of certificate No. 8142, acting under the power of attorney dated March 31, 2008;

For the defendants:

M.A. Yaremenko, holder of passport 4607 No. 656140, and D.I. Stepanov, holder of certificate No. 4575 dated March 27, 2003, each acting for Eco Telecom Limited under a power of attorney dated April 29, 2008;

V.V. Yegorov, holder of passport 4506 No. 326008, acting for Altimo Holdings and Investments Ltd. under the power of attorney dated March 25, 2008;

S.V. Minakova, holder of passport 4602 No. 437991, acting for Avenue Limited, Janow Properties Limited and Santel Limited under the power of attorney dated May 6, 2008;

Nobody appeared to represent Telenor East Invest AS; and

Nobody appeared to represent CT-Mobile; and

For the third parties:

Nobody appeared to represent VimpelCom;

N.V. Batalova, holder of certificate No. 263, acting for Mikhail Fridman under the power of attorney dated April 29, 2008;

N.V. Batalova, holder of certificate No. 263, acting for Alexey Reznikovich under the power of attorney dated May 14, 2008;

A.A. Lyapin, holder of passport 0503 No. 327220, acting for Arve Johansen under the power of attorney dated May 7, 2008;

K.K. Kasian, holder of passport 4503 No. 846597, acting for Fridtjof Rusten under the power of attorney dated May 7, 2008; and

Nobody appeared to represent Henrik Torgersen; and

found that:

The plaintiff filed with the business court a claim seeking an order that the defendants jointly and severally pay US$3,797,818,500.

The order of May 12, 2008 scheduled a second preliminary hearing. It was ordered that the plaintiff give notice of the time and place of such hearing to all parties to the proceedings and submit proof of such notice to the court.

Representatives of the plaintiff, the defendants other than Telenor East Invest AS and CT-Mobile and the third parties other than VimpelCom and Henrik Torgersen appeared at the hearing.

As proof of notice the time and place of the preliminary hearing to all parties to the proceedings, including Telenor East Invest AS and Henrik Torgersen, the plaintiff submitted documents of the courier service DHL (CJSC DHL International), including notices of delivery and air waybills.

Telenor East Invest AS was notified by delivery of a notice at its address in Russia, namely, the address of Telenor Russia AS, which was 32 Sadovay-Kudrinskaya Street, Building 1, Moscow 123001.

As proof of notice to Telenor East Invest AS, the plaintiff also submitted a record of review of Telenor's website by a notary public on June 1-7, 2008.

Henrik Torgersen, who is a director of VimpelCom, was notified as a third party by delivery of the court order of May 12, 2008 c/o VimpelCom at 10, 8th March Street, Building 14, Moscow 127083.

The representative of Arve Johansen as a third party moved the court to terminate proceedings, because the plaintiff did not have the status of a Russian joint stock company and, therefore, had no right to file the claim under review. The petitioner who submitted that motion referred to Article 150(1)(1) of the Code of Arbitration Procedure of the Russian Federation (the "Procedural Code").

However, said Article provides that a business court must terminate proceedings in a case if it determines that such case may not be considered by the business court. The plaintiff's right to file this claim may only be considered by the court during the trial as provided for by Articles 152-166 of the Procedural Code. In addition, although the petitioner argues that the proceedings should be terminated because the plaintiff had no right to file the claim, this argument is not supported by an appropriate reference to a law or regulation.

In such circumstances, the court sees no basis to grant the motion.

The representative of Fridtjof Rusten as a third party moved the court to transfer the case to a business court of competent jurisdiction, because this dispute does not fall within the territorial jurisdiction of the Business Court for the Khanty-Mansi Autonomous Okrug – Yugra.

However, Article 36(2) of the Procedural Code provides that a claim against defendants registered or residing in different political subdivisions of the Russian Federation may be filed with the business court having jurisdiction over the place of registration or residence of any defendant. One of the defendants is CT-Mobile with its registered office in the Khanty-Mansi Autonomous Okrug – Yugra.

Therefore, said third party's motion is unfounded and should be denied.

The plaintiff moved the court to appoint experts to conduct an economic forensic examination in order (i) to estimate how VimpelCom's value would increase if Vimpelcom entered the Ukrainian mobile communications market in 2004 and (ii) to estimate the losses incurred by VimpelCom as a result of the defendants acting in bad faith.

As special knowledge is required to address such matters, the business court believes that such motion for an expert examination should be granted under Article 82 of the Procedural Code.

In addition, the plaintiff moved the court to compel VimpelCom to disclose the following evidence in order to conduct the above-mentioned expert examination:

With respect to VimpelCom:

- Its balance sheets (Form No. 1) for 2004, the fourth quarter of 2004, 2005, the fourth quarter of 2005, the first quarter of 2006, 2006, 2007 and the first quarter of 2008;

- Its profit and loss statements (Form No. 2) for 2004, the fourth quarter of 2004, 2005, the fourth quarter of 2005, the first quarter of 2006, 2006, 2007 and the first quarter of 2008;

- Its statements of changes in equity (Form No. 3) for 2004, the fourth quarter of 2004, 2005, the fourth quarter of 2005, the first quarter of 2006, 2006, 2007 and the first quarter of 2008;

- Its cash flow statements (Form No. 4) for 2004, the fourth quarter of 2004, 2005, the fourth quarter of 2005, the first quarter of 2006, 2006, 2007 and the first quarter of 2008;

- Its schedules to a balance sheet (Form No. 5) for 2004, the fourth quarter of 2004, 2005, the fourth quarter of 2005, the first quarter of 2006, 2006, 2007 and the first quarter of 2008;

- Its balance sheets and income statements for 2004, the fourth quarter of 2004, 2005, the fourth quarter of 2005, the first quarter of 2006, 2006, 2007 and the first quarter of 2008 in accordance with GAAP;

- Its breakdown of intangible assets;

- Information on its construction in progress (if construction on any of its projects has been frozen or suspended);

- Its business plan, if any;

- Information on the number of its employees for 2004, the fourth quarter of 2004, 2005, the fourth quarter of 2005, the first quarter of 2006, 2006, 2007 and the first quarter of 2008;

- Information on the average value per user as of November 1, 2004, November 1, 2005, January 1, 2006, April 1, 2006, January 1, 2007, January 1, 2008 and April 1, 2008;

- Information on the structure of the value per user, in order to estimate the net monthly revenue per user;

- The total number of subscribers as of November 1, 2004, November 1, 2005, April 1, 2006, January 1, 2007, January 1, 2008 and April 1, 2008;

- Any material facts that could affect the price of shares during the period (or on the date) of acquisition of URS (the fourth quarter of 2005 to the first quarter of 2006);

- A copy of its charter and copies of all amendments thereto up to the date of valuation;

- A statement listing each owner of more than a 5% interest, as recorded in its register of holders of registered securities (specifying the number of such shareholder's stock account, the number of his shares and his ownership percentage);

- The executive summary of its auditor's report prepared following the statutory audit of its accounts for 2005-2007 in accordance with Russian law; and

- Copies of all its certificates of state registration; and

With respect to Ukrainian RadioSystems:

- Its balance sheets (Form No. 1) for 2004, the fourth quarter of 2004, 2005, the fourth quarter of 2005, the first quarter of 2006, 2006, 2007 and the first quarter of 2008;

- Its profit and loss statements (Form No. 2) for 2004, the fourth quarter of 2004, 2005, the fourth quarter of 2005, the first quarter of 2006, 2006, 2007 and the first quarter of 2008;

- Its statements of changes in equity (Form No. 3) for 2004, the fourth quarter of 2004, 2005, the fourth quarter of 2005, the first quarter of 2006, 2006, 2007 and the first quarter of 2008;

- Its cash flow statements (Form No. 4) for 2004, the fourth quarter of 2004, 2005, the fourth quarter of 2005, the first quarter of 2006, 2006, 2007 and the first quarter of 2008;

- Its schedules to a balance sheet (Form No. 5) for 2004, the fourth quarter of 2004, 2005, the fourth quarter of 2005, the first quarter of 2006, 2006, 2007 and the first quarter of 2008;

- Its balance sheets and income statements for 2004, the fourth quarter of 2004, 2005, the fourth quarter of 2005, the first quarter of 2006, 2006, 2007 and the first quarter of 2008 in accordance with GAAP;

- Its breakdown of intangible assets;

- Information on its construction in progress (if construction on any of its projects has been frozen or suspended);

- Its business plan, if any;

- Information on the number of its employees for 2004, the fourth quarter of 2004, 2005, the fourth quarter of 2005, the first quarter of 2006, 2006, 2007 and the first quarter of 2008;

- Information on the average value per user as of November 1, 2004, November 1, 2005, January 1, 2006, April 1, 2006, January 1, 2007, January 1, 2008 and April 1, 2008;

- Information on the structure of the value per user, in order to estimate the net monthly revenue per user;

- The total number of subscribers as of November 1, 2004, November 1, 2005, April 1, 2006, January 1, 2007, January 1, 2008 and April 1, 2008;

- Any material facts that could affect the price of shares during the period (or on the date) of acquisition of URS (the fourth quarter of 2005 to the first quarter of 2006);

- A copy of its charter and copies of all amendments thereto up to the date of valuation;

- A statement listing each owner of more than a 5% interest, as recorded in its register of holders of registered securities (specifying the number of such shareholder's stock account, the number of his shares and his ownership percentage);

- The executive summary of its auditor's report prepared following the statutory audit of its accounts for 2005-2007; and

- Copies of all its certificates of state registration.

The plaintiff argues that such documents are necessary for the above-mentioned expert examination. The court believes that this argument is well founded and such motion should be granted.

In addition, the plaintiff moved the court to compel VimpelCom to disclose the following documents:

1. A duly certified copy of the agreement of November 11, 2005 for the acquisition of 100% of the shares in Ukrainian RadioSystems;

2. A duly certified copy of the request to Ukraine's anti-monopoly authority for the approval of the acquisition of shares in Ukrainian RadioSystems;

3. Duly certified copies of the relevant statements by the sellers of Ukrainian RadioSystems;

4. A duly certified copy of the decision of VimpelCom's chief executive officer to acquire shares in Ukrainian RadioSystems;

5. Duly certified copies of any letters by VimpelCom's executive bodies to VimpelCom's Board of Directors regarding the purchase of shares in Ukrainian RadioSystems (including the timing of such purchase, adverse effects of a delay in the execution of the relevant agreement, etc.) (dated 2004-2005);

6. Duly certified copies of the letters of September 29, 2005 and October 4, 2005 by VimpelCom to Telenor;

7. A duly certified copy of the expert opinion on the Ukrainian mobile market in 2005-2006;

8. A duly certified copy of the expert opinion confirming an increase in VimpelCom's value if shares in Ukrainian RadioSystems are acquired; and

9. Duly certified copies of the letter of July 13, 2005 by Alfa Telecom to VimpelCom shareholders and the letter of August 5, 2005 by Eco Telecom to VimpelCom shareholders.

Such motion is well founded and should be granted. Under such circumstances, the court believes that another hearing should be scheduled to complete preparations for the trial. With reference to Articles 82, 135, 184 and 185 of the Procedural Code,

it is ordered that

1. The motion of Arve Johansen as a third party for termination of proceedings be denied;

2. The motion of Fridtjof Rusten as a third party for the transfer of the case to a business court of competent jurisdiction be denied;

3. The motion of the plaintiff, Farimex Products, Inc., to compel discovery from VimpelCom as a third party be granted;

4. The motion of the plaintiff, Farimex Products, Inc., for a forensic examination be granted;

5. A preliminary hearing be scheduled for 2:30 p.m. on June 23, 2008 at 54/1 Lenin Street, Khanty-Mansiysk;

6. The plaintiff give notice of the time and place of such hearing to all parties to the proceedings and submit proof of such notice to the court before the hearing;

7. It be explained to the parties to the proceedings that they may submit to the business court questions that should be answered during the expert examination, request that their nominees be appointed as experts or that the examination be conducted by a specific

expert agency, request the disqualification of an expert and/or request that additional questions to be answered by the expert be included in the order appointing experts; and

8. VimpelCom submit to the court copies of the following documents, with a corporate seal of VimpelCom or Ukrainian RadioSystems affixed thereto:

With respect to VimpelCom:

- Its balance sheets (Form No. 1) for 2004, the fourth quarter of 2004, 2005, the fourth quarter of 2005, the first quarter of 2006, 2006, 2007 and the first quarter of 2008;

- Its profit and loss statements (Form No. 2) for 2004, the fourth quarter of 2004, 2005, the fourth quarter of 2005, the first quarter of 2006, 2006, 2007 and the first quarter of 2008;

- Its statements of changes in equity (Form No. 3) for 2004, the fourth quarter of 2004, 2005, the fourth quarter of 2005, the first quarter of 2006, 2006, 2007 and the first quarter of 2008;

- Its cash flow statements (Form No. 4) for 2004, the fourth quarter of 2004, 2005, the fourth quarter of 2005, the first quarter of 2006, 2006, 2007 and the first quarter of 2008;

- Its schedules to a balance sheet (Form No. 5) for 2004, the fourth quarter of 2004, 2005, the fourth quarter of 2005, the first quarter of 2006, 2006, 2007 and the first quarter of 2008;

- Its balance sheets and income statements for 2004, the fourth quarter of 2004, 2005, the fourth quarter of 2005, the first quarter of 2006, 2006, 2007 and the first quarter of 2008 in accordance with GAAP;

- Its breakdown of intangible assets;

- Information on its construction in progress (if construction on any of its projects has been frozen or suspended);

- Its business plan, if any;

- Information on the number of its employees for 2004, the fourth quarter of 2004, 2005, the fourth quarter of 2005, the first quarter of 2006, 2006, 2007 and the first quarter of 2008;

- Information on the average value per user as of November 1, 2004, November 1, 2005, January 1, 2006, April 1, 2006, January 1, 2007, January 1, 2008 and April 1, 2008;

- Information on the structure of the value per user, in order to estimate the net monthly revenue per user;

- The total number of subscribers as of November 1, 2004, November 1, 2005, April 1, 2006, January 1, 2007, January 1, 2008 and April 1, 2008;

- Any material facts that could affect the price of shares during the period (or on the date) of acquisition of URS (the fourth quarter of 2005 to the first quarter of 2006);

- A copy of its charter and copies of all amendments thereto up to the date of valuation;

- A statement listing each owner of more than a 5% interest, as recorded in its register of holders of registered securities (specifying the number of such shareholder's stock account, the number of his shares and his ownership percentage);

- The executive summary of its auditor's report prepared following the statutory audit of its accounts for 2005-2007 in accordance with Russian law; and

- Copies of all its certificates of state registration; and

With respect to Ukrainian RadioSystems:

- Its balance sheets (Form No. 1) for 2004, the fourth quarter of 2004, 2005, the fourth quarter of 2005, the first quarter of 2006, 2006, 2007 and the first quarter of 2008;

- Its profit and loss statements (Form No. 2) for 2004, the fourth quarter of 2004, 2005, the fourth quarter of 2005, the first quarter of 2006, 2006, 2007 and the first quarter of 2008;

- Its statements of changes in equity (Form No. 3) for 2004, the fourth quarter of 2004, 2005, the fourth quarter of 2005, the first quarter of 2006, 2006, 2007 and the first quarter of 2008;

- Its cash flow statements (Form No. 4) for 2004, the fourth quarter of 2004, 2005, the fourth quarter of 2005, the first quarter of 2006, 2006, 2007 and the first quarter of 2008;

- Its schedules to a balance sheet (Form No. 5) for 2004, the fourth quarter of 2004, 2005, the fourth quarter of 2005, the first quarter of 2006, 2006, 2007 and the first quarter of 2008;

- Its balance sheets and income statements for 2004, the fourth quarter of 2004, 2005, the fourth quarter of 2005, the first quarter of 2006, 2006, 2007 and the first quarter of 2008 in accordance with GAAP;

- Its breakdown of intangible assets;

- Information on its construction in progress (if construction on any of its projects has been frozen or suspended);

- Its business plan, if any;

- Information on the number of its employees for 2004, the fourth quarter of 2004, 2005, the fourth quarter of 2005, the first quarter of 2006, 2006, 2007 and the first quarter of 2008;

- Information on the average value per user as of November 1, 2004, November 1, 2005, January 1, 2006, April 1, 2006, January 1, 2007, January 1, 2008 and April 1, 2008;

- Information on the structure of the value per user, in order to estimate the net monthly revenue per user;

- The total number of subscribers as of November 1, 2004, November 1, 2005, April 1, 2006, January 1, 2007, January 1, 2008 and April 1, 2008;

- Any material facts that could affect the price of shares during the period (or on the date) of acquisition of URS (the fourth quarter of 2005 to the first quarter of 2006);

- A copy of its charter and copies of all amendments thereto up to the date of valuation;

- A statement listing each owner of more than a 5% interest, as recorded in its register of holders of registered securities (specifying the number of such shareholder's stock account, the number of his shares and his ownership percentage);

- The executive summary of its auditor's report prepared following the statutory audit of its accounts for 2005-2007; and

- Copies of all its certificates of state registration.

1. A duly certified copy of the agreement of November 11, 2005 for the acquisition of 100% of the shares in Ukrainian RadioSystems;

2. A duly certified copy of the request to Ukraine's anti-monopoly authority for the approval of the acquisition of shares in Ukrainian RadioSystems;

3. Duly certified copies of the relevant statements by the sellers of Ukrainian RadioSystems;

4. A duly certified copy of the decision of VimpelCom's chief executive officer to acquire shares in Ukrainian RadioSystems;

5. Duly certified copies of any letters by VimpelCom's executive bodies to VimpelCom's Board of Directors regarding the purchase of shares in Ukrainian RadioSystems (including the timing of such purchase, adverse effects of a delay in the execution of the relevant agreement, etc.) (dated 2004-2005);

6. Duly certified copies of the letters of September 29, 2005 and October 4, 2005 by VimpelCom to Telenor;

7. A duly certified copy of the expert opinion on the Ukrainian mobile market in 2005-2006;

8. A duly certified copy of the expert opinion confirming an increase in VimpelCom's value if shares in Ukrainian RadioSystems are acquired; and

9. Duly certified copies of the letter of July 13, 2005 by Alfa Telecom to VimpelCom shareholders and the letter of August 5, 2005 by Eco Telecom to VimpelCom shareholders.

This order may be appealed by appropriate proceedings.

By:
Ye.A. Karankevich
Judge

[Seal]
[Stamp:     (*Illegible*)
            [signed]
            clerk
            The Business Court for the Khanty-Mansi Autonomous Okrug]